UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FIVE STAR DEVELOPMENT RESORT
COMMUNITIES, LLC,

                                         Plaintiff,

      -against-

iSTAR RC PARADISE VALLEY LLC ,

                                         Defendant.

                                   No. 09 Civ. 2085 (LTS)

**MEMORANDUM OPINION AND ORDER**
**GRANTING MOTION FOR PRELIMINARY INJUNCTION**

        In this action arising out of a $112,025,000 Development Loan and Security Agreement, dated May 18, 2007 (the "Loan Agreement"), entered into by a borrower, plaintiff Five Star Development Resort Communities, LLC ("Plaintiff" or "Five Star"), and a lender, defendant iStar RC Paradise Valley LLC ("Defendant" or "iStar"), Five Star asserts various contract and tort claims under New York state law.  The Court has subject matter jurisdiction of the controversy pursuant to 28 U.S.C. § 1332.  Five Star's request for a preliminary injunction is before the Court.  The memorandum opinion constitutes the Court's findings of fact and conclusions of law for the purposes of Federal Rules of Civil Procedure 52 and 65.

        Five Star submitted a proposed Order to Show Cause for Preliminary Injunction with Temporary Restraining Order on May 18, 2009, pursuant to Federal Rule of Civil Procedure 65, seeking to enjoin and restrain iStar from terminating its Loan Agreement with Five Star, declaring Five Star in default of its Loan Agreement, or otherwise exercising any remedies against Five Star on the basis of any purported default by Five Star.  (Docket entry no. 19.)  The Court scheduled a

hearing for June 30, 2009 (the "June 30 Hearing").  Shortly thereafter, the parties submitted a stipulation (the "Stipulated TRO") in which iStar agreed, pending the June 30 Hearing, not to take any of the actions that were the subject of Five Star's temporary restraining order request.  The parties further stipulated that the motion was to be determined on the basis of the parties' affidavits, documentary submissions, and legal arguments.  No live testimony was presented.  At the conclusion of the June 30 Hearing, the Court ordered that the provisions of the Stipulated TRO were to remain in full force and effect pending the adjudication of the preliminary injunction application and further order of the Court.  (Docket entry no. 39.)  The Court has thoroughly considered the parties' written submissions as well as arguments presented by counsel at the June 30 Hearing.  For the reasons stated below, Plaintiff's application for a preliminary injunction is granted.

## BACKGROUND

The Court makes the following findings of fact.  Plaintiff Five Star Development Resort Communities LLC is an Arizona limited liability company whose sole member is Five Star Development Properties LLC, also an Arizona limited liability company.  Plaintiff sought to develop a mixed use project anchored by a Ritz Carlton hotel (the "Project") on a 120-acre parcel of land in the adjacent towns of Paradise Valley, Arizona and Scottsdale, Arizona (the "Property").  Defendant iStar RC Paradise Valley LLC is a Delaware limited liability company whose membership interests are wholly-owned by iStar Financial, a publicly-traded real estate investment trust.  The parties entered into a Loan Agreement (Am. Compl. Ex. A), in which Defendant, the Lender, agreed to lend Plaintiff, the Borrower, the principal amount of $112,025,000 (the "Loan").  (Cowart Decl. ¶ 13.)[1]  The Loan enabled Five Star to purchase the Property and was intended to

---

[1] Citations to declarations incorporate by reference citations to their accompanying documentary submissions.

finance "horizontal construction" of the Property, including the acquisition of the necessary permits, until Five Star could obtain a construction loan and begin the development phase commonly known as "vertical construction." (Cowart Decl. ¶ 13, Sotolov Decl. ¶ 11.)

iStar disbursed approximately $50 million on the closing date and was obligated to fund the remainder of the Loan pursuant to a series of requisitions ("Draw Requests") submitted by Five Star throughout the duration of the Loan. (Cowart Decl. ¶ 14.) The Project fell behind schedule, in large measure due to the formation of a political action committee that opposed the Project and forced Five Star to prevail in a local referendum before obtaining the requisite Special Use Permit. Five Star kept iStar abreast of its efforts to obtain the Special Use Permit, in which it finally succeeded on November 24, 2008. (Id. ¶¶ 19-27.)

The Loan Agreement sets conditions that Five Star must satisfy before iStar is obligated to grant Five Star's Draw Requests. iStar acceded to Five Star's first 18 such requests (id. ¶ 18) but did not honor Five Star's Draw Request 19, which was submitted on December 12, 2008, or Five Star's subsequent requests (id. ¶ 31). In a December 22, 2008, email sent to Five Star from iStar Vice President Troy Stephan regarding the December 12, 2008, request, Stephan wrote "I have submitted my approval to fund the current draw request." (Cowart Decl. ¶¶ 30-35.) The parties disagree as to whether the email was conclusive of iStar's approval of the request or whether it was merely one of multiple approvals necessary before iStar would accede to it. (Sotolov Decl. ¶¶ 28-31.)

In the months that followed Five Star's submission of Draw Request 19, iStar demanded additional documentation from Five Star (Cowart Decl. ¶ 36); Five Star provided iStar with certain documents and eventually submitted Draw Requests 20 and 21 (id. ¶¶ 47-48); the parties held a meeting on January 6, 2009, the details of which are disputed but are not material to

the resolution of the instant motion (id. ¶¶ 37-40) (Sotolov Decl. ¶ 37); iStar never acceded to Draw Request 19, and only partially acceded to Draw Requests 20 and 21 (Cowart Decl. ¶ 43); iStar refused to approve a proposed Construction Contract, precluding Five Star from moving forward with the Project (id. ¶ 32); Five Star wrote a letter to iStar asserting that its refusal to fund the Draw Requests was delaying the Project (id. ¶ 45); iStar responded to the letter and contested Five Star's assertions (id. ¶ 45) (Sotolov Decl. ¶ 41); iStar sent a letter dated March 3, 2009, suggesting that Five Star committed various events of default and reserving its right to exercise any rights and remedies accordingly (Cowart Decl. ¶ 55) (Sotolov Decl. ¶ 43); and this litigation ensued.[2]

        Five Star alleges that iStar's refusal to fund Draw Requests 19, 20 and 21 rendered it unable to meet its subsequent contractual obligations. The primary contractual obligations that Five Star has been unable to perform are those attendant to the maturation of the Loan. The Loan's initial maturity date was May 18, 2009, but the Loan Agreement provides for three possible extensions of the maturity date, through November 2010, subject to the satisfaction of certain conditions. (Cowart Decl. ¶ 15.) Whether Five Star would have satisfied those conditions but for iStar's breaches of the Loan Agreement or, conversely, iStar was justified in denying the Draw Requests and may declare Five Star in default for not meeting its obligations with the passage of the May 18, 2009, initial maturity date, is the focus of the parties' dispute. The Court finds that if iStar were to declare Five Star in default on the Loan Agreement and foreclose on the Property, as iStar asserts it is entitled to do absent judicial intervention, Five Star's multi-year, multi-million dollar investment in the Project, in all likelihood, would be lost irrevocably, as Five Star would be unlikely

---

[2]     The Loan Agreement contains a choice of law provision designating New York law as the applicable law, as well as a forum selection clause designating the state or federal courts in the state of New York as the appropriate fora for litigation of any disputes arising under the Loan Agreement. (Loan Agreement §§ 11.8, 11.10.)

to find an alternative source of financing.  (Cowart Decl. ¶¶ 70-77.)

DISCUSSION

Five Star seeks an order "(a) enjoining and restraining iStar and [related persons and entities] during the pendency of this action, from acting or taking any steps or otherwise engaging in any conduct to terminate [the Loan Agreement]; (b) enjoining and restraining iStar, during the pendency of this action, from acting or taking steps or otherwise engaging in any conduct to declare Five Star in default under the Loan Agreement; (c) enjoining and restraining iStar, during the pendency of this action, from acting or taking any steps or otherwise engaging in any conduct to exercise any of iStar's remedies against Five Star pursuant to the Loan Agreement on the basis of a purported default by Five Star; and (d) granting Five Star such other and further relief as this Court deems necessary and proper."  (Docket entry no. 18.)  The Court considers Five Star's preliminary injunction application under the well-settled standard of this Circuit: Five Star must make a "showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief."  Jackson Dairy, Inc. v. H.P. Hoods & Sons, Inc., 596 F.2d 70, 73 (2d Cir. 1979); see also Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., --- F.3d ----, 2010 WL 786584, at *1 (2d Cir. Mar. 10, 2010).

Irreparable Harm

The first inquiry is whether Five Star would suffer irreparable harm in the absence of a preliminary injunction.  The Court concludes that Five Star's undisputed factual proffers satisfy the irreparable harm requirement.

Absent judicial intervention, iStar would be entitled to declare Five Star in default

and foreclose on the Property, as Five Star has not repaid the outstanding principal on the Loan which, according to iStar, was due on May 18, 2009.  (Sotolov Decl. ¶ 52.)   The Loan Agreement provides iStar the right to take possession of the property due to this purported Event of Default.  (Loan Agreement §§ 9.1, 9.2.)  "The ability of a creditor to foreclose can suffice to establish irreparable harm."  Kamine/Besicorp Allegany v. Rochester Gas & Elec. Corp., 908 F. Supp. 1180, 1188 (W.D.N.Y. 1995) (citing Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 975 (2d Cir. 1989)).  Foreclosure in this instance (if it ultimately were determined to have been wrongful) would be particularly harmful due to Five Star's substantial efforts to develop the Project.  For example, Five Star waged an extensive (and ultimately successful) referendum campaign in order to obtain the Special Use Permit after a political action committee organized opposition to the Project.  (Cowart Decl. ¶¶ 18-27.)  The Court finds these facts analogous to those that obtained in Monument Realty LLC v. Washington Metro. Area Transit Auth., 540 F. Supp. 2d 66 (D.D.C. 2008), in which the court concluded that the plaintiffs would likely suffer irreparable harm if they were to lose their opportunity to acquire a specific commercial property.  The court reasoned that the property at issue was "unique" to plaintiffs because it was integral to a larger development project in which the plaintiffs, like Plaintiff in the instant case, had already invested considerable resources.  Id. at 76.

Additionally, Five Star proffers it would face financial ruin if iStar were to terminate the Loan.  (Cowart Decl. ¶ 77.)  Five Star proffered in connection with the hearing that it had spent four months seeking alternative financing for the Project to replace the Loan but, given the conditions prevailing in the credit market, it had been unable to do so.  (Cowart Decl. ¶ 74 n.8.)  Five Star also alleges that the Project would be stigmatized if iStar were to declare that Five Star had defaulted on the Loan, further lengthening the odds that Five Star could obtain alternate financing.  (Cowart Decl. ¶ 74.)  This threat to Five Star's ongoing financial viability can, in and of

itself, satisfy the irreparable harm requirement.  See Doren v. Salem Inn, Inc., 422 U.S. 922, 932 (1975); Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp., 992 F.2d 430, 435 (2d Cir. 1993) ("a threat to the continued existence of a business can constitute irreparable injury") (internal citations and quotation marks omitted).  Five Star's proffers as to the grave consequences to its business that would ensue from foreclosure are undisputed by iStar and the Court finds them credible.  Accordingly, the Court concludes that Five Star would suffer irreparable harm in the absence of a preliminary injunction.

> Sufficiently Serious Questions Going to the Merits to Make Them a Fair Ground for Litigation

With respect to the second prong of the Jackson Diary analysis, Five Star argued at the June 30 Hearing that it is entitled to a preliminary injunction based upon the second alternative ground: that there are sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor.  (Transcript, Case No. 09 Civ. 2085, June 30, 2009, at 4.)  The Court concludes that Five Star has made the necessary showing with respect to its breach of contract claim.

Five Star asserts that iStar's failure to grant Draw Requests 19, 20 and 21 and its refusal to approve the proposed Construction Contract constitute breaches of contract to which any subsequent breach committed by Five Star, such as Five Star's failure to either obtain an extension of the initial maturity date or to repay the Loan by that date, is attributable.  iStar asserts that Five Star failed to satisfy various conditions precedent provided in the Loan Agreement and that iStar therefore acted within its rights.[3]  To assert a breach of contract claim under New York law, a

---

[3]     Five Star disputes the assertion but argues, alternatively, that if it did fail to satisfy any of these conditions, iStar, based on a previous course of conduct in which it allegedly did not enforce these conditions, either waived the conditions or is

plaintiff must plead: (1) the existence of a contract; (2) the plaintiff's adequate performance of the contract; (3) the defendant's breach of the contract; and (4) damages.  See Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996).  iStar asserts that Five Star cannot succeed on its claim because it did not adequately perform its obligations under the contract.  iStar proffers, through the declaration of iStar Senior Vice President David Sotolov, that Five Star failed to satisfy the express conditions in the Loan Agreement necessary to compel iStar to extend the maturity date, and failed to satisfy the conditions necessary to compel iStar to honor Draw Requests 19, 20 and 21.  (Sotolov Decl. ¶¶ 3-4.)  The exhibits attached to the Sotolov Declaration include correspondence between the parties in which iStar enumerates the conditions that Five Star has purportedly failed to satisfy, with reference to the relevant contract provisions. (Sotolov Decl. Exs. 12, 13, 15, 17.)   Among the conditions Five Star purportedly failed to satisfy is the obligation to use "commercially reasonable efforts" to comply with the Development Schedule as required by Loan Agreement § 3.6.  Sotolov's declaration explicitly conflicts with the factual proffers submitted by Larry Cowart, Chief Financial Officer of Five Star.  (Sotolov Decl. ¶ 34 ("Cowart's conclusory statements that (i) Borrower supplied all documentation to iStar, and (ii) Borrower was not informed of what conditions remained unsatisfied during this period are simply untrue").)

---

estopped from asserting them now.  iStar in turn points out that the contract expressly provides that waivers must be made in writing to be effective and that it cannot be estopped from exercising its contractual rights.  Under New York law, courts have held in certain instances that parties can waive no-waiver provisions through their course of conduct.  See, e.g., Travellers Int'l AG v. Trans World Airlines, Inc., 722 F. Supp. 1087, 1098 (S.D.N.Y. 1989).  In light of the Court's conclusion that Five Star has raised sufficiently serious questions going to the merits of its breach of contract claim premised upon its assertion that it has not breached the Loan Agreement, the Court need not consider further in connection with this motion practice the question of whether the no-waiver provisions in the Loan Agreement were waived.

Through the declaration of Larry Cowart, Five Star proffers that, contrary to iStar's assertion that Five Star breached Loan Agreement § 3.6, its efforts to comply with the Development Schedule were commercially reasonable given the political opposition it faced in securing the Special Use Permit. (Cowart Reply Decl. ¶ 10.) Five Star further asserts that iStar's course of conduct throughout the period of the Loan – on which the Court has a scant factual record at this point – confirmed that iStar deemed Five Star's efforts "commercially reasonable" until, in bad faith, iStar made a strategic decision to declare its borrowers in default. Five Star also proffers, through Cowart's declaration, that Stephan's approval of Draw Request 19 – subsequently withdrawn by Sotolov – demonstrates that Five Star's Request was satisfactory and was denied due to Sotolov's strategic choice rather than any good-faith determination by iStar as to whether Five Star had performed its contractual obligations. (Cowart Reply Decl. ¶¶ 14-17.) Five Star has submitted a detailed chart proffering that every lender request that iStar alleges was unsatisfied was either satisfied by Five Star, was not satisfied on account of a justifiable excuse, or was not a justifiable demand by iStar under the terms of the Loan Agreement. (Cowart Reply Decl., Exs. 9, 10.)

At the June 30 Hearing, iStar argued that Exhibits 10G and 10H, appended by Five Star to the Cowart Reply Declaration, reveal that Five Star failed to satisfy certain conditions precedent to the funding of the Draw Requests. Those exhibits include various plans (sewer plans, paving plans, etc.) that Sotolov had demanded in his March 2009 letter. The exhibits reflect that the plans were not approved by the relevant authorities until March 2009, which demonstrates that Five Star had not received approval of the plans at the time it submitted Draw Request 19. At the June 30 Hearing the parties disputed the significance of this fact. After thorough consideration of the Loan Agreement and the arguments of counsel, but without the benefit of live testimony, the Court

cannot conclude that the relevant contractual provision (Loan Agreement § 3.2) unambiguously provides that Five Star was required to secure approval of these plans as a condition precedent to iStar's obligation to fund Draw Requests 19, 20 and 21.

On this record, the Court concludes that Five Star's contested proffers raise sufficiently serious questions going to the merits of Five Star's breach of contract claim to make them a fair ground for litigation.  See Roso-Lino Beverage Distrib. v. Coca-Cola Bottling Co., 749 F.2d 124, 126 ("[t]hat there are serious questions is clear from the parties' conflicting stories of the reasons Coca-Cola had for ending Roso-Lino's distributorship"); AIM Int'l Trading, L.L.C. v. Valcucine S.p.A., No. 02 Civ. 1363, 2002 U.S. Dist. LEXIS 10373, *18-19 (S.D.N.Y. June 11, 2002) ("Plaintiffs and defendants disagree . . . as to what reasons, if any, Valcucine has for terminating their relationship with plaintiffs . . . [t]hese conflicting accounts regarding the reasons for ending the distributorship raise serious questions going to the merits to make them a fair ground for litigation"); Travellers Int'l AG v. Trans World Airlines, 684 F. Supp. 1206, 1217 (S.D.N.Y. 1988) (concluding that plaintiff had demonstrated sufficiently serious questions going to the merits of the interpretation of a key contractual provision, although defendant had also demonstrated "substantial basis" for resolving the merits against plaintiff); see also Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., --- F.3d ----, 2010 WL 786584, at *1 (2d Cir. Mar. 10, 2010) (holding that "the 'serious questions' standard for assessing a movant's likelihood of success on the merits remains valid in the wake of recent Supreme Court cases").

In light of the Court's conclusion regarding Five Star's breach of contract claim, the Court need not address Five Star's other claims at this time.

### The Balance of Hardships Tips Decidedly Toward Five Star

As explained above, Five Star has demonstrated that it faces loss of the Property and

potential insolvency in the absence of injunctive relief. iStar, in contrast, does not allege that it would be severely prejudiced by preservation of the status quo pending resolution of the merits of the litigation. On these facts, the Court concludes that the balance of hardships tips decidedly toward Five Star, the party requesting preliminary relief. See Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp., 992 F.2d 430, 436 (2d Cir. 1993) ("[T]he balance of the equities in this case tips decidedly in favor of appellant being granted specific performance of its contract because neither Eagle Sales nor the four new dealers will suffer harm proportionate to appellant's loss of business as a result of a status quo injunction."). Accordingly, Five Star's request for a preliminary injunction is granted, as follows:

## INJUNCTION

IT IS HEREBY ORDERED, pursuant to Rule 65 of the Federal Rules of Civil Procedure, that iStar RC Paradise Valley LLC and its affiliates, officers, managers, agents, attorneys, employees, assigns and any other persons acting on their behalf (collectively, "iStar") are preliminarily enjoined and restrained from: (i) acting or taking any steps or otherwise engaging in any conduct to terminate that certain Development and Security Agreement entered into between iStar, as lender, and Five Star, as borrower, and dated as of May 18, 2007 (the "Loan Agreement"); (ii) acting or taking any steps or otherwise engaging in any conduct to declare Five Star in default under the Loan Agreement; and (iii) acting or taking any steps or otherwise engaging in any conduct to exercise any of iStar's remedies against Five Star pursuant to the Loan Agreement on the basis of a purported default by Five Star.

IT IS FURTHER ORDERED, that Plaintiff must post a bond in the amount of $50,000 with the Clerk of Court by March 26, 2010. The Court finds this bond is adequate to serve as security for the payment of such costs and damages as may be incurred or suffered by any party who may later

be found to have been wrongfully enjoined or restrained. Failure to post the bond by the above date will terminate the preliminary injunction.

IT IS FURTHER ORDERED, that, subject to timely posting of the required bond, this Preliminary Injunction will remain in full force and effect until the final judgment in this action is enacted, unless it is terminated earlier by order of the Court.

This decision resolves docket entry no. 19.

SO ORDERED.

Dated: New York, New York
March 18, 2010

LAURA TAYLOR SWAIN
United States District Judge