Mary E. Flynn
Danielle C. Lesser
Rudolph F. Lehrer
MORRISON COHEN LLP
909 Third Avenue
New York, New York  10022
(212) 735-8600
*Attorneys for Plaintiff*
*Five Star Development Resort Communities, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

FIVE STAR DEVELOPMENT RESORT
COMMUNITIES, LLC,

                           Plaintiff,

      -against-

iSTAR RC PARADISE VALLEY LLC,

                           Defendant.

------------------------------------------------------------------X

Case No. 09 Civ. 2085 (LTS)(AJP)

# MEMORANDUM OF LAW OF FIVE STAR DEVELOPMENT RESORT COMMUNITIES, LLC IN OPPOSITION TO MOTION OF iSTAR RC PARADISE VALLEY LLC FOR SUMMARY JUDGMENT

# MorrisonCohen LLP

909 Third Avenue, New York, NY 10022-4731 • p:212.735.8600 • f:212.735.8708

#2634026 v14 \020396 \0004

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... iv

PRELIMINARY STATEMENT .............................................................................................1

STATEMENT OF FACTS .....................................................................................................2

A.    iStar Concedes Draw 19 is a Soft Cost Draw and Approved It ...........................................3

B.    Fearful of the Market, iStar Orders its Officers to "Get Creative" and Find Reasons Not to Fund the Loan ...........................................................................................................4

C.    The Indian Bend Right of Way ...........................................................................................6

D.    The Development Schedule ..................................................................................................7

E.    The January 6, 2008 Meeting...............................................................................................8

F.    Section 3.2 of the Loan Agreement ...................................................................................10

        1.    The Court Found §3.2 to be Ambiguous ...............................................................11

        2.    iStar's Interpretation of the Timing of Satisfaction of the Conditions Precedent in §3.2 is Incorrect.................................................................................12

        3.    Section 3.2 Refers to "Completion of Construction" and Not "Construction" or "Commencement of Construction" ......................................................................12

        4.    iStar Offers An Implausible and Inconsistent Explanation For Why It Funded Draws 1 Through 18 But Not 19 Through 21 .........................................................13

G.    iStar's Funding Confirms That Five Star Was Not In Default ...........................................16

H.    The Initial Maturity Date ...................................................................................................16

I.    Other Alleged Contract Breaches ......................................................................................17

J.    The Loan Agreement is not Unambiguous As to When Construction had to be Completed..........................................................................................................................17

ARGUMENT........................................................................................................................17

        I.    ISTAR'S MOTION FAILS TO MEET ITS BURDEN UNDER FED. R. CIV. P. 56.............17

II.    ISTAR'S FAILURE TO PROVIDE FIVE STAR NOTICE OF ITS ALLEGED DEFAULTS
       UNDER § 3.2 IS FATAL TO ISTAR'S ARGUMENT THAT ISTAR COULD WITHHOLD
       FUNDING ...............................................................................................................18

III.   WHETHER FIVE STAR WAS REQUIRED TO COMPLY WITH ALL OF THE CONDITIONS
       OF SECTION 3.2 OF THE LOAN AGREEMENT PRIOR TO SUBMITTING DRAW 19 RAISES
       ISSUES OF FACT THAT PRECLUDE SUMMARY JUDGMENT .......................................19

       A.    Timing of Compliance ..............................................................................19

       B.    Draw 19 Was A Soft Cost Draw or, at a Minimum, Issues of Fact Exist
             With Respect to the Nature of that Draw  .................................................21

IV.    FIVE STAR SATISFIED ITS OBLIGATIONS UNDER THE LOAN; ISTAR'S CONTENTIONS
       MERELY CREATE, AT BEST, ISSUES OF FACT...........................................................21

       A.    Five Star Did Satisfy All Requirements, If Any, For Funding Draws 19, 20
             and 21 .......................................................................................................21

             1.    Five Star Complied With Section 3.2(E) .......................................22

                   (a)    Five Star's Plat...................................................................22

                   (b)    Five Star's Other Licenses, Permits and Approvals ..........23

       B.    Five Star Complied With Section 3.2(K) (Plans and Specifications)........25

       C.    Five Star Was In Compliance With Section 3.2(D)....................................26

       D.    Five Star Was In Compliance With Section 3.2(B) (Material

             Contracts).................................................................................................26

             1.    iStar's Estoppel Certificates and Collateral Assignment Positions
                   Are Meritless...................................................................................27

       E.    Five Star Was Not in Default of Section 3.2(C) (Insurance) and Section
             3.2(L) (Payment and Performance Bond)..................................................27

       F.    Five Star Was In Compliance With Section 3.2 (N) (Development
             Schedule)..................................................................................................27

       G.    Fact Issues Regarding Compliance...........................................................28

V.     ISTAR CANNOT BENEFIT FROM ITS OWN MISCONDUCT TO ARGUE THAT FIVE STAR
       FAILED TO EXTEND THE MATURITY DATE OR COMPLY WITH SECTION 3 .............29

A.    It Was Futile for Five Star to Serve an Extension Notice in April 2009 in the Face of iStar's Unilateral and Unlawful Termination of Funding in Late December 2008 ...............................................................................29

B.    iStar's Frustration of Performance is a Factual Question Which Warrants Denial of its Motion for Summary Judgment ...........................................31

C.    iStar Should Be Estopped From Asserting That Five Star Breached The Loan Agreement........................................................................................32

D.    iStar Cannot Change Its Basis For Declaring A Default ...........................34

      1.    Requirements of Builder's Risk Insurance and Payment and Performance Bond .........................................................................34

      2.    Indian Bend ROW.........................................................................35

E.    iStar's Actions Constitute Waiver .............................................................37

VI.    WHETHER FIVE STAR COULD HAVE COMPLETED CONSTRUCTION BY THE INITIAL MATURITY DATE RAISES ISSUES OF FACT ...........................................................39

VII.    ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON ISTAR'S FIRST COUNTERCLAIM SEEKING DECLARATORY RELIEF ...................................................39

CONCLUSION ...............................................................................................................40

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Advanced Analytics, Inc. v. Citigroup Global Mkts., Inc.*, No. 04 Civ. 3531, 2009 U.S. Dist.
LEXIS 130133 (S.D.N.Y. Aug. 5, 2009) ...........................................................18

*Anjelino v. New York Times Co.*, 200 F.3d 73 (3d Cir. 1999) .....................................16

*Arista Records LLC v. Usenet.com, Inc.*, No. 07 Civ. 8822, 2008 U.S. Dist. LEXIS 95514
(S.D.N.Y. Nov. 24, 2008) .....................................................................39

*Bourne v. Walt Disney Co.*, 68 F.3d 621 (2d Cir. 1995) ............................................20

*CIBC Bank & Trust Co. v. Banco Central do Brasil*, 886 F. Supp. 1105 (S.D.N.Y. 1995) .........30

*Champion Spark Plug Co. v. Auto Sundries Co.*, 273 F. 74 (2d. Cir. 1921) ................38

*Christian Dior-New York, Inc. v. Koret, Inc.*, 792 F.2d 34 (2d Cir. 1986) ............................37, 38

*Columbia Artists Mgmt., LLC v. Alvarez*, No. 08 Civ. 11254, 2010 U.S. Dist. LEXIS 137154
(S.D.N.Y. December 23, 2010) .............................................................11

*DeVito v. Hempstead China Shop*, 38 F.3d 651 (2d Cir. 1994) ....................................20

*Eastway Constr. Corp. v. New York*, 762 F.2d 243 (2d Cir. 1985), *cert. denied*, 484 U.S. 918,
108 S. Ct. 269 (1987) .......................................................................18

*Federated Retail Holdings, Inc. v. Sanidown, Inc.*, No. 06 Civ. 6119, 2009 U.S. Dist. LEXIS
68383 (S.D.N.Y. Aug. 5, 2009) ...........................................................17

*Filmline (Cross-Country) Productions, Inc. v. United Artists Corp.*, 865 F.2d 513 (2d Cir.
1989) .......................................................................................19

*Garrett v. Music Publ'g Co. of Am., LLC*, No. 09 Civ. 5627, 2010 U.S. Dist. LEXIS 86460
(S.D.N.Y. Aug. 17, 2010) .................................................................32

*Halifax Fund, L.P. v. MRV Communications, Inc.*, No. 00 Civ. 4878, 2001 U.S. Dist. LEXIS
20933 (S.D.N.Y. Dec. 18, 2001) .........................................................32

*Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357 (7th Cir. 1990) ................36

*Interscope Records v. Kimmel*, No. 3:07-cv-0108, 2007 U.S. Dist. LEXIS 43966 at *5 (N.D.N.Y.
June 18, 2007)).............................................................................39

*Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC*, 470 F. Supp. 2d 345 (S.D.N.Y. 2007) ................................................................................................................................18

*Ixe Banco, S.A. v. MBNA America Bank, N.A.*, No. 07 Civ. 0432, 2009 U.S. Dist. LEXIS 89979 (S.D.N.Y. Sept. 29, 2009) ............................................................................31, 39

*Karabu Corp. v. Pension Benefit Guaranty Corp.*, No. 96 Civ. 4960, 1997 U.S. Dist. LEXIS 19582 (S.D.N.Y. December 10, 1997) .........................................................16, 19

*Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706 (2d Cir. 2001) .................32, 33

*Leading Mfr. Pte. Ltd. v. Bradlees Stores, Inc.*, 313 B.R. 565 (S.D.N.Y. 2004) ..........................20

*Leventhal v. New Valley Corp.*, No. 91 Civ. 4238, 1992 U.S. Dist. LEXIS 456 (S.D.N.Y. Jan. 17, 1992) ................................................................................................................35

*Lomas & Nettleton Co. v. Cent. Fed. Sav. & Loan Ass'n of Nassau Cty.*, No. 80 Civ. 975, 1981 U.S. Dist. LEXIS 13429 (S.D.N.Y. July 9, 1981) ................................................31

*Nationwide Life Ins. Co. v. Bankers Leasing Assn.*, 182 F.3d 157 (2d Cir. 1999) .......................18

*Point Products A.G. v. Sony Music Entm't, Inc.*, No. 93 Civ. 4001, 2000 U.S. Dist. LEXIS 10066 (S.D.N.Y. 2000) .....................................................................................................19

*Randolph Equities, LLC v. Carbon Capital, Inc.*, 648 F. Supp. 2d 507 (S.D.N.Y. 2009) ............37

*Rode & Brand v. Kamm Games, Inc.*, 181 F.2d 584 (2d Cir. 1950) .......................................36, 37

*RUS, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302 (S.D.N.Y. 2003) .....................................18, 29

*Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425 (2d Cir. 1992) .....................................20

*Smith v. Petrou*, 705 F. Supp. 183 (S.D.N.Y. 1989) ....................................................................16

*Travellers Int'l AG v. TransWorld Airlines, Inc.*, 722 F. Supp. 1087 (S.D.N.Y. 1989) ...............38

*Vernon Lumber Corp. v. Harcen Constr. Co.*, 155 F.2d 348 (2d Cir. 1946) .........................36, 38

*Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003 (2d Cir. 1991) ...........31

*Wyeth v. King Pharmaceuticals, Inc.*, 396 F. Supp. 2d 280 (E.D.N.Y. 2005) ..............................37

## STATE CASES

*335 Second Street Housing Corp. v. Fridal Enters., Inc.*, 36 A.D.3d 608, 830 N.Y.S.2d 173 (2d Dep't 2007) ................................................................................................................33

*Canterbury Realty & Equip. Corp. v. Poughkeepsie Sav. Bank*, 135 A.D.2d 102, 524 N.Y.S.2d 531 (3d Dep't 1988)..................................................................................................32

*Current Med. Directions, LLC v. Salomone*, 902010 NY Slip Op 50315U (N.Y. Sup. Ct. 2010) 34

*DeCapua v. Dine-A-Mate, Inc.*, 292 A.D.2d 489, 744 N.Y.S.2d 417 (2d Dep't 2002) ................38

*Destiny USA Holdings, LLC v. Citigroup Global Markets Realty Corp.*, 2009 NY S Slip Op. 51550U, 2009 N.Y. Misc. LEXIS 1908 (N.Y. Sup. Ct. Onondaga Co. July 17, 2009), *aff'd in part, modified in part,* 69 A.D.3d 212, 889 N.Y.S.2d 793 (4th Dep't
Nov. 13, 2009) ..................................................................................................................36

*In re Herzog*, 301 N.Y. 127 (1950) ...........................................................................................11

*Lamberti v. Angiolillo*, 73 A.D.3d 463, 905 N.Y.S.2d 560 (1st Dep't 2010) ...............................38

*Littlejohn v. Shaw*, 159 N.Y. 188, 53 N.E. 810 (1899) ..........................................................35, 37

*Madison Ave. Leasehold, LLC v. Madison Bently Assoc. LLC*, 30 A.D.3d 1, 811 N.Y.S.2d 47 (1st Dep't 2006) ...........................................................................................................37, 38

*Merzon v. Lefkowitz*, 289 A.D.2d 142 735 N.Y.S.2d 106, 107 (1st Dep't 2001) .........................32

*Merrill Lynch Realty/Carll Burr, Inc. v. Skinner*, 63 N.Y.2d 590, 483 N.Y.S.2d 979 (1984) .....31

*Modern Commc'n Servs., Inc. v. NEP Image Group, LLC*, 2008 NY Slip Op 50995U, 866 N.Y.S.2d 93 (N.Y. Sup. Ct. 2008) ........................................................................................38

*Nassau Trust Co. v. Montrose Concrete Products Corp.*, 56 N.Y.2d 175, 451 N.Y.S.2d 663 (1982) .................................................................................................................................33

*Renali Realty Group 3, LLC v. Robbins MBW Corp.*, 259 A.D.2d 682, 686 N.Y.S.2d 855 (2d Dep't 1999) ..........................................................................................................................39

*Schnitzer v. Fruehauf Trailer Co.*, 283 A.D. 421, 128 N.Y.S.2d 242 (1st Dep't), *aff'd*, 307 N.Y. 876, 122 N.E.2d 754 (1954) ..................................................................................................11

*Special Situations Fund III, L.P. v. Versus Tech. Inc.*, 227 A.D.2d 321, 642 N.Y.S.2d 894 (1st Dep't 1996) .........................................................................................................................30

*Sunshine, Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc.*, 135 A.D.2d 891, 522 N.Y.S.2d
292 (3d Dep't 1987) ..............................................................................................31

*Webster's Red Seal Publs. v. Gilberton World-Wide Publications, Inc.*, 67 A.D.2d 339, 415
N.Y.S.2d 229 (1979) *aff'd*, 53 N.Y.2d 643, 438 N.Y.S.2d 998 (1981) ................20

## FEDERAL STATUTES

Federal Rules of Civil Procedure Section 9(b), 9(c), 12(b)(6), 12(f), 26 and 37 ............................7

Federal Rules of Civil Procedure Section 56 ...........................................................................1, 17

Plaintiff and Counterclaim Defendant Five Star Development Resort Communities LLC ("Five Star") respectfully submits this memorandum of law in opposition to the motion of Defendant and Counterclaimant iStar RC Paradise Valley LLC ("iStar") pursuant to Fed. R. Civ. P. 56 to dismiss Five Star's claims and grant judgment on iStar's first counterclaim.

## PRELIMINARY STATEMENT

In December 2008, after 18 months of funding and honoring 18 draw requests under a May 2007 Loan (the "Loan Agreement") for the infrastructure construction of a luxury mixed-use development in Paradise Valley and Scottsdale, Arizona (the "Project"), iStar breached its funding obligations by unexpectedly terminating funding. iStar pulled the plug with the 19th Draw Request ("Draw 19"). We now know that iStar's actions were motivated by its fear of the declining markets and its own failing finances, although neither provided a contractual basis for termination of funding. After iStar made the decision to stop funding -- or, as iStar's Executive Vice President put it -- to "turn off the spigot," iStar then spent weeks struggling to manufacture the pretext of unspecified contractual defaults by Five Star to justify its breach. These pretextual "breaches" were not identified prior to Draw 19, occurred after iStar terminated funding, and one even occurred in April 2009, a month after Five Star commenced this action. None justify failing to fund Draw 19.

Today, iStar continues to spin a story of how Five Star failed to satisfy various conditions precedent to funding under §3.2 of the Loan Agreement, with which iStar argues Five Star had to comply fully prior to iStar being obligated to continue to fund. iStar, however, cannot prove that §3.2 unambiguously provides it a defense to funding.

iStar's legal argument continues to evolve from its initial position in January 2009 when it argued that satisfaction of the conditions precedent in §3.2 was required prior to **any funding at all** to where it is now, when it argues that funding the first 18 draws was okay but it could

terminate funding thereafter because *the Project was entering into a new phase*.  This argument

however does not square with:

> (1) the ruling by this Court in which it granted Five Star's motion for
> a preliminary injunction enjoining, *inter alia*, iStar from declaring
> Five Star in default of the Loan or otherwise pursuing its default
> remedies, in which this Court **specifically found §3.2 ambiguous** and
> required live testimony to resolve such ambiguity,
>
> (2) the language of §3.2 of the loan agreement, which requires
> satisfaction of the conditions precedent, not prior to the
> commencement of construction, but as construction progressed and
> prior to the *completion of construction*, or
>
> (3) iStar's prior positions, including its partial funding on January 5,
> 2009 of Draw 19 and a January 16, 2009 admission that Five Star was
> not in default on that date.

For iStar to prevail, it must prove on this motion that §3.2 unambiguously provides it

with a defense to funding.  iStar argues that Five Star's failure to pay a multimillion dollar

extension fee to extend the Initial Maturity Date in April 2009 -- four months after iStar

terminated funding in breach of the agreement and one month after Five Star commenced this

action -- was an Event of Default.  It also argues that two other defaults exist, both of which iStar

articulated for the first time in its Answer in July 2010, after discovery closed and which rely on

Loan provisions that conflict with the provisions of §3.2.  iStar struggles to assert an

interpretation of the Loan Agreement that justifies its termination of funding in December, 2008,

but the arguments offered by iStar yield, unquestionably, material issues of fact that are fatal to

iStar's motion and warrant its denial.

## STATEMENT OF FACTS[1]

Between June 2007 and November 2008, iStar funded 18 consecutive draw requests.  Pl.

56.1 St. Resp. to ¶ 25.  iStar admits that it "never declared Five Star to be in default [and] never

---

[1] Capitalized terms are defined in Local Civil Rule 56.1 Counterstatement of Material Facts of Five
Star Development Resort Communities LLC ("Pl. 56.1 St."), unless set forth otherwise herein.

suggested that any delay in construction ... constitute[d] a default ... ." Pl. 56.1 St. Resp. to ¶ 60.

On December 12, 2008, Five Star submitted Draw Request 19 ("Draw 19"). Chmil Decl., Ex. 7. Draw 19 sought reimbursement for "Soft Costs," most of which were continuing payments to consultants for which iStar had previously reimbursed Five Star. Pl. 56.1 St. Resp. to ¶¶ 26, 29; Loan Ag. at 20 ("Soft Costs").[2]

### A.  iStar Concedes Draw 19 is a Soft Cost Draw and Approved It

In his deposition, iStar asset manager David Sotolov ("Sotolov") conceded that expenses sought in Draw 19 were for the same services as had been previously approved of and paid in connection with Draw 15 with respect to, for example, Fleet Fisher Engineering, Inc. Sotolov 139:6-140:20;[3] Pl. 56.1 St. Resp. to ¶ 29. Upon receipt of Draw 19, iStar Construction Manager Troy Stephan ("Stephan") advised Five Star that he would require time to review the draw request and the back-up, and additional information he also requested. Lesser Decl. Ex. 3 (Cowart ex. GG). Five Star complied. Lesser Decl. Ex. 4, Cowart ex. II. On December 22, 2008, Stephan was satisfied with the submitted documentation and confirmed iStar's approval of Draw 19 to Five Star. Lesser Decl. Exs. 5, 6 & 7 (Cowart Inj. Decl. ¶ 34; Ex. 5 of Cowart Inj. Decl.; Cowart Ex. KK). Indeed, this had been the course of conduct between the parties; when iStar asked for documents that it required, Five Star always complied. Lesser Decl. Exs. 8 & 9 (Ayoub 22:19-23:10; 75:18-76:6; 79:13-21; Cowart 208:7-20; 275:5-9; 280:6-15).

Five Star had no reason to doubt whether Stephan's December 22, 2008 approval was final because Five Star was never advised by iStar that anything more than Stephan's approval was necessary and Five Star was unaware of any other internal approval process within iStar.

---

[2] The expenses sought in Draw 19 were not Hard Costs, which undermines iStar's key factual premise. "Draw 19 was fundamentally different from the prior eighteen Draw Requests because it was the first to seek significant funding from the Hard Cost budget ..." iStar Brief ("MSJ Br.") at 34. But see Pl. 56.1 St. Resp. to ¶'s 25, 26, 29.

[3] References to deposition exhibits: "witness name" ex. "deposition exhibit letter or number".

Lesser Decl. Exs. 8, 9 & 10 (Ayoub 114:12-19; Cowart 167:13-168:10; 231:7-21; Neubecker 109:13-21). Sotolov advised his iStar colleagues that he too had approved Draw Request 19 on December 23, 2008. Lesser Decl. Ex. 11 (Hyatt ex. 44).

Although it had not yet received funding, Five Star proceeded with the Project and on December 30, 2008, its contractor and subcontractors had a Kick Off meeting anticipating mobilization and construction. Pl. 56.1 St. Resp. to ¶ 19; Lesser Decl. Ex. 12 (Shepherd 122:18-22; 123:5-11).

**B.      Fearful of the Market, iStar Orders its Officers to "Get Creative" and Find Reasons Not to Fund the Loan**

Unbeknown to Five Star, iStar wanted to halt funding.    Internal iStar emails reveal that on December 19, 2008, this loan hit the radar of iStar's president, Jay Nydick. Lesser Decl. Ex. 13 (Hyatt ex. 29).  In an email from Hyatt to Nydick, Hyatt expressed confidence that Five Star would complete construction on time and secure an extension of the Initial Maturity Date. Lesser Decl. Ex. 13 (Hyatt Ex. 29); Pl. 56.1 St. Resp. to ¶ 22.  Hyatt also confirmed that Five Star was on budget and was in compliance with the metrics of the Loan.  Lesser Decl. Ex. 14 (Hyatt Ex. 31). Hyatt proposed a meeting with the borrower to discuss iStar's funding commitment. Lesser Decl. Ex. 15 (Hyatt ex. 36).

During this period, iStar went silent and did not return Five Star's calls inquiring about the funding of the approved Draw 19. Lesser Decl. Ex. 5 (Cowart Inj. Decl. ¶ 78). On December 30, 2008, the day of the Kick Off meeting and the day the draw was to have been funded (Lesser Decl. Ex. 9 (Cowart 157:14-19)), by telephone, Sotolov unexpectedly advised Five Star that it should immediately halt work on the Project and that iStar wanted to meet. Lesser Decl. Exs. 8, 12 & 9 (Ayoub 117:7-118:25; Shepherd 94:20-95:12; Cowart 187:5-188:3 239:15-240:15)). Later that day, Sotolov advised Five Star by email that although Stephan had approved Draw 19,

Draw 19 had not yet been "fully" approved. Lesser Decl. Ex. 5 (Cowart Inj. Decl. ¶ 35).  Sotolov also confirmed a January 6, 2009 meeting.  (Id.).

Although iStar refused to communicate during this time with Five Star, it engaged in significant internal dialogue and dialogue with its counsel, to figure out how to avoid funding the Loan. See Lesser Decl. Ex. 16 (iStar Privilege Log at p. 2-10).

R. Michael Dorsch III ("Dorsch"), iStar's Executive Vice President had not previously been involved with this loan but was instrumental in shutting down funding. Lesser Decl. Ex. 17 (Dorsch 6:22-25; 18:24-19:2).  Dorsch testified that Draw 19 was submitted during the "worst credit market conditions in 20 plus years . . ." Id., (Dorsch 31:14-32:5). While Dorsch feared the economy, he lacked specific knowledge of the expenses for which Five Star sought payment in Draw 19. Id., (Dorsch 32:23-33:5).  Dorsch's opinion was clear: if iStar funded the Loan, that money "would be lost the day it was advanced."  Id., (Dorsch 37:15-21).  Dorsch viewed continuing to fund Five Star's Loan as "throwing good money after bad ..." Id., (Dorsch 55:25-56:3, 69:4-7). Dorsch wanted to "turn off the spigot" Id., (Dorsch ex. 4) and he directed those overseeing the Loan to "get creative" to avoid funding.  Id., (Dorsch ex. 7). Stephan attempted to "get creative" by combing the Loan Agreement for possible documentation requirements with which Five Star had not complied (and which iStar had not previously requested).  Id., (Dorsch 80:17-81:9).

While Dorsch was confident in his conviction that iStar should freeze its commitment (Id., (Dorsch 62:23-63:11)), he had little confidence in the iStar team, including Sotolov, and reacted strongly when he learned of Stephan's approval (Id., (Dorsch 74:6)):

> "I can't believe Sotolov & Company let them go down this road and incur these expenses." (Lesser Decl. Ex. 20 (Dorsch ex. 11)).  "I talked to Hyatt and Sotolov, both frankly seem to be out over their skis on this one. (Lesser Decl. Ex. 21 (Dorsch ex. 12)).

iStar's view of this Loan, as expressed through its internal e-mails was:

- "My suggestion is to freeze our commitment." Lesser Decl. Ex. 22 (Dorsch ex. 2).

- "Right now, they're just throwing our money away, since I think they have no chance of getting this project off the ground." Lesser Decl. Ex. 23 (Dorsch ex. 5).

- "Let's be creative and look hard for reasons to limit or halt funding. Do you like losing $?" Lesser Decl. Ex. 24 (Dorsch ex. 6).

- "It should be a 'last resort' to allow them to spend $ today toward horizontal construction." Lesser Decl. Ex. 25 (Dorsch ex. 8).

- "In reading the Material Adverse Effect definition, it seems that we can call this because the borrower cannot complete construction before the Required Completion Date. Why wouldn't we say this lets us halt funding?" Lesser Decl. Ex. 26 (Sotolov ex. 43).

During this period, iStar's parent was in imminent danger of violating its own bank debt covenants. Lesser Decl. Ex. 5 (Cowart Inj. Decl. ¶¶ 79-80). Moody's Investors Service downgraded iStar Financial's bonds to junk. (Id.). In an earnings call, iStar Financial's Chief Financial Officer revealed its strategy of foreclosing on properties on which it had loaned funds. (Id.). In sum, iStar began searching in December, 2008 for a way to terminate funding of the Loan because of the prevailing market conditions and its own faltering finances, but had no colorable contractual basis for terminating funding.

## C. The Indian Bend Right of Way

As part of Draw 19, Five Star included a request for $370,000 to purchase the Indian Bend right of way (the "Indian Bend ROW") a requirement by the Town of Paradise Valley to obtain final plat approval. Df. 56.1 St. ¶ 13. There is no provision in the Loan Agreement concerning the Indian Bend ROW. That parcel is not included in the property description of the Mortgaged Premises securing the Loan. (Chmil Decl. Ex 1 (Loan Ag. at 14 (definition of "Mortgaged Property"). iStar did not disapprove or object to the Development Agreement. It partially funded Draw 19 in the amount of $370,000 and received a copy of the deed to the Indian Bend ROW on March 2, 2009. Pl. 56.1 St. Resp. to ¶ 15. The deed reflected that Five

Star Communities, an affiliate of Five Star, owned the Indian Bend ROW.[4]   Nevertheless, this purchase by Five Star Communities, which post-dates iStar's termination of funding, is among the defaults alleged by iStar in its first counterclaim for declaratory relief and on which iStar seeks judgment.

### D.    The Development Schedule

The Loan Agreement provided that an initial Development Schedule was to have been annexed as Schedule 1.1(D) although it was not a part of the final document.  Pl. 56.1 St. Resp. to ¶ 16.  In its present motion, iStar argues Five Star's failure to adhere to this schedule is a violation of §3.6(A)(iv) and thus an Event of Default under §9.1(W).  MSJ Br. at 2, 26-27.  iStar however, fails to address why Five Star could be in breach of an exhibit that was never annexed to the Loan Agreement.

Even had the initial Development Schedule been attached, it was not final, it provided for "site work horizontal construction" to continue through "November, 2009" (which was six months _after_ the Initial Maturity Date), and the Loan Agreement only required Five Star to act with commercial reasonableness.  Pl. 56.1 St. Resp. to ¶¶ 18, 26 & 66.  In his deposition, Sotolov conceded that the Development Schedule typically changes throughout the course of a construction project.  Lesser Decl. Ex. 2 (Sotolov 51:11-18).  The dates in the Development Schedule were moot because the entitlement process encountered significant delays, through no fault of Five Star.  Df. 56.1 St. ¶¶ 6-12.  Hyatt acknowledged that getting the Special Use Permit ("SUP") approved was not a sure thing.  Lesser Decl. Ex. 27 (Hyatt 33:3-15).  iStar knew that it would be responsible for funding the Loan, even though the entitlements were not secured.

---

[4] The first time iStar's objected to the ownership of the Indian Bend ROW was when it asserted its fraud claim in its Answer and Counterclaims (Lesser Decl. Ex. 1).  This counterclaim is presently the subject of Five Star's motion, pursuant to Fed. R. Civ. P. 9(b), 9(c), 12(b)(6), 12(f), 26 and 37, to preclude or strike defenses.  D.E. 85 ("Five Star MTD").

Lesser Decl. Ex. 27 (Hyatt 34:21-24).

Five Star attended 32 public work study sessions and hearings and various other meetings before the Paradise Valley Town Council and Planning Commission during a 12 month process to obtain the SUP, which is the zoning entitlement that permits the development of the Project. Cowart Inj. Decl. at ¶ 18. Five Star kept iStar informed of all delays and developments in the entitlement process. Pl. 56.1 St. Resp. to ¶9; Lesser Decl. Ex. 29 (Cowart 59:24-60:7). Sotolov attended the April 10, 2008 Town Council meeting when the Town Council approved Five Star's SUP application; he summarized the meeting for iStar. Lesser Decl. Exs. 2, 28 (Sotolov 99:25-100:6; Hyatt ex. 15). Hyatt congratulated Five Star on winning the election. Pl. 56.1 St. Resp. to ¶ 57. iStar never objected to the delays resulting from the zoning process or the failure to meet any dates in the initial Development Schedule and indeed continued to fund 18 draw requests during the entire June 2007 through November 2008 period. Df. 56.1 St. ¶ 25.

### E.   The January 6, 2008 Meeting

On January 6, 2009 (three weeks after Five Star submitted Draw 19), the parties met at Five Star's offices. Lesser Decl. Ex. 2 (Sotolov 240:5-5-9; Sotolov 240:2-4). At the meeting, Dorsch tried to bully Five Star by citing current conditions in the real estate market, criticizing Five Star's abilities and demanding that Five Star produce "missing" documents required by the Loan Agreement, which documents iStar refused to identify. Pl. 56.1 St. Resp. to ¶ 26; Lesser Decl. Ex. 5 (Cowart Inj. Decl. ¶ 43). Five Star reiterated at the meeting that it could fast track the schedule and would complete construction by May 18, 2009 if iStar would resume funding. Id. ¶ 39. Dorsch predicted that Five Star would be unable to get the Project off the ground and sell the residences. iStar has since hired Five Star's sales team and other professionals for another project iStar foreclosed on in the area! Ayoub Decl. ¶ 11.

Dorsch suggested it was "unwise" for Five Star to rush to complete the Construction by

#2634026 v14 \020396 \0004

8

the Initial Maturity Date and that Five Star should halt the Project until the economy rebounded.

Lesser Decl. Ex. 5 (Cowart Inj. Decl. ¶ 41).

Dorsch argued that Draw 19 was rejected because it was Five Star's first "Hard Cost" draw, and required prior approval by iStar of the Construction Contract. Members of Five Star explained that Dorsch was mistaken because Draw 19 was a Soft Cost draw. Dorsch was embarrassed by this revelation and iStar's own Stephan's concurrence in Five Star's position. Pl. 56.1 St. Resp. to ¶ 26; Lesser Decl. Exs. 8, 10 (Ayoub 130:4-16; 131:14-24; 132:8-15; Neubecker 53:18-54:2). On January 9, 2008, iStar sent a letter authored by Sotolov that listed a wide ranging list of documents that it would require prior to advancing any future funding. Lesser Decl. Ex. 29 (Cowart ex. VV). Sotolov testified that although he signed the letter, the letter had been drafted by iStar's counsel. Lesser Decl. Ex. 2 (Sotolov 256:3-6). In this letter, Sotolov admits as follows:

> We admit to temporary confusion as to whether Request for Advance No. 19 reflected an overage of the Soft Cost Budget. Upon further review, we determined that some of the Soft Costs for this deal were lumped together into the Hard Cost Budget. This was simply a misunderstanding and has been resolved.

Lesser Decl. Ex. 20 (Cowart ex. VV). By this admission, Sotolov conceded that the funds Five Star sought were for Soft Costs, and should not have been treated any differently from previous Soft Cost draws.[5] iStar's Disbursement Coordinator had explained to Sotolov, Stephan and Dorsch that Draw 19 was for "soft costs but are billed under hard costs per iForm set up". Pl. 56.1 St. Resp. to ¶ 26. At his deposition, Sotolov refused to say that this letter was a notice of Default under the Loan Agreement. Lesser Decl. Exs. 30, 2 (Cowart ex. CC; Sotolov 256:21-260:10). Sotolov refused to take a position as to whether Five Star was in default at all Id., (Sotolov 52:19-53:2; 62:3-8; 63:6-9) although he acknowledged that it was part of his role to do

---

[5] iStar omitted this letter in the present motion, presumably because it raises issues of fact.

so. Id., (Sotolov 53:3-7).

One day earlier, Five Star had forwarded to iStar a collection of documents. These documents were provided not because Five Star agreed that they were contractually required, but because, as Shepherd testified: "anything to get started." Lesser Decl., Ex. 13 (Shepherd 30:3-8). In his haste, Shepherd inadvertently sent the wrong counterpart of the contract with Summit Builders, Five Star's construction contractor. Id., (Shepherd 33:18-21). This version did not include Five Star's President's signature page. Id., (Shepherd 33:18-21). Of course, iStar knew since June, 2008 that Summit Builders was the general contractor and did not object (Shepherd Decl. Ex. PS-3), and thus iStar's request was simply another dilatory hurdle to funding.

By letter dated February 2, 2009, in another counsel-drafted, Sotolov-signed, iStar letter Lesser Decl. Ex. 2 (Sotolov 275:18-20), Sotolov provided a new laundry list of documents that iStar required that Five Star provide prior to Commencement of Construction. Shepherd Decl. Ex. PS-31. Still, iStar failed and refused to fund the outstanding pre-construction draw requests.

Sotolov then signed three letters on March 3, 2009. The first of these letters, like the others, was authored by iStar's counsel. Lesser Decl. Ex. 2 (Sotolov 280:7-10); Lesser Decl. Ex. 33 (Cowart ex. AAA-1). In this March 3, 2009 letter, Sotolov contradicted iStar's position that certain documents were required prior to the Commencement of Construction, as he had previously stated in his February 2, 2009 letter. In this letter, Sotolov stated that the documents are required prior to *any funding*. Compare Lesser Decl. Ex. 33, Cowart ex. AAA-1 and Ex. 32, Cowart ex. ZZ (see discussion of builder's risk insurance and payment and performance bonds). Sotolov would not say whether this was a Notice of Default, either. Lesser Decl. Ex. 2 (Sotolov 288:11-290:17).

## F.   Section 3.2 of the Loan Agreement

iStar argues that Five Star failed to fulfill conditions precedent set forth in §3.2 which

excused its failure to fund.  iStar failed to put Five Star on notice of these so-called failures with

the opportunities to cure under the Loan Agreement (that were anywhere from 30 to 120 days).

Loan Ag. §9.1(D).   Even were these documentation provisions applicable despite the pre-

construction phase of the Project, if iStar were to obtain summary judgment and foreclose on this

Property, Five Star would lose its $55 million investment in this property and the enhancement

of the value of the Property that resulted from Five Star's tireless efforts during the entitlement

process.  (Ayoub Decl. ¶ 5; Lesser Decl. Ex. 41 (iStar Underwriting and Evaluation Report).

Five Star should have an opportunity to prove at trial iStar's deliberate misinterpretation of

Section 3.2 of the Loan Agreement. See In re Herzog, 301 N.Y. 127, 137 (1950) ("It is axiomatic

that the law does not favor forfeiture or penalties but strives to effectuate the purpose and intent

which may be gathered not only from the instrument itself but from the circumstances

surrounding its making and its expressed purpose and intent."); Schnitzer v. Fruehauf Trailer

Co., 283 A.D. 421, 432, 128 N.Y.S.2d 242, 253 (1st Dep't), aff'd, 307 N.Y. 876, 122 N.E.2d 754

(1954) ("'Forfeitures are abhorrent to the law and will not be declared if there is any other

reasonable theory upon which a case can be settled.'"); see also, Columbia Artists Mgmt., LLC

v. Alvarez, No. 08 Civ. 11254, 2010 U.S. Dist. LEXIS 137154 * 9 (S.D.N.Y. December 23,

2010) (Where there is ambiguity in a contractual term, the law does not favor a construction

which creates a condition precedent.) iStar must prove that there are no issues of fact with

respect to its interpretation of §3.2.  iStar fails for several reasons.

### 1.    The Court Found §3.2 to be Ambiguous

This Court previously found §3.2 to be ambiguous:

> After thorough consideration of the Loan Agreement and the
> arguments of counsel, but without the benefit of live testimony, the
> Court cannot conclude that the relevant contractual provision (Loan
> Agreement §3.2) unambiguously provides that Five Star was required
> to secure approval of these plans as a condition precedent of iStar's

obligation to fund Draw Requests 19, 20 and 21.

Injunction Order (D.E. 60) at p. 10 (emphasis added).  iStar offers no deposition or other evidence to clarify the parties' intentions with respect to this paragraph and therefore fails to address the Court's concerns.

### 2. iStar's Interpretation of the Timing of Satisfaction of the Conditions Precedent in §3.2 is Incorrect

iStar argues that Sections 3.1, 3.2 and 3.3 are consistent with each other and require satisfaction of certain conditions prior to the contemplated funding event in each section.  MSJ Br. at 34-35.  These sections however, differ with respect to when satisfaction of the particular conditions precedent must be satisfied.  Sections 3.1 and 3.3 require funding only after the "prior or concurrent satisfaction" of the conditions precedent in those provisions.  Likewise, other provisions are specific as to their temporal requirements.  See e.g. Loan Ag. §3.4 ("Borrower Agrees to satisfy the following conditions precedent *on or before* the Required Completion Date"); §3.5 (same) §5.4 (Insurance requirements "(A) During Construction;" "(B) Post Construction").  By contrast, §3.2 does not use the same language with respect to the timing of the satisfaction of the conditions precedent in relation to funding.  Section 3.2 only refers to satisfaction of conditions precedent as they relate to "such subsequent advances." In other words, as Construction progressed, the conditions precedent in §3.2(A) through (O) had to be satisfied prior to funding "such subsequent advance[]" to which that condition applied.  Loan Ag. §3.2. This interpretation is supported by Five Star's counsel who negotiated the Loan Agreement.  Pl. 56.1 St. Resp. to ¶ 34.  He notes that iStar's counsel specifically deleted the "prior or concurrent" language from Section 3.2.  Id.

### 3. Section 3.2 Refers to "Completion of Construction" and Not "Construction" or "Commencement of Construction"

iStar argues that §3.2 requires the satisfaction of the conditions precedent set forth in that

paragraph *after* Five Star obtained the SUP and *as it moved into* the construction phase.  MSJ Br. at 7.  iStar's view of §3.2 however does not use the defined terms in the Loan Agreement that would support this interpretation.  Section 3.2 does not use the term "Commencement of Construction" which might have more readily supported iStar's interpretation.  This section refers to the Completion of Construction which is defined as "the *completion* [and not *commencement*] of Construction, in accordance with the Plans and Specifications and pursuant to the terms of this Agreement."  Loan Ag. at 4 ("Completion of Construction") (emphasis added).  The most reasonable interpretation of the language of this section then, is that the conditions precedent set out in subparagraphs (A) through (O) must be satisfied as applicable, depending on the condition precedent but *prior to the date when Construction has been completed* and not prior to commencement, as iStar argues.

The satisfaction of those conditions precedent prior to the Completion of Construction (meaning the date on which construction is completed) is consistent with the temporal language employed in many of §3.2's subparagraphs that contemplate compliance as Construction progressed.  For example:

> (E): "Lender shall have received and approved all required licenses, permits and approvals necessary and applicable to Construction *then being conducted* and Borrower agrees to thereafter obtain such other required building permits needed *for each portion of the Construction prior to commencing such portion of Construction.*" (emphasis added)

> (I): "Lender shall have received and approved a statement from the Contractor setting forth, *as of a current date*, a description of all subcontracts and purchase orders §....(emphasis added)

### 4.   iStar Offers An Implausible and Inconsistent Explanation For Why It Funded Draws 1 Through 18 But Not 19 Through 21

iStar requires an unambiguous contractual rationale for why it was required to fund Draws 1 through 18 but not required to fund Draws 19 through 21.  To thread this needle, iStar now argues that satisfaction of the conditions precedent in §3.2 was required for advances of

funds relating to Hard Costs and Soft Costs as they pertain to Completion of Construction,
therefore Soft Costs that relate, to or arise during, the entitlement process are not governed by the
conditions precedent set out in §3.2.

iStar claims that all subparts of §3.2 had to be satisfied on or before December 12, 2008,
the date of the revised Draw 19 request because this was the first draw after the date on which
the SUP was obtained or alternatively, because Five Star was entering into the construction
phase of the Project. MSJ Br. at 7. The Loan Agreement however, does not include any reference
to a temporal "line of demarcation" when the SUP is approved, and as iStar admits, Draw 19 was
for the pre-construction phase. Pl. 56.1 St. Resp. to ¶ 34. iStar's latest excuse also conflicts with
the contractual arguments that iStar has previously made.[6]

Dorsch refuted iStar's current argument. He testified that whether Draw 19 related to the
commencement of construction would have no impact on his decision to fund Draw 19. Lesser
Decl. Ex. 17 (Dorsch 7:12-20).  Dorsch also testified that it wasn't the Loan Agreement that
resulted in funding Draws 1 through 18 but rather an inexperienced iStar deal team who did not
communicate sufficiently with the Borrower.  Lesser Decl. Ex. 17 (Dorsch 102:14-20; 104:12-
22); Ex. 21 (Dorsch ex. 12).

iStar's present theory also conflicts with Sotolov's January 16, 2009 letter to Five Star:

> Lender's funding of prior draws requests is irrelevant for purposes of
> the pending draw request. By funding the prior draw requests, Lender
> did not waive Borrower's obligation to comply with any of the

---

[6] Sotolov distinguishes Draw 19, and subsequent draws from the prior 18 draws, and the provisions
of the Loan Agreement to which they are subject, as follows:

> While the first eighteen Draw Requests did request funding for "Soft
> Costs," those Soft Costs were not categorized as line items under the
> Hard Costs budget or as Soft Costs "related to the Completion of
> Construction." All the prior Soft Costs were drawn from the Soft Costs
> section of the budget. Therefore, the conditions precedent in Section 3.2
> of the Loan Agreement did not apply. Sotolov Dec. ¶ 7.

> express terms of the Loan Agreement, including the conditions
> precedent to funding.    Waiving certain requirements was for
> Borrower's benefit and facilitated Borrower's ability to proceed,
> especially in a trying market.

Lesser Decl. Ex. 36 (Cowart ex. YY). It also conflicts with Sotolov's February 2, 2009 letter, in

which he similarly referred to satisfaction of §§3.2, 3.3 and 3.4 as a condition to funding **any**

Loan proceeds at all.    Lesser Decl. Ex. 31 (Cowart ex. ZZ).    Sotolov also testified that

satisfaction of all conditions precedent in §3.2 were required prior to the funding of **any** draw,

whether for Hard or Soft Costs. Lesser Decl. Ex. 2 (Sotolov 64:4-65:6; 65:7-65:11; 65:23-66:6;

66:12-66:17).

Sotolov's January 9, 2009 letter recognized Draw 19 for what it was, a Soft Cost draw.

Sotolov and iStar however now draw a new and artificial distinction between Soft Costs incurred

**before** the SUP was issued and Soft Costs incurred after.  MSJ Br. at 7; Df. 56.1 St. ¶ 28. The

Loan Agreement does not offer two definitions of Soft Costs.    See Loan Ag. at 20 ("Soft

Costs").[7]

Previously, in Defendant iStar RC Paradise Valley LLC's Reply Memorandum of Law in

Further Support of Its Motion to Dismiss (D.E. 55), iStar described §3.2 as follows:

> Additionally, the plain language of Section 3.2 makes clear that it
> applies to *both* Hard Costs and Soft Costs, and absolutely no
> distinction is made in the conditions applicable to either category of
> costs. (emphasis in original.)

D.E. 55 at p. 8.[8] iStar's own arguments then, demonstrate iStar's conflicting interpretations of

---

[7] iStar's new argument conflicts with in its own 56.1 statement where it states:

> 24.  Under the Loan Agreement, all funding disbursements following
> the initial disbursements were governed by Sections 3.1, 3.2, 3.3, 3.4
> and/or 3.5 of the Loan Agreement.  (Chmil Decl. Ex. 1 (Loan Ag. §
> 3).) (emphasis added.)

[8] Sotolov validated Five Star's arguments in a December 22, 2008 email:

Section 3.2 and that the interpretation of §3.2 cannot be resolved on summary judgment.[9]

**G.    iStar's Funding Confirms That Five Star Was Not In Default**

Sotolov testified that under §3.2(A), iStar was only obligated to fund an advance to Five Star "so long as no event of default exists within eleven business days after lenders receipt of a complete request for advance." Sotolov 61:3-62:2; see 7-11; Df. 56.1 St. ¶ 35.   Based upon iStar's own interpretation of the language of §3.2(A), then, by partially funding Draw 19, on January 6, 2009, which iStar argues is a Hard Cost draw subject to the requirements of §3.2, iStar confirmed, on such funding date, that as of such date, Five Star *was not in breach of the Loan Agreement*. That Five Star was **not** in breach is confirmed by the following statement in Sotolov's January 16, 2009 letter:  "More importantly, and emphatically, at no time and in no fashion did Lender communicate to Borrower to halt work at the Project. Lender has no authority to do so, and in its history has never done so, even on a defaulted loan, *much less a loan that is not in default*."  Lesser Decl. Ex. 36 (Cowart. ex. YY at p. 2 (emphasis added)).

**H.    The Initial Maturity Date**

iStar argues that Five Star's failure to extend the Initial Maturity Date is an incurable Event of Default under §§2.4(B) and 9.1(A) of the Loan Agreement. MSJ Br. at 10.  iStar frustrated Five Star's performance under the Loan Agreement and unilaterally terminated the Loan Agreement, rendering Five Star's compliance with §2.4(B) impossible.  After iStar

---

I am leery of restricting funding and giving them a claim that "they couldn't complete the work because iStar didn't give them the proceeds to do it." (Lesser Decl. Ex. 36 (Dorsch Ex. 23)).

Partially funding Draw 19 on January 5, 2009 constituted a waiver of iStar's right to claim a breach by Five Star prior to that date. Karabu Corp. v. Pension Benefit Guaranty Corp., No. 96 Civ. 4960, 1997 U.S. Dist. LEXIS 19582 at *36-7, (S.D.N.Y. December 10, 1997).

[9] iStar cannot take a conflicting position in this motion and has waived the ability to present a contrary position to this Court in its motion for summary judgment. Smith v. Petrou, 705 F. Supp. 183, 185 (S.D.N.Y. 1989) (litigant's initial position constituted a waiver of his later contrary position); Anjelino v. New York Times Co., 200 F.3d 73, 100 (3d Cir. 1999) (district court held party to its prior representation that it would forgo further discovery).

terminated funding, Five Star had no ability to comply with the Extension Conditions. See also Pl. 56.1 St. Resp. to ¶ 22.

### I.    **Other Alleged Contract Breaches**

iStar relies on twelve new Loan Agreement provisions for the first time in its Answer (Lesser Decl. Ex. 1), five of which it relies upon in the present motion.[10]  iStar therefore alleged, for the first time in its Answer and in this motion, breaches of the following provisions of the Loan Agreement: §§ 9.1 (B); § 3.2(B); § 3.2(C); § 3.2(D); and §7.11.  The current motion therefore relies on new conditions precedent that are the subject of Five Star pending motion to dismiss and for other relief.  These conditions were not raised until at least two years after the events in question occurred.  iStar's position is a litigation contrivance intended to justify iStar's conduct because it is clear that iStar's contemporaneous excuses were insufficient.[11]

### J.    **The Loan Agreement is not Unambiguous As to When Construction had to be Completed**

iStar also argues that "the Loan Agreement explicitly required that the construction of the horizontal improvements be completed by maturity." MSJ Br. at p. 1.  This statement is not accurate. Pl. 56.1 St. Resp. to ¶ 18. At a minimum, the date by which Five Star had to complete Construction is yet another material issue of fact. Id.

## ARGUMENT

### I.    iStar's Motion Fails to Meet Its Burden Under Fed. R. Civ. P. 56

The moving party bears the burden of establishing that there are no genuine issues of material fact for trial. See Federated Retail Holdings, Inc. v. Sanidown, Inc., No. 06 Civ. 6119

---

[10] Notably, iStar's Amended Counterclaims do not include even a general averment that iStar had satisfied all of its obligations under the Loan Agreement.

[11] iStar's motion has literally proved Five Star's point. Five Star expressed concern upon receipt of iStar's vague and deficient Answer as being a prelude to sand-bagging Five Star with new defenses and claims following close of discovery. Accordingly, Five Star has moved to dismiss and to preclude and the points therein preclude the grant of summary judgment in iStar's favor. (D.E. 85).

(Swain, J.), 2009 U.S. Dist. LEXIS 68383, at *7 (S.D.N.Y. Aug. 5, 2009); Advanced Analytics, Inc. v. Citigroup Global Mkts., Inc., No. 04 Civ. 3531, 2009 U.S. Dist. LEXIS 130133, at *29 (S.D.N.Y. Aug. 5, 2009) (Swain, Jr.); Int'l Healthcare Exch., Inc. v. Global Healthcare Exch., LLC, 470 F. Supp. 2d 345, 354 (S.D.N.Y. 2007) (Swain, J.).  On a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and all reasonable inferences shall be drawn in favor of the non-moving party.  Id.; see also Advanced Analytics, Inc., 2009 U.S. Dist. LEXIS 130133 at *28-29.  Any assessments as to credibility and decisions as to conflicting versions of events are matters to resolve at trial. Id. at *29.  Summary judgment is considered to be a "drastic device."  Nationwide Life Ins. Co. v. Bankers Leasing Assn., 182 F.3d 157, 160 (2d Cir. 1999) ("the moving party bears a heavy burden") (quoting Eastway Constr. Corp. v. New York, 762 F.2d 243, 249 (2d Cir. 1985), cert. denied, 484 U.S. 918, 108 S. Ct. 269 (1987)).

iStar's recycled opposition to Five Star's motion for preliminary injunction fails to resolve key fact issues identified by this Court, not the least of which is whether iStar cited the missing documentation "reasons" for terminating funding in order to avoid its contractual obligation in violation of iStar's duty of good faith under the Agreement and New York law. RUS, Inc. v. Bay Indus., 322 F. Supp. 2d 310, 315 (S.D.N.Y. 2003) (summary judgment denied in part due to issue of fact as to pretextual excuses for terminating contract).

## II.   iStar's Failure to Provide Five Star Notice of its Alleged Defaults under §3.2 is Fatal to iStar's Argument that iStar Could Withhold Funding

iStar is in no position to argue that it was not obligated to fully fund Draw 19 and fund Draws 20 and 21 because Five Star failed to satisfy the conditions precedent set forth in §3.2. See e.g. MSJ Br. at 15. Sotolov refused to characterize any of the letters that he signed during the period January through March 2009 as default notices and his January 16, 2009 letter

specifically recognized that Five Star was not in default. See supra at 9. If iStar thought Five Star was in default, it was obligated pursuant to §9.1(D) to put Five Star on notice and give it anywhere from 30 days to 120 days to cure. Loan Ag. §9.1(D). iStar's position at the time then was either that it did not view these failures of condition precedent as Defaults or that it intended to terminate funding regardless of whether it had the contractual authority to do so.

If a party claims nonperformance, then it must afford a defaulting party any contractually-secured opportunity to cure prior to terminating a contract. Karabu Corp. v. Pension Benefit Guaranty Corp., No. 96 Civ. 4960, 1997 U.S. Dist. LEXIS 19582 (S.D.N.Y. December 10, 1997); Filmline (Cross-Country) Productions, Inc. v. United Artists Corp., 865 F.2d 513, 518 (2d Cir. 1989) (failure to give contractually-secured opportunity to cure constituted fatal defect of contract termination). The "curability" of a default is a question of fact. Point Prods. A.G. v. Sony Music Entm't, Inc., No. 93 Civ. 4001, 2000 U.S. Dist. LEXIS 10066 at *14 (S.D.N.Y. 2000). iStar, then, cannot not rely on the failure to comply with conditions precedent set forth in §3.2 as a basis to justify its withhold of funding.

III. **WHETHER FIVE STAR WAS REQUIRED TO COMPLY WITH ALL OF THE CONDITIONS OF SECTION 3.2 OF THE LOAN AGREEMENT PRIOR TO SUBMITTING DRAW 19 RAISES ISSUES OF FACT THAT PRECLUDE SUMMARY JUDGMENT**

iStar's claim that Five Star failed to satisfy the conditions precedent listed in §§3.2(B), 3.2(C), 3.2(D), 3.2(E), 3.2(K), 3.2(L) and 3.2(N) of the Loan Agreement is based on a mischaracterization of §3.2, offers a temporal component to §3.2 that is unsupported by its language and conflicts with prior interpretations offered by iStar. See infra III(A).

A. **Timing of Compliance**

When the Loan Agreement was executed in May 2007, the parties could not foresee at what point during the development timeline each of the conditions set out in §3.2 would be

satisfied, or even when they would become relevant.  Accordingly, unlike in §§3.1 and 3.3, the

Loan Agreement specifically does not require prior or concurrent compliance with the conditions

precedent in §3.2.[12]    West Decl. ¶¶ 1-13; see infra at I(1)-(3).  All that §3.2 states is that

conditions precedent had to be satisfied in connection with "such" advance.  Loan Ag. §3.2; see

also Pl. 56.1 St. Resp. to ¶34.  This distinction implies that advances were to be made as

Construction progressed and as the condition precedent in question became relevant.  See

generally West Decl.  Five Star satisfied those conditions that were appropriate and relevant for

the stage of the Project.

When a contract does not specify time of performance, the law implies a reasonable time.

Webster's Red Seal Publs. v. Gilberton World-Wide Publications, Inc., 67 A.D.2d 339, 343, 415

N.Y.S.2d 229 (1979) aff'd 53 N.Y.2d 643, 438 N.Y.S.2d 998 (1981).  Additionally, even were

iStar's arguments persuasive, where, as here, "'language used is susceptible to differing

interpretations, each of which may be said to be as reasonable as another,' then the interpretation

of the contract becomes a question of fact for the jury."  Bourne v. Walt Disney Co., 68 F.3d

621, 629 (2d Cir. 1995) (quoting Seiden Assoc., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428

(2d Cir. 1992)).  This fact-based inquiry requires an examination of extrinsic evidence concerning

the parties' intent.  DeVito v. Hempstead China Shop, 38 F.3d 651, 654 (2d Cir. 1994).  The

District Court decision in Leading Mfr. Pte. Ltd. v. Bradlees Stores, Inc., 313 B.R. 565, 575

(S.D.N.Y. 2004) is instructive.  There, the Court held:

> In it is impossible to tell when any of the conditions precedent to the
> contract became effective, or if the Appellants were required to show
> their willingness to perform under the contract by the submission of

---

[12] The parties' uncertainty with respect to the length of time required for Completion of Construction
is further evidenced by the language §3.6(E) which refer to Five Star's "diligent perform[ance of] the
development, design and Construction using all commercially reasonable efforts ..." Loan Ag.
§3.6(E) (emphasis added).

samples. Construing the lack of evidence in Appellants' favor, as is required on a summary judgment motion by Bradlees, there is a genuine issue of material fact as to whether Appellants were required to have fulfilled any conditions precedent at the time of cancellation.

Id. at 575. iStar's claim that all of the conditions specified in these provisions were to be

satisfied **before** Five Star submitted Draw 19 is a disputed issue of material fact.

**B.     Draw 19 Was A Soft Cost Draw or, at a Minimum, Issues of Fact Exist With Respect to the Nature of that Draw**

iStar mischaracterizes the expenses sought in Draw 19:

- iStar argues that Draw 19 included significant Hard Costs. MSJ Br. at 7.

- iStar argues that Draw 19 should be treated differently because it was the first draw submitted following the date the SUP was issued on November 24, 2008 (MSJ Br. at 7).

These arguments are contradicted by the evidence:

- Draw 19 sought reimbursement for expenses for consultants for whom iStar had previously reimbursed with no requirement that Five Star satisfy the conditions precedent set forth in Section 3.2. See Cowart Decl. at ¶3.

- Five Star advised iStar and iStar conceded that Draw 19 was for Soft Costs. Pl. 56.1 St. Resp. to ¶ 26.

- iStar's letter's to Five Star dated January 16, 2009 (Lesser Decl. Ex. 35 (Cowart ex. YY)); February 2, 2009 (Lesser Decl. ex. 31, Cowart ex. ZZ), as well as the deposition testimony of Dorsch and Sotolov concur that Draw 19 is a Soft Cost draw. See infra at (I)(4).

iStar's proffered interpretation requires this Court to focus exclusively on the timing of

Draw 19, namely after the approval of the SUP, to arbitrarily require satisfaction of the

conditions precedent in §3.2. Five Star's interpretation, at a minimum, raises material issues.

**IV.     FIVE STAR SATISFIED ITS OBLIGATIONS UNDER THE LOAN; ISTAR'S CONTENTIONS MERELY CREATE, AT BEST, ISSUES OF FACT**

**A.     Five Star Did Satisfy All Requirements, If Any, For Funding Draws 19, 20 and 21**

iStar generally contends that Five Star (1) failed to extend the Initial Maturity Date and

(2) did not satisfy purported conditions to funding.[13]   To the extent this Court concludes that Five Star was obligated to fully comply with §3.2 prior to funding Draw 19, Five Star's inability to complete Construction was the direct result of iStar's decision to terminate funding.   In any event, as explained below, none of iStar's contentions with respect to unfulfilled conditions precedent has merit.

### 1.   Five Star Complied With Section 3.2(E)

iStar's claim of noncompliance with Section 3.2(E), which generally pertains to licenses, permits and approvals, is grossly misleading because it ignores Section 3.2(E)'s two key components: (1) its temporal component;[14] and (2) its reasonableness component.[15]

#### (a)   Five Star's Plat

iStar argues that a final plat had to be approved and recorded before iStar had any obligation to make any advances.  MSJ Br. p.16.  First, the Loan Agreement does not say that. Chmil Decl. Ex. 1, Loan Ag.   Second, iStar made advances for 18 months without a final plat. Pl. 56.1 St. Resp. to ¶ 60.  Third, obtaining a "final" plat (a preliminary plat was already in place)

---

[13] Notably iStar cannot rely on any of its prior letters dated January 9, 2009, January 16, 2009, February 2, 2009 and March 3, 2009, respectively.  Each of those letters post-dated Draw Requests 19, 20 and 21 by weeks or months.  iStar cannot claim that Five Star failed to comply with the Loan Agreement on December 12, 2008 when, at that time, iStar had not declared a single default much less sent one letter to Five Star even implying such.  Pl. 56.1 St. AMF. ¶¶ 6-9.  Indeed, in the weeks following Draw Request 19, iStar itself confirmed there was absolutely no default in its January 16 letter, since it requested additional information from the borrower and after it approved a portion of Draw Request 19. Pl. 56.1 St. Resp. to ¶ 42.

[14] Section 3.2(E) states, "Lender shall have received and approved all required licenses, permits and approvals necessary and applicable to Construction *then being conducted* and Borrower agrees to *thereafter* obtain such other required building permits needed *for each portion of the Construction* prior to commencing such portion of Construction and deliver copies thereof to Lender." (Emphasis added).

[15] Section 3.2(E) states, "Lender shall have received *evidence reasonably satisfactory* to Lender that the Project may be completed in accordance with applicable Legal Requirements and that any such Legal Requirements are in full force and effect and Borrower is in full compliance therewith.  Lender shall have received *evidence reasonably satisfactory* to Lender that a final subdivision map or parcel has been approved by all Governmental Authorities with respect to the Paradise Valley portion of the Land." (Emphasis added).

was an administrative act, dependent only on scheduling a Town Council meeting, and was relevant only to vertical construction. Pl. 56.1 St. Resp. to ¶ 49. iStar also never raised this objection in December 2008. Not even iStar's *2009* letters stated that the reason for iStar's termination of funding in *2008* was because the final plat had not yet been recorded. Pl. 56.1 St. Resp. to ¶ 49. This argument, then, is nothing more than a litigation contrivance.[16]

### (b)   Five Star's Other Licenses, Permits and Approvals

iStar raises objections concerning (1) Five Star's at-risk agreement with the Town;[17] and (2) a perimeter wall permit. MSJ Br. at 19-21. Neither meritless point was ever previously raised in any of iStar's letters to Five Star. Pl. 56.1 St. Resp. to ¶ 48.

First, iStar does not cite the at-risk agreement in Df 56.1 Stmt. In any event, it is <u>not</u> objecting to Five Star's actual at-risk agreement with the Town. MSJ Br. at p. 19-20. Nor is iStar objecting to the actual at-risk grading on the Paradise Valley parcel. <u>Id.</u> Rather, iStar is arguing that, as a consequence of the at-risk grading in Paradise Valley, there would eventually be a need to perform channel work <u>in the adjacent jurisdiction of the City of Scottsdale</u>. <u>Id.</u> iStar therefore argues that Five Star needed approval from Scottsdale, <u>before</u> Five Star started the Paradise Valley grading. <u>Id.</u> iStar's argument fails. First, the "Project Completion Date" at issue here concerned work only on the Paradise Valley portion of the parcel, and not the Scottsdale

---

[16] iStar's reasoning regarding the plat also highlights its bad faith: iStar contends that Draw 19 sought funding to pay for the Indian Bend ROW. Df. 56.1 St. ¶¶ 12-14. iStar argues that purchase of the Indian Bend ROW was a condition to the Town's approval of the plat. Df. 56.1 St. ¶¶ 12-14. iStar is thus arguing that it did not need to fund the approval of the plat because Five Star had not sought approval of the plat. The Court should reject iStar's circular position.

[17] The at-risk agreement gave Five Star the immediate approval to commence grading and drainage work, provided that it post an assurance with the Town to cover re-vegetation, if re-vegetation became necessary. Shepherd Decl. ¶ 31.

portion.[18]   Second, §3.3(P) requires that Construction complies with the Legal Requirements applicable to the then current state of the Construction; suggesting that the future channeling work, even if true, is not relevant to the then current stage of Construction.   Third, iStar cites the deposition of Town Engineer William Mead, but Mead testified that the Scottsdale channel work could be performed at the same time as the Paradise Valley channel work. Lesser Decl. Ex. 38 (Mead 41:12-16).   Mead also testified that the plans were prepared for the Scottsdale channel work and that the Scottsdale jurisdiction "was aware the channel was going to be dug." Lesser Decl. Ex. 38 (Mead 41:17).   Fourth, options existed in the interim or in lieu of this temporary channel.[19] Fifth, the initial Development Schedule, which iStar inconsistently relies on, projected horizontal construction through November, 2009. Pl 56.1 St. Resp. to ¶ 18.   iStar's argument is therefore without basis.

iStar also objects to the construction of a permanent masonry perimeter fence ("Perimeter Fence"). MSJ Br. p. 20-21. iStar never before raised this objection. Pl. 56.1 St. at additional material facts ("AMF") ¶¶ 6-8 (iStar 1/9/09, 1/16/09, 2/2/09 and 3/3/09 letters). iStar claims that Five Star should have obtained a permit and constructed the Perimeter Fence, prior to commencing horizontal construction. Id. This argument confirms iStar's ignorance of the SUP (sent to iStar in April, 2008) as well as the basic mechanics of horizontal construction. Pursuant to the SUP, the Town required Five Star to follow the agreed-upon schedule, which required Five Star to complete the Project in a specific sequence of events. Pl. 56.1 St. Resp. to ¶ 49. Per this sequence, Five Star was required to "substantially complete" horizontal or civil

---

[18] Horizontal construction only needed to be completed on the Paradise Valley portion. Pl. 56.1 St. Resp. to ¶ 49 Loan Ag. at 16 ("Project Completion Date").

[19] iStar acknowledged it may be temporary: "...So without this temporary channel in the city -- I don't know if it's a temporary channel. Let me start the question again." Pl. 56.1 St. Resp. to ¶ 49; Lesser Decl. Ex. 38 (Mead 41:23-25); see also Shepherd Decl. ¶¶ 41-42 (simple measures to address water with sheetflow).

improvements before it commenced construction of the perimeter walls. Pl. 56.1 St. Resp. to ¶ 49. As Town Engineer Mead testified, the wall layout plan set forth that the developer would grade the site and push out dirt to the periphery, resulting in "berms." Lesser Decl. Ex. 38 (Mead 56:1-25-58:1); 39 (Mead ex. 13). The perimeter wall would then be placed on top of the berm. Lesser Decl. Ex. 38 (Mead 56:1-25-58:1); Ex. 39 (Mead ex. 13). iStar argues that Five Star should have constructed the perimeter wall first, and then graded the site, thereby pushing the dirt *on top of the wall*. MSJ Br. at 20. Mead testified that this approach made no sense. Lesser Decl. Ex. 38 (Mead. 57:20-25). Accordingly, this ground is also spurious.

### B.    Five Star Complied With Section 3.2(K) (Plans and Specifications)

iStar argues that Five Star failed to obtain government approval of its plans and specifications. Section 3.2(K) of the Loan Agreement however, only requires that iStar approve the plans and specifications and that such documents comply with applicable laws (i.e., Legal Requirements). Pl. 56.1 St. Resp. to ¶ 50; Loan Ag. § 3.2(K), ex. A at p. 12, 31-32. There is no "governmental approvals" requirement in Section 3.2(K). Id. iStar's recitation of the definition of "Plans and Specifications" omits the last sentence of that definition which refers to Schedule 1.1(I). Id. at 16. Schedule 1.1(I) attaches nearly 30 detailed plans and specifications.[20] Id. at Sched. 1.1(I). Accordingly, iStar's own exhibit demonstrates satisfaction of this requirement, dating back to the execution of the Loan Agreement.

iStar contends that other drawings should be considered plans and specifications. These

---

[20] These Plans and Specifications are entitled: Overview Resort Site Plan, Program Summary, Diagrammatic Key Map, Resort Core Enlargement Ground Level, Spa/Fitness Center Floor Plan, Enlarged Spa/Fitness Center Floor Plan, Typical Casita Room Floor Plan, Typical Suite Floor Plan, Typical Casita Building Floor Plan – CS & DQ Type A, Typical Casita Building Floor Plan – CS & K Type B, Typical Casita Building Floor Plan – K & DQ, Resort Landscape Master Plan, Land Use Plan, Main Entry Drive Plan, Main Entry Drive Signage, Indian Bend Road Entry, Scottsdale Road Entry, Luxury Detached Residences, Resort Patio Homes. (Chmil Decl. Ex. 1, Loan Ag. (Schedule 1.1(I)).

other drawings, which iStar is referring to, are the drawings which Shepherd sent to iStar on January 8, 2009. Pl. 56.1 St. Resp. to ¶ 42. iStar acknowledged receipt of these drawings in its January 16, 2009 letter but waited until February to approve them. Pl. 56.1 St. Resp. to ¶ 42, February 2, 2009 letter.[21] Nevertheless, when iStar did approve them, it did so pursuant to Section 3.2(K), and not 3.2(E).[22]

### C.   Five Star Was In Compliance With Section 3.2(D)

Five Star was in compliance with Section 3.2(D), and all necessary utilities had been accounted for. Shepherd Decl. ¶¶ 25-28. Pl. 56.1 St. Resp. to ¶ 45.

### D.   Five Star Was In Compliance With Section 3.2(B) (Material Contracts)

iStar baselessly objects to the form of Summit's contract pursuant to §3.2(B) although the operative schedule related only to horizontal work. Pl. 56.1 St. Resp. to ¶ 37. Five Star sent the contract and schedule as early as December 28, 2008. Pl. 56.1 St. Resp. to ¶ 41. Although iStar argues that it rejected the form of the construction contract in its January 9, 2009 letter (MSJ Br. p.22) it actually did not object or even reference a specific form or budget requirement for the Summit Builder's contract until February. Pl. 56.1 St. Resp. to ¶ 41. iStar also accepted the HKS contract although it had a defect similar to the one from which iStar claims Summit's contract suffered. Pl. 56.1 St. Resp. to ¶ 41.

---

[21] iStar does not explain why the Court should overlook its intentional delay in reviewing Five Star's January submission. Likewise, Five Star's engineer incurred further delays in filing these drawings since iStar was withholding the necessary funding to cover these filings. Shepherd Decl. ¶ 33.

[22] As explained above, Section 3.2(K) does not have a "government approval" requirement. iStar is merely attempting to graft an approval requirement where none existed in the first place. Even, assuming arguendo, that Section 3.2(E) did apply, then the requisite approvals would only apply to construction then being conducted. And, at that time, Five Star was immediately moving ahead with grading; thus, it needed only to have at-risk grading plans approved which, of course, it did. Shepherd Decl. ¶ 41.

1.    **iStar's Estoppel Certificates and Collateral Assignment Positions Are Meritless**

iStar argues that it somehow was entitled to "estoppel certificates" in connection with certain contracts which iStar declines to identify. MSJ Br. p. 23 relying on §3.2(B). Both the Loan Agreement and the Closing Checklist make it clear that they are not applicable here. Pl. 56.1 St. Resp. to ¶ 40. With regard to collateral assignments, the closing checklist, which iStar's counsel drafted, identified the drafting, preparation and submission of those documents as "Lender's responsibility." Pl. 56.1 St. Resp. to ¶ 36. iStar does not contend that it ever prepared any such form or that it requested same from Five Star (Pl. 56.1 St. AMF. ¶¶ 5-8) . As anticipated, iStar continues to invent purported new reasons not to fund, which have no merit.

E.    **Five Star Was Not in Default of Section 3.2(C) (Insurance) and Section 3.2(L) (Payment and Performance Bond)**

Contrary to iStar's contention, Five Star did comply with its bonding and insurance obligations. Pl. 56.1 St. Resp. to ¶¶ 42-44, 54, 55, 63, 67. The policies were ultimately not obtained because the Project was stopped before construction started. Shepherd Decl. ¶ 43.

Perhaps more importantly, whether the failure to provide builder's risk insurance or a bond, even were they applicable, is a Default (for which iStar was obligated to provide notice to Five Star and opportunity to cure) or an Event of Default (for which iStar was not obligated to provide notice and opportunity to cure), is a material issue of fact. Loan Ag. § 9.1(D).

F.    **Five   Star   Was   In   Compliance   With   Section   3.2   (N) (Development Schedule)**

iStar's claims with respect to §3.2(N) are baseless:

- the Initial Development Schedule was not attached to the final loan document. Pl. 56.1 St. Resp. to ¶¶ 11, 16, 17.[23]

---

[23] iStar cannot genuinely contend to the Court that a purported initial Development Schedule exhibit was the "official" schedule for the Project, but then ignore other purported exhibits to the Loan

- by late December, 2008, the initial Development Schedule was no longer applicable; Pl. 56.1 St. Resp. to ¶ 57.
- iStar acknowledged and agreed that Five Star's schedule was being adjusted ever since the April, 2008 Town meeting. Pl. 56.1 St. Resp. to ¶ 57.

Five Star's actions were fully consistent with §3.6(E)'s "commercial reasonableness" requirements. Pl. 56.1 St. Resp. to ¶ 66. Before approving Draw 19 on December 12, 2008, Stephan inquired as to certain aspects of the scheduling, which Five Star responded to and which responses led to Stephan's approval of Draw 19. Pl. 56.1 St. Resp. to ¶ 28. Assuming iStar's inquiry was in good faith, and proceeding under the assumption that iStar agreed that the schedule was subject to revision going forward (as it was in the past), Five Star forwarded a development schedule on December 30, 2008 to iStar. Pl. 56.1 St. Resp. to ¶ 58; Lesser Decl. Ex. 12 (Shepherd Dep. 117:1-25-118:1-25). At the January 6, 2009 meeting with iStar, Five Star submitted another schedule to iStar. Pl. 56.1 St. Resp. to ¶ 32; Lesser Decl. Ex. 12 (Shepherd Dep. 117:1-25-118:1-25). iStar did not object to either schedule until two months later, on March 3, 2009. Pl. 56.1 St. Resp. to ¶ 59; Shepherd Decl. ¶ 49. Five Star amply demonstrated at the January 6 meeting that it could complete Construction by the Initial Maturity Date. Pl. 56.1 St. Resp. to ¶ 58; Nordick Decl. ¶¶ 1-11.

### G. Fact Issues Regarding Compliance

iStar's motion must be denied for another reason – many of the purportedly unsatisfied conditions require complicated determinations of fact that cannot be resolved on the present record. For example, iStar claims that Five Star failed to supply "reasonably satisfactory" evidence that a final subdivision map has been approved by all government authorities and that the project could be completed in accordance with applicable legal requirements. Whether Five

---

Agreement. By selectively relying on certain purported exhibits to the Loan Agreement, and then ignoring others, iStar further demonstrates that questions of fact exist as to what the parties considered to be the complete copy of the Loan Agreement, and which exhibits control.

Star had provided "reasonably satisfactory" evidence on the relevant dates is a question of disputed fact. Likewise, iStar admits that on January 8, 2009, Five Star submitted plans that contained "requisite final governmental approvals" pursuant to Section 3.2(K) and on December 30, 2008 and January 6, 2009, Five Star submitted development schedules pursuant to §3.2(N). Even assuming that iStar prevails in its argument that the conditions precedent set out in §3.2 had to be satisfied prior to funding Draw 19, whether Five Star's submissions satisfied these conditions as of the date of iStar's breach, is a question of fact that must be resolved at trial. RUS, Inc. v. Bay Indus., Inc., 322 F. Supp. 2d 302, 310 (S.D.N.Y. 2003) ("whether ... report was 'reasonably satisfactory' will require the resolution of disputed issues of fact ... [as to] severity of the problems ... in light of the transaction as a whole.").

## V. iStar CANNOT BENEFIT FROM ITS OWN MISCONDUCT TO ARGUE THAT FIVE STAR FAILED TO EXTEND THE MATURITY DATE OR COMPLY WITH SECTION 3

In the event that the Court agrees that (i) iStar could declare Defaults under §3.2 although it did not comply with the notice to cure provision (§9.1(D)); (ii) Five Star was obligated to comply with all of the conditions in §3.2 prior to commencing Construction; (iii) Five Star failed to satisfy conditions precedent in §3.2, and (iv) there are no material issues of fact with respect to the foregoing, iStar's motion is still defeated by material questions of fact surrounding whether iStar's actions excused Five Star's performance.

### A. It Was Futile for Five Star to Serve an Extension Notice in April 2009 in the Face of iStar's Unilateral and Unlawful Termination of Funding in Late December 2008

Incredibly, iStar argues that an immediate Event of Default took place in April 2009 -- four months after it terminated funding -- because Five Star failed to perform all requirements relating to extending the Initial Maturity Date, including paying substantial fees to iStar. Assuming that iStar is correct, it is hard to understand how this Event of Default would have

justified withholding funding in December 2008, nor does iStar explain this glaring vacuum of time between iStar's termination of funding and the failure to satisfy the Extension Conditions in its motion.  Also important, however, is that in April 2009, the parties were in litigation.  Shortly thereafter, in May 2009, this Court granted Five Star's application for a preliminary injunction. Five Star attempting to extend the Initial Maturity Date at any point in time after iStar terminated funding, unquestionably would have been an act of utter futility.

Under well-settled New York law, Five Star was relieved of its obligation to pursue the remaining conditions precedent under the Loan Agreement and complete Construction once iStar made clear it would not live up to its contractual duty to continue funding development.  "A party will be relieved or discharged from the performance of futile acts or conditions precedent, including the tender of payment, upon the failure or refusal of a party to honor its obligations under their contract."  Special Situations Fund III, L.P. v. Versus Tech. Inc., 227 A.D.2d 321, 321, 642 N.Y.S.2d 894, 895 (1st Dep't 1996).  See also CIBC Bank & Trust Co. v. Banco Central do Brasil, 886 F. Supp. 1105, 1113 (S.D.N.Y. 1995) ("When a defendant's behavior demonstrates that satisfaction of a condition precedent would be futile, the plaintiff is relieved from satisfying that condition.  Futility is inherently a factual inquiry. . . .") (internal citations omitted).

Once iStar made clear its intent to terminate funding the Loan, development was frozen, making it futile for Five Star to seek further approvals from the Town of Paradise Valley or the City of Scottsdale or do so on an accelerated basis.  In addition, many of these approvals required cash that Five Star simply did not have without iStar's funding.  Lomas & Nettleton Co. v. Cent. Fed. Sav. & Loan Ass'n of Nassau Cty., No. 80 Civ. 975, 1981 U.S. Dist. LEXIS 13429 at *16-17 (S.D.N.Y. July 9, 1981) (holding that bank's repudiation of Standby Commitment

excused plaintiff from performing condition precedent. "Once it becomes clear that one party will not live up to the contract, the aggrieved party is relieved from the performance of futile acts, such as conditions precedent."); Sunshine, Steak, Salad & Seafood, Inc. v. W.I.M. Realty, Inc., 135 A.D.2d 891, 892-93, 522 N.Y.S.2d 292, 293 (3d Dep't 1987) ("defendant frustrated plaintiff from obtaining a liquor license and it would have been futile for plaintiff to perform the remaining conditions precedent"); Wolff & Munier, Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1009 (2d Cir. 1991). Accordingly, any effort by Five Star to continue to perform under the terms of the Loan Agreement were futile and its compliance with extending the Initial Maturity Date (paying millions of dollars to iStar) or the conditions precedent in the Loan Agreement were excused.

### B.    iStar's   Frustration   of   Performance   is   a   Factual   Question Which Warrants Denial of its Motion for Summary Judgment

iStar's refusal to honor its funding obligations was based on its pretextual assertions of failures of conditions precedent under Loan Agreement, which position frustrated Five Star's ability to timely complete Construction.

New York courts have consistently held that a party cannot hinder the satisfaction of a condition precedent and then rely on the failure of that condition to justify its refusal to perform its contractual obligations. For example, in Ixe Banco, S.A. v. MBNA America Bank, N.A., No. 07 Civ. 0432, 2009 U.S. Dist. LEXIS 89979 at *22 (S.D.N.Y. Sept. 29, 2009), the court denied both parties' motions for summary judgment where the defendant may have "materially hindered [the plaintiff's] ability to obtain the requisite Government Approvals in a timely manner." As the court noted, "'[w]here a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.'" Id. at *21 (quoting Restatement (Second) Contracts § 245 and citing Merrill Lynch Realty/Carll Burr, Inc.

v. Skinner, 63 N.Y.2d 590, 597, 483 N.Y.S.2d 979, 983 (1984).  Accord Merzon v. Lefkowitz, 289 A.D.2d 142, 143, 735 N.Y.S.2d 106, 107 (1st Dep't 2001) (reversing trial court's grant of summary judgment; defendant "cannot rely on the non-occurrence of a condition precedent if . . . he was instrumental in preventing or frustrating its occurrence"); Canterbury Realty & Equip. Corp. v. Poughkeepsie Sav. Bank, 135 A.D.2d 102, 107, 524 N.Y.S.2d 531, 534-35 (3d Dep't 1988) (issue of fact presented as to whether Bank caused the condition precedent on which it relied to accelerate loan, which would discharge obligation of guarantor)

Here, iStar's own conduct in terminating funding frustrated Five Star's performance of its obligations under the Loan Agreement, leading to Five Star's inability to extend the Initial Maturity Date pursuant to §2.4(B) of the Loan Agreement.  iStar's frustration of performance precludes its reliance on the failure of conditions precedent to bar Five Star's contract claims.

## C.    iStar    Should    Be    Estopped    From    Asserting That Five Star Breached The Loan Agreement

Equitable estoppel is an affirmative defense that prevents another party from denying a material fact.  Garrett v. Music Publ'g Co. of Am., LLC, No. 09 Civ. 5627, 2010 U.S. Dist. LEXIS 86460, at *15 (S.D.N.Y. Aug. 17, 2010).  This defense normally involves a close examination of equities and questions of fact inappropriate for resolution on summary judgment. See Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 725 (2d Cir. 2001) ("Whether equitable estoppel applies in a given case is ultimately a question of fact."); see also Halifax Fund, L.P. v. MRV Communications, Inc., No. 00 Civ. 4878, 2001 U.S. Dist. LEXIS 20933, at *11 (S.D.N.Y. Dec. 18, 2001) (Equitable estoppel on a close examination of the facts and the equities.).

The doctrine of equitable estoppel is a judicial doctrine of equity that "is properly invoked where the enforcement of the rights of one party would work an injustice upon the other

party due to the latter's justifiable reliance upon the former's words or conduct." <u>Kosakow</u>, 274 F.3d at 724-25. Thus, even if this court does not find that there is a legally binding modification to an agreement, equitable estoppel (or even an unwithdrawn waiver) can safeguard against enforcement of the original agreement. <u>Nassau Trust Co. v. Montrose Concrete Products Corp.</u>, 56 N.Y.2d 175, 184-185, 451 N.Y.S.2d 663, 668 (1982) (Defendant's estoppel defense, where defendant reasonably relied on plaintiff's representations that no default would be declared on a loan, and where defendant detrimentally relied, yielded sufficient factual questions to defeat plaintiff's motion for summary judgment.).

To prevail on a theory of equitable estoppel, a party must show that an adverse party (1) engaged in conduct which amounts to a false representations or concealment of material facts; (2) intended that such conduct would be acted upon; and (3) knew the real facts. <u>Garrett</u>, 2010 U.S. Dist. LEXIS 86460, at *15. A party must also show that it (1) lacked knowledge of the true facts; (2) relied upon the adverse party's conduct; and (3) prejudicially changed its position. <u>Id.</u> at *15. Courts consider the course of conduct established by the parties over a period of time when assessing the factors delineated above: specifically, courts look at whether the party to be estopped induced the other party's reasonable belief, and reliance thereon, that an established course of conduct would be adhered to. <u>See, e.g.</u>, <u>335 Second Street Housing Corp. v. Fridal Enters., Inc.</u>, 36 A.D.3d 608, 609, 830 N.Y.S.2d 173, 173-74 (2d Dep't 2007) (summary judgment upheld on the basis of equitable estoppel because defendant induced plaintiff's reasonable belief that the higher interest rate would not be imposed through parties' course conduct). Courts focus on the conduct of a party to determine whether equitable estoppel has been demonstrated, and not on the party's intent (as with waiver). <u>See, e.g.</u>, <u>Current Med.</u>

Directions, LLC v. Salomone, 902010 NY Slip Op 50315U, at *8-9 (N.Y. Sup. Ct. 2010).[24]

Here, Five Star justifiably relied on:

- iStar's partial funding of Draw 19;

- iStar's statement that Five Star was not in breach on January 16, 2009;

- the course of conduct established over the course of 18 months and iStar's funding of 18 previous draw requests.

At a minimum, whether iStar is estopped from asserting Five Star's breach of its obligations under the Loan Agreement and insisting, for the first time, on a new hyper-technical and unsupported interpretation of the Loan Agreement depends on material disputed issues of fact.

### D.    iStar Cannot Change Its Basis For Declaring A Default

iStar's alleged bases for declaring Five Star in default has evolved from its first letter in mid-January 2009 until the present motion, with its list of alleged defaults by Five Star continuously expanding.  Nor is iStar in a position to assert now that certain alleged failures under the Loan Agreement constitute immediate Events of Default for which Five Star was entitled to no opportunity to cure.  These bases were not raised prior to iStar's July 23, 2010 Answer and are the subject of Five Star's pending motion to dismiss.

#### 1.    Requirements of Builder's Risk Insurance and Payment and Performance Bond

In iStar's letters dated January 9, 2009, February 2, 2009 and March 3, 2009, Lesser Decl. Exs. 29, 31 & 32 (Cowart exs. VV, ZZ and AAA-1, respectively), iStar consistently viewed the requirements of obtaining builder's risk insurance and a payment and performance bond for Hard

---

[24] iStar's citation to Town of Hempstead v. Inc. Village of Freeport is inapposite.  (See Defendant's Brief, at 37).  There, the court concluded that defendant could not have justifiably relied on plaintiff's forbearance in enforcing certain minimum fee payments (the "Minimum Commitment"), in part, because the language of that agreement specifically precluded relying on plaintiff's forbearance as a defense to enforcing the Minimum Commitment.  iStar has not pointed to any language in the Loan Agreement which is similarly specific.

Costs as requirements under §§ 3.2(C) and (L) and which, once satisfied, would permit funding under §3.2. At no time prior to iStar's July 23, 2010 Answer did iStar allege that these failures (assuming they were required and were not obtained) constituted immediate Events of Default under §§3.6(C); 5.4; 9.1(B) or (W). Moreover, §5.4 requires Five Star to obtain builder's risk insurance <u>during</u> Construction (<u>see</u> §5.4(A)) and not prior to the commencement of Construction as iStar now argues.

### 2.      **Indian Bend ROW**

At no time prior to its Answer did iStar allege that the purchase by Five Star and transfer of the Indian Bend ROW to an affiliate constituted a breach of §7.11 and thus an immediate Event of Default under §9.1(B). Of course that alleged Event of Default could not have occurred prior to March 2009 when iStar received a copy of the deed to that property that reflected the transfer to Five Star's affiliate. This purported Event of Default occurred well after iStar had breached by terminating funding and was never raised by iStar as an issue until July 2010.

Under New York law, "[i]t is well settled that where a party to a contract terminates the contract and presents a specific reason for the termination, that party is estopped from raising a different reason upon the commencement of an action." <u>Leventhal v. New Valley Corp.</u>, No. 91 Civ. 4238, 1992 U.S. Dist. LEXIS 456, at *12 (S.D.N.Y. Jan. 17, 1992). This doctrine has long been part of New York contract law, as the Court of Appeals indicated in <u>Littlejohn v. Shaw</u>, 159 N.Y. 188, 191, 53 N.E. 810, 811 (1899):

> The principle is plain, and needs no argument in support of it, that if a particular objection is taken to the performance and the party is silent as to all others, they are deemed to be waived. This waiver of all other objections is not only justly inferable, generally; but is especially so, when, as under the circumstances present in this case, the deliberateness with which the objections are stated leaves it to be implied that there has been a consideration of the matter of the acceptance of the goods and a result reached upon particular grounds.

Accord <u>Rode & Brand v. Kamm Games, Inc.</u>, 181 F.2d 584, 587 (2d Cir. 1950) (rejecting defendants' newly raised defense where "it was not until this action was instituted, in the fall of 1948, that defendants first raised the objection which they now [assert] would have be[en] fatal to the plaintiff's claim"); <u>Vernon Lumber Corp. v. Harcen Constr. Co.</u>, 155 F.2d 348, 351 (2d Cir. 1946) ("having declined to perform on entirely different grounds, [plaintiff] cannot now employ delay in [defendant's] payment as a defense").

"Once a party declares a default on one ground under New York law, it may not subsequently defend the declaration of default on a different ground." <u>Destiny USA Holdings, LLC v. Citigroup Global Markets Realty Corp.</u>, 2009 NY Slip Op. 51550U, 2009 N.Y. Misc. LEXIS 1908, at *43 (N.Y. Sup. Ct. Onondaga Co. July 17, 2009), *aff'd in part, modified in part*, 69 A.D.3d 212, 889 N.Y.S.2d 793 (4th Dep't Nov. 13, 2009).[25]

The doctrine is particularly applicable in this case, where iStar's early 2009 letters were prepared by counsel and carefully itemized the provisions of the Loan Agreement that Five Star allegedly had breached (when the iStar loan officers were instructed to "get creative"). As in <u>Littlejohn</u>, the deliberateness with which iStar's letters were drafted demonstrates that iStar and its counsel carefully considered the status of the project and the applicable provisions of the Loan Agreement. <u>See also Rode & Brand</u>, 181 F.2d at 587 (defendants "had ample opportunity to examine the [goods] and determine whether or not they complied with the contract"). Had

---

[25] Contrary to iStar's assertion in prior briefing, this doctrine remains viable under New York law and is not to be conflated with the more general doctrine of "mend the hold." As Judge Posner explained in his careful explication of the mend the hold doctrine in <u>Harbor Ins. Co. v. Continental Bank Corp.</u>, 922 F.2d 357, 364 (7th Cir. 1990), "mend the hold" is sometimes used "without reference to contract law at all," and in such instances the reach of the doctrine is "uncertain." However, the doctrine is more properly applied in contract cases, such as here. "A party who hokes up a phony defense to the performance of his contractual duties and then when that defense fails (at some expense to the other party) tries on another defense for size can properly be said to be acting in bad faith." <u>Id.</u> at 363.

iStar timely raised the objections included in its counterclaim, such as by including those objections in its early 2009 letters, Five Star could have taken corrective action, to the extent those letters raised bona fide issues.

### E.     iStar's Actions Constitute Waiver

By failing to insist on Five Star's compliance at any point in time prior to late December 2008, with conditions precedent iStar now claims that Five Star breached, iStar waived its right to insist on compliance with these provisions.  The no waiver clauses on which iStar relies, §§11.4 and 11.7, are no bar to Five Star's waiver argument.

The law in New York is well-settled that even where a contract provides that there shall be no waiver or amendment not evidenced by a writing, the prohibition of oral waiver may itself be waived.  See, e.g., Christian Dior-New York, Inc. v. Koret, Inc., 792 F.2d 34, 39 (2d Cir. 1986) (internal quotations and citations omitted); see also Wyeth v. King Pharmaceuticals, Inc., 396 F. Supp. 2d 280, 290 (E.D.N.Y. 2005) (New York law provides "that the existence of a non-waiver clause in a contract does not by itself preclude the waiver of a provision of, or right under, the contract.") (internal quotations and citations omitted); Madison Ave. Leasehold, LLC v. Madison Bently Assoc. LLC, 30 A.D.3d 1, 6, 811 N.Y.S.2d 47, 51 (1st Dep't 2006) ("Any provision of a contract is subject to waiver . . . The inclusion of a merger clause in an instrument is no bar to waiver because a contractual provision against oral waiver may itself be waived.") (internal quotations and citations omitted).  A party may waive its contractual rights through subsequent course of conduct.  See Randolph Equities, LLC v. Carbon Capital, Inc., 648 F. Supp. 2d 507, 517 (S.D.N.Y. 2009); Travellers Int'l AG v. TransWorld Airlines, Inc., 722 F. Supp. 1087, 1089 (S.D.N.Y. 1989); see also Lamberti v. Angiolillo, 73 A.D.3d 463, 464, 905 N.Y.S.2d 560, 561 (1st Dep't 2010) Madison Ave. Leasehold, LLC., 30 A.D.3d at 5, 811 N.Y.S.2d at 51-52.

#2634026 v14 \020396 \0004

iStar's claim that a more verbose no-waiver provision must be enforced according to its terms, and as such, cannot be waived by an established course of conduct, is certainly not a well-settled proposition under New York law. In fact, Financial Technologies Int'l, Inc. v. Smith, which iStar relies on, in part, for this proposition, cites to DeCapua v. Dine-A-Mate, Inc. in support of this claim, which found only that an unambiguous no-waiver provision, *coupled with reasonable notice that strict compliance with the contract at issue would subsequently be demanded*, precluded a finding of a waiver of the right to insist on strict compliance with the terms of a contract. See DeCapua v. Dine-A-Mate, Inc., 292 A.D.2d 489, 491-92, 744 N.Y.S.2d 417, 420 (2d Dep't 2002).

Whether a party had the intent to waive a contract right is invariably a question of fact. *See* Christian Dior-New York, 792 F.2d at 39-40 (finding that a defendant, claiming that plaintiff waived its right to terminate a licensing contract, notwithstanding the contract's no-oral-waiver-or-modification provision, "must also be given an opportunity to prove its waiver defense at trial."); Champion Spark Plug Co. v. Auto Sundries Co., 273 F. 74, 79-80 (2d Cir. 1921) (finding that the issue of waiver depended on the intention of the parties and that "where such intent is disputed, it necessarily becomes a question for the determination of a jury."); Vernon Lumber, 155 F.2d 348 (2d Cir. 1946) (same).[26]

---

[26] iStar's reliance on Modern Commc'n Servs., Inc. v. NEP Image Group, LLC, 2008 NY Slip Op 50995U, 866 N.Y.S.2d 93 (N.Y. Sup. Ct. 2008) is unfounded. There, the court held that plaintiff's continued acceptance of rent from defendants after property alterations occurred did not constitute a waiver because the nonwaiver clause specifically excepted the conduct, which might otherwise have given rise to an inference of waiver. iStar also cites to another state court commercial lease case addressing acceptance of rent as a form of waiver, Renali Realty Group 3, LLC v. Robbins MBW Corp., 259 A.D.2d 682, 683, 686 N.Y.S.2d 855, 856 (2d Dep't 1999), in which the court only generally found, without any explanation, that acceptance of rent did not waive the right to enforce a lease since the lease contained a no-waiver clause. Neither of these cases are relevant here.

## VI.  WHETHER FIVE STAR COULD HAVE COMPLETED CONSTRUCTION BY THE INITIAL MATURITY DATE RAISES ISSUES OF FACT

To the extent iStar contends that Five Star could not perform, irrespective of iStar's own bad faith and interference, determination of this causation inquiry is a question of fact which is inappropriate for summary judgment. See Ixe Banco, S.A. v. MBNA America Bank, N.A., No. 07 Civ. 0432, 2009 U.S. Dist. LEXIS 89979 at *30 (S.D.N.Y. Sept. 29, 2009) ("That the other conditions were not satisfied by March 31, 2006 is not proof that they would not have been, had the requisite Government Approvals been obtained by this time.")

It is impossible to resolve the fact issues as to whether Five Star could have completed Construction by the Initial Maturity Date or otherwise met the obligations iStar alleges it failed to meet, on this record. See Shepherd and Nordick Decls., generally. There are myriad issues of fact relating to, among other things, the parties' intentions in negotiating the ambiguous Loan Agreement, when any conditions under §3.2 had to be satisfied by Five Star, and the consequences of iStar's bad faith decision to terminate funding.

## VII.  ISSUES OF FACT PRECLUDE SUMMARY JUDGMENT ON ISTAR'S FIRST COUNTERCLAIM SEEKING DECLARATORY RELIEF

In its motion to dismiss iStar's counterclaims (D.E. 85), Five Star argued that iStar's counterclaim seeks a declaratory judgment that is a 'mirror image' of Five Star's claims, serves no purpose and should be dismissed, citing Arista Records LLC v. Usenet.com, Inc., No. 07 Civ. 8822, 2008 U.S. Dist. LEXIS 95514, at *10 (S.D.N.Y. Nov. 24, 2008) (citing Interscope Records v. Kimmel, No. 3:07-cv-0108, 2007 U.S. Dist. LEXIS 43966 at *5 (N.D.N.Y. June 18, 2007)). iStar has variously argued that its claim is a mirror image of Five Star's declaratory judgment claim and then that it is not. (D.E. 99). In either case, the claim should be dismissed. If it is a mirror image, case law says it should be dismissed. If its claim is a new one and not a mirror image, the parties have conducted no discovery on the issues raised by the counterclaim because

#2634026 v14 \020396 \0004

it was interposed after discovery closed.  In either case, this counterclaim is the subject of a motion to dismiss and cannot be sustained for the reasons set forth in that motion and as set forth elsewhere in this brief.

## CONCLUSION

For the foregoing reasons, Five Star respectfully requests that the Court deny iStar's motion in its entirety and that any decision on this Motion be held in abeyance until Five Star has either moved or waived its opportunity to move for summary judgment in accordance with the Court's Order dated October 20, 2010 (D.E. 84) and for such other and further relief as this Court deems just and proper.

Dated: New York, New York
      January 31, 2011

**MORRISON COHEN LLP**

By: _____
     Mary E. Flynn
     Danielle C. Lesser
     Rudolph F. Lehrer
     909 Third Avenue
     New York, New York  10022
     (212) 735-8600

*Attorneys for Plaintiff-Counterclaim Defendant*
*Five Star Development Resort Communities, LLC*

#2634026 v14 \020396 \0004

40