UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
FIVE STAR DEVELOPMENT RESORT  :
COMMUNITIES, LLC,  :
  :
                       Plaintiff,  :
  :    No. 09 CV 2085 (LTS)
   -against-  :
  :    ECF Case
iSTAR RC PARADISE VALLEY LLC,  :
  :
                       Defendant.  :
----------------------------------------------------------------x

# DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
# ITS MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF PLAINTIFF'S
# ALLEGED CONSEQUENTIAL, INDIRECT, AND SPECIAL DAMAGES

**KATTEN MUCHIN ROSENMAN LLP**
575 Madison Avenue
New York, New York 10022
(212) 940-8800

*Attorneys for Defendant iStar RC Paradise Valley LLC*

# TABLE OF CONTENTS

Page

Preliminary Statement ............................................................................................................. 1

Statement .................................................................................................................................. 3

ARGUMENT .............................................................................................................................. 5

    POINT I  EVIDENCE RELATING TO PLAINTIFF'S CLAIMS FOR CONSEQUENTIAL AND OTHER INDIRECT DAMAGES SHOULD BE EXCLUDED BY THE CLEAR AND UNAMBIGUOUS TERMS OF THE LOAN AGREEMENT ........................................................................................ 5

    POINT II  PLAINTIFF CANNOT RECOVER SPECULATIVE DAMAGES THAT WERE NOT CONTEMPLATED WHEN THE LOAN AGREEMENT WAS EXECUTED ............................................................................................................. 9

CONCLUSION ........................................................................................................................ 14

Defendant iStar RC Paradise Valley LLC ("iStar" or "Lender") submits this memorandum of law in support of its Motion *in Limine* seeking to exclude expert and other evidence of Plaintiff's alleged consequential, indirect or special damages. Those damages, which are alleged to consist of lost profits accruing to the future development of the Project, are proscribed by the clear and unambiguous terms of Section 11.2 of the subject loan agreement, and are also barred by applicable law proscribing recovery of speculative damages.

## **Preliminary Statement**

On May 18, 2007, Five Star Development Resort Communities LLC ("Five Star" or "Borrower") entered into a Development Loan and Security Agreement with iStar (the "Loan Agreement"), pursuant to which iStar agreed to loan up to $112,025,000 (the "Loan") to fund: (i) the acquisition of a 120-acre parcel in Paradise Valley and Scottsdale, Arizona; (ii) the process to change the entitlements on the Paradise Valley parcel; and (iii) the construction of "horizontal improvements" on that parcel. (*See* Chmil Aff.[1] Ex. A, Loan Agreement.) The entitlements would permit Five Star to construct a Ritz Carlton hotel and a surrounding residential development. Five Star had never before developed such a resort/residential project. (*See id.* Ex. D, Excerpts of the Deposition of Jerry Ayoub at 44:1-11.) The success of that project would depend on a host of factors, including obtaining from governmental entities the sought-after entitlements, obtaining financing for the construction of the hotel, and marketing and selling residential lots to builders and homeowners. At the origination of the Loan: the scope of the entitlements that the municipalities would consent to provide was still unknown (*see* Am. Compl.[2] ¶¶ 21, 27, 37-38, 40-44, 46, 48-49, 54); plans for the horizontal and subsequent

---

[1] "Chmil. Aff." refers to the affidavit of Bonnie L. Chmil, dated May 17, 2012, submitted herewith.
[2] "Am. Compl." refers to the Amended Complaint herein, dated May 14, 2009. (Docket Entry No. 18.)

vertical improvements were not prepared or approved (*see id.* ¶ 13; Chmil Aff. Ex. B, David Schmid email); the necessary contractors had not been retained (*see id.*); and sales contracts with lot buyers and builders had not been signed. (*See id.* Ex. C, Excerpts of Deposition of Bernard Lanny Cowart at 78:3-80:4.) As the Court already knows, Five Star was unable to meet its own schedule for the project: the "Special Use Permit," a key entitlement from the Town of Paradise Valley, was issued and approved more than a year later than Five Star had planned. (Am. Compl. ¶¶ 37, 40-44, 46-49.) As a result of the delay, Five Star would have commenced horizontal construction into the teeth of one of the worst economic recessions this nation has ever seen, a recession that severely affected the Arizona real estate market.

Five Star has retained two experts to construct a grandiose account of how Five Star, despite these uncertainties and hurricane-force economic headwinds, was going to earn hundreds of millions in profits from this project. That evidence includes without limitation: (a) the testimony and reports of Saul Solomon and Gadi Kaufmann, who are being proffered as Five Star's expert witnesses to substantiate its lost profits claim; and (b) Plaintiff's Exhibits 305-307 on which those experts purport to rely. iStar has rebuttal experts that will convincingly puncture Five Star's account. But the Court need not embark on a consideration of any of this evidence, because Five Star's evidence of lost profits is barred as a matter of law.

The reasons for preclusion are straightforward. First, evidence of Plaintiff's lost profits is barred by the clear and unambiguous terms of the Loan Agreement. Section 11.2 of that agreement contains the following provision, written in all capital letters: "LENDER SHALL HAVE NO LIABILITY HEREUNDER FOR ANY CONSEQUENTIAL, SPECIAL, PUNITIVE OR INDIRECT DAMAGES." (*See* Chmil. Aff. Ex. A.) New York law strongly supports the enforceability of this bargained-for provision, and this Court should issue an order precluding

Plaintiff from introducing any evidence of its alleged lost profits – *i.e.*, its alleged "consequential," "special" or "indirect" damages. (No claim for punitive damages is made in connection with the breach of contract claim, nor would they be awardable.) Second, even in the absence of Section 11.2, the Court should preclude Five Star's purported evidence of lost profits because they are entirely speculative and not awardable under New York law. Five Star had no track record in resort/residential development (*see id.* Ex. D, Excerpts of Deposition of Jerry Ayoub at 44:1-11), and the multiple, complex factors bearing on the success of any such development preclude Five Star, as a matter of law, from contending that the failure to fund Draw 19 was the only thing between it and its purported bonanza.

### Statement

This case arises out of the Loan to fund under certain conditions, among other things, certain of Five Star's loan acquisition costs, "hard costs" and "soft costs" necessary to construct the "Initial Project" as defined in the Loan Agreement. (*See id.* Ex. A at § 2.1.) That "Initial Project" consisted of infrastructure improvements for the hotel and residential components on the Paradise Valley portion of the land, sometimes referred to as "horizontal improvements," generally consisting of sewers, a stormwater drainage channel, water and other utilities, and streets. (*See id.* at p. 11.) The Loan Agreement did not provide for the financing of "vertical improvements," such as the hotel or the residential homes themselves, or for horizontal or vertical improvements to be built as part of the retail and condominium portion of the project located in Scottsdale. That financing would have had to be obtained by Five Star – an impossible task given the economic environment surrounding the construction of luxury real estate projects in Arizona in 2008/2009. (*See id.* Ex C, Excerpts of Deposition of Bernard Lanny Cowart at 243:18-244:15; *id.* Ex. D, Excerpts of Deposition of Jerry Ayoub at 137:2-137:5.)

The Loan was a two-year loan and matured in full by its own terms on May 18, 2009. Under Section 2.4(A) of the Loan Agreement, Five Star agreed that "[a]ll payments shall be made without deduction, defense, set-off or counterclaim . . . ." Five Star did not repay any part of the Loan at Maturity and has paid no part of the Loan at any time subsequent. (Am. Counterclaims[3] ¶¶ 30-36.) It failed to complete construction by the Loan's Maturity Date as required (see Chmil Aff. Ex. E, Declaration of David Sotolov at ¶¶ 4, 13), and, as iStar later learned, transferred certain valuable easement rights in violation of the Loan Agreement. (Am. Counterclaims ¶¶ 45-65.) Five Star has attempted to excuse these various breaches by claiming that iStar is itself in breach by failing to fully fund what is referred to as Draw Request 19 and two smaller subsequent draws totaling approximately $1.75 million. iStar had previously advanced over $71 million – which together with interest and other charges remains unpaid.

This Court, on July 6, 2010, dismissed Five Star's claims of negligent misrepresentation, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, and tortious interference with prospective economic relations and denied leave to replead those claims. (See Docket Entry No. 64.) As a result, Five Star's remaining claim against iStar in the present action is one for breach of contract alleging a breach of the Loan Agreement and seeking damages in an amount to be determined at trial (Count VIII). As the Court recognized in its July 6, 2010 opinion, the other counts simply seek other remedies--declaratory relief (Count I), permanent injunction (Count II), specific performance (Count III) -- for the alleged breach of contract. (See id.)

Five Star's request for monetary damages in Count VIII appears to consist almost entirely of lost profits caused by its inability to proceed with both the hotel and residential project on the

---

[3] "Am. Counterclaims" refers to iStar's Amended Counterclaims herein, dated October 14, 2010. (Docket Entry. No. 82.)

4

Paradise Valley portion of the land and the retail and condominium project on the Scottsdale portion. Section 11.2 of the Loan Agreement, however, provides that "LENDER SHALL HAVE NO LIABILITY HEREUNDER FOR ANY CONSEQUENTIAL, SPECIAL, PUNITIVE OR INDIRECT DAMAGES." (*See* Chmil Aff. Ex. A.) Under the circumstances presented here, New York courts have uniformly enforced such exculpatory provisions, so Five Star's lost profits and other consequential damages should be barred as a matter of law.

Even absent these clear contract provisions, Plaintiff's claimed damages are entirely speculative and should be excluded for that reason as well. (*See* Point II *infra*). Five Star's evidence and its expert opinions are speculative because Five Star has never developed a project of this type or magnitude and further because the development of this project was an untried and complex venture dependent upon numerous conditions, events and contingencies that would have to be established or assumed to be established in order to assess Five iStar's supposed lost profits.

## ARGUMENT

### POINT I

EVIDENCE RELATING TO PLAINTIFF'S CLAIMS FOR CONSEQUENTIAL
AND OTHER INDIRECT DAMAGES SHOULD BE EXCLUDED BY
THE CLEAR AND UNAMBIGUOUS TERMS OF THE LOAN AGREEMENT

Plaintiff cannot recover lost profits or other consequential or indirect damages[4] at trial because Section 11.2 of the Loan Agreement precludes such relief. Contract provisions such as this one that expressly limit the liability of the parties involved are routinely enforced under New

---

[4] There is no doubt that lost profits are a form of consequential damages. *See Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*, 487 F.3d 89, 109 (2d Cir. 2007) (lost profits are consequential damages); *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 322 (S.D.N.Y. 2009) (same).

5

York law. *See Net2Globe Int'l, Inc. v. Time Warner Telecom of New York*, 273 F. Supp. 2d 436, 450, 456 (S.D.N.Y. 2003) (rejecting plaintiff's contention that liability provision in telecommunications contract was invalid under New York law); *DynCorp v. GTE Corp.*, 215 F. Supp. 2d 308, 317 (S.D.N.Y. 2002) ("Under New York law, sophisticated parties with equal bargaining power can agree to limit the liability that the other may recover from a breach of contract."); *World-Link, Inc. v. Citizens Telecomm. Co.*, No. 99 Civ. 3054(GEL), 2000 WL 1877065, at *5 (S.D.N.Y. Dec. 26, 2000) (holding liability-limitation provision enforceable on its face).

A limitation on liability provision in a contract represents the parties' agreement on the allocation of economic risk in the event the contract is not fully performed. *MyPlayCity, Inc. v. Conduit Ltd.*, No. 10 Civ. 1615(CM), 2011 WL 3273487, at *6 (S.D.N.Y. July 29, 2011) (citing *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436 (1994)). And, it has been recognized in this context that "it is not a Court's role to rewrite an unambiguous contract because it turned out poorly for one side." *Id*; *see also Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d 419, 433 (S.D.N.Y. 2004) (granting motion *in limine* to strike all evidence relating to claims of lost profits on the sole ground of limiting language of "the contract as the best source of evidence for the intentions of the parties."). The contracted allocation here -- proscribing the recovery of lost profits in the form of consequential damages -- makes particular sense in the context of this Loan Agreement. iStar was funding initial and limited acquisition and development costs -- in exchange for interest on the Loan and some fees -- for a project that was untried, un-tested and subject to a host of other further conditions and contingencies. Under those circumstances, it was obvious why a lender would not want to nor be obligated to assume the risk of liability for lost profits on the pipe dream of the project. Thus,

the pricing of the Loan was based upon a limitation of this exposure and neither the Loan's pricing nor the bargained for provision should be re-structured now.

Five Star may seek to challenge the application of this clear, unambiguous and enforceable provision by arguing over iStar's motivation for not funding Draw 19. But any such argument is unavailing. Numerous cases have established the principle that a breach of a commercial contract, even if willful, will not warrant disregarding a provision limiting liability. For example, Judge Koeltl stated that "'whether the breaching party deliberately rather than inadvertently failed to perform contractual obligations' does not affect provisions limiting the measure of damages for breach of contract unless stated in the contract." *Alleyne v. Four Seasons Hotel--New York*, No. 99 Civ. 3432, 2001 WL 135770, at *17 (S.D.N.Y. Feb. 15, 2001) (*citing Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 435, 618 N.Y.S.2d 882, 885 (1994)); *see also DynCorp v. GTE Corp., supra*, 215 F. Supp. 2d at 318.

Courts in this District have also consistently held that limitation provisions are enforceable as a matter of law even where the conduct of the purportedly breaching party was economically motivated. Recently, Judge McMahon granted partial summary judgment enforcing a limitation of liability provision when the breaching party purposely terminated a revenue sharing agreement and access to the internet related products generating the revenues that were supposed to be shared. *MyPlayCity*, 2011 WL 3273487, at *2. The plaintiff further accused the defendant of secretly altering revenue data in calculating the payments due under the agreement. *Id.* at *7. Nevertheless, the Court granted summary judgment and dismissed the plaintiff's consequential damages claim, stating, "New York Courts set the bar quite high in placing misconduct with the exceptions, demanding nothing short of . . . a compelling demonstration of egregious intentional misbehavior evincing extreme culpability: malice,

7

recklessness, deliberate or callous indifference to the rights of others, or an extreme pattern of wanton acts." *Id.* (alteration in original; internal quotation marks omitted).

Similarly, in *Net2Globe*, the plaintiff argued that the defendant voided a liability-limitation provision by intentionally reducing its quality of services to lower costs. 273 F. Supp. 2d at 451. The court rejected the plaintiff's argument, holding that "this economically motivated decision cannot, as a matter of law, rise to the level of malice or intentional wrongdoing necessary to invalidate the contract's limitation on liability provision." *Id.* The court also held that the defendant's "belief that [the plaintiff] had breached its contractual obligations" further supported enforcement of the limitation provision, as it demonstrated that defendant did not act out of "malice or intentional wrongdoing" but rather "to mitigate damages in accordance with fundamental principles of contract law." *Id.* at 456. *See also In re CCT Communications, Inc.*, 464 B.R. 97, 106-109 (S.D.N.Y. 2011); *Tradex Europe SPRL v. Conair Corp.*, No. Civ. 1760 (KMW)(FM), 2008 WL 1990464, at *5-6 (S.D.N.Y. May 7, 2008).

Nothing that Five Star could present in this case would satisfy the extremely high standard established by these cases. In fact, this Court's recent decision on summary judgment in this very action establishes, as a matter of law, that the standard cannot be met here. (*See* Docket Entry No. 137.) In denying summary judgment, the Court found that Section 3.2 of the Loan Agreement was ambiguous. Such a finding means, as a matter of law, that iStar's interpretation of Section 3.2 was a reasonable one. *See, e.g., In re Robbins Int'l, Inc.*, 275 B.R. 456, 464, n.6 (S.D.N.Y. 2002) (Swain, J.) ("contract is ambiguous if the contract is capable of more than one meaning when viewed objectively by a reasonably intelligent person. . . .") (citations omitted); *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (same). Thus, iStar's refusal to fund Draw 19 for lack of the materials required by Section 3.2

was based on a reasonable interpretation of that provision. If, in failing to fund Draw 19, iStar relied on a reasonable interpretation of its contractual rights, it can hardly be guilty of be "malicious" or "egregious intentional misbehavior." This conclusion is further buttressed by the Court's July 6, 2010 dismissal of Five Star's tort claim for breach of the implied covenant of good faith. Simply put, iStar's economic motivation for enforcing rights under a reasonable interpretation of a contract cannot justify ignoring the limitations of Section 11.2. Plainly, Plaintiff's lost profits claim is an impermissible "attempt[] to obtain through litigation what [it] failed to [and, indeed, could not] secure at the bargaining table." *Awards.com, LLC v. Kinko's, Inc.*, 42 A.D.3d 178, 185, 834 N.Y.S.2d 147, 153 (1st Dep't 2007).

Accordingly, any evidence of consequential, special or indirect damages that Five Star seeks to proffer must be excluded from trial by the express language of the Loan Agreement and applicable law.

POINT II

PLAINTIFF CANNOT RECOVER SPECULATIVE DAMAGES THAT WERE NOT CONTEMPLATED WHEN THE LOAN AGREEMENT WAS EXECUTED

Under New York law, in an action for breach of contract, a party is entitled to recover lost profits <u>only if</u> it can satisfy its burden of establishing that those "particular damages" were "<u>reasonably certain</u> and <u>directly traceable</u> to the breach, not remote or the result of other intervening causes". *Kenford Co. v. County of Erie*, 502 N.Y.S.2d 131, 132 (1986) ("*Kenford I*") (emphasis added.) *See also, Schonfeld, supra*, 218 F.3d at 172. Moreover, "evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate." *Id.* (citation omitted). *See also, Dupont Flooring Systems, Inc. v. Discovery Zone, Inc.*, No. 98 Civ. 5101 (SHS), 2004 WL 1574629, at *7 (S.D.N.Y. July 14, 2004) ("a stricter standard is applied to a 'new business' attempting to demonstrate lost profits").

9

Five Star's claimed losses are neither reasonably certain nor directly traceable to iStar's alleged breach. Thus, Five Star cannot meet its burden here.

First, Plaintiff's evidence and expert opinions offered to support its lost profits claim are highly speculative and based on numerous assumptions regarding the requirements of the project. "Projections of future profits based upon a multitude of assumptions that require speculation and conjecture and few known factors do not provide the requisite certainty." *Schonfeld*, 218 F.3d at 172 (internal quotation marks and citation omitted). Indeed, courts routinely reject claims that are based on such projections. *See, e.g., id.* at 173-74; *Dupont Flooring*, 2004 WL at *7-8; *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 333-34 (2d Cir. 1993) (lost profit claim could not have been proven as a matter of law because it was a "network of conjecture" despite the fact that proof of lost profits was notably "voluminous."); *Kidder, Peabody & Co. v. IAG Int'l Acceptance Group*, 28 F. Supp. 2d 126, 131-33 (S.D.N.Y. 1998).

Five Star has never developed a resort/residential project of this type and the project was an entirely new enterprise. Plaintiff, therefore, cannot show any established course of business or that its projections are borne out by historic record of actual performance. Accordingly, any estimation of its possible profits from this untried and unproven venture are mere conjecture. *See, e.g., Treasure Lake Assocs. v. Oppenheim*, 993 F. Supp. 217, 220 (S.D.N.Y. 1998) (fact that real estate developer's subject business this was a new venture made it "especially difficult to prove the amount of damages with the requisite certainty."); *St. Lawrence Factory Stores v. Ogdensburg Bridge and Port Auth.*, 810 N.Y.S.2d 532, 533 (3d Dep't 2006), *aff'd as modified*, 13 N.Y.3d 204 (2009); *Manniello v. Dea*, 461 N.Y.S.2d 582, 585 (3d Dep't 1983); *Dupont Flooring*, 2004 WL 1574629, at *8; *Kidder, Peabody & Co.*, 28 F. Supp. 2d at 144–46 (borrower

not entitled to lost profits because, as a new business, it lacked any established income stream or historical performance against which to compare its lack of income after the lawsuit and thus "cannot prove damages with reasonable certainty in the face of [ ] extensive assumptions."); *Kenford I*, 502 N.Y.S.2d at 133 (no reasonable certainty of lost profits projections relating to prospective stadium where projections were based on the assumptions that the project would be completed, and that the stadium would be available for use and successfully operated over time). *Cf. Slane & Slane Designs, LLC v. Narragansett Jewelry Co.*, No. 02 Civ. 4039 (LTS) (THK), 2004 WL 2187131 (S.D.N.Y. Sept. 30, 2004) (Swain, J.) (declining to dismiss a jewelry sales business' breach of contract claim against manufacturer, where, *inter alia*, the parties' 6 year relationship allowed for witness' personal knowledge of both actual and historical sales and purchase orders, and ability to testify as to the factual and theoretical basis of her company's alleged damages).

Second, in light of the multitude of intervening factors, Plaintiff's alleged loss of profits is not "directly traceable" to the harm it complains of. *See Dupont Flooring*, at *6 (party claiming damages could not prove that alleged breach caused financial failure where "a farrago of factors" contributed to that eventual failure); *Treasure Lake Assocs.*, 993 F. Supp. at 221 (insufficient evidence that real estate sales would have been consummated and of the amount of likely profits were it not for the complained of Notice of Pendency, where "[t]he contracts that [real estate developer] entered into with prospective purchasers contained, as most real estate contracts do, a variety of contingencies"); *Randolph Equities, LLC v. Carbon Capital, Inc.*, 648 F. Supp. 2d 507, 521 (S.D.N.Y. 2009) (real estate developer's potential profits from apartment complex development financing transaction were only tenuously related to the mezzanine loan at

issue because profits, if any, would have wholly come from the conversion and sale of condo units).

The success of Five Star's project depended on numerous contingencies and events, including among others, changes in entitlements, additional financing for vertical construction and selling residential lots. Accordingly, Plaintiff's expert opinions rest precariously on numerous assumptions that a host of intervening conditions, events and contingencies would occur. Thus, the projections of the amount of the claimed lost profits do not relate to the Loan Agreement itself, but rather different, hypothetical sale and leasing transactions down the road that do not involve iStar. It is precisely on account of the speculative nature of the returns involved in real estate development projects, such as Paradise Valley, that courts routinely deny requests for purported lost profits in this context. *See, e.g., Treasure Lake Assocs.*, 993 F. Supp. at 220-221 (granting summary judgment to dismiss claim for lost profits related to condominium development deal); *St. Lawrence Factory Stores*, 810 N.Y.S.2d at 533 (granting summary judgment to dismiss claim for lost profits related to shopping center project); *Manniello*, 461 N.Y.S.2d at 585 (denying award of lost profits related to subdivision project); *Randolph Equities, supra.*

Third, courts have also dismissed lost profits claims where the defendant lacked "near exclusive control" over the profitability of subject project. Here, iStar, who was merely a lender, had no such exclusive control. *See Schonfeld*, 218 F.3d at 175 (citing *Travellers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1578 (2d Cir.1994)); *Randolph Equities*, 648 F. Supp. 2d at 521.

In this respect, this Court's recent decision in *Randolph Equities* to exclude lost profits damages and evidence of such losses at trial is instructive. In that case, a potential borrower

under a planned multi-million dollar real estate financing loan for the development of a residential apartment complex brought breach of contract claims against its potential mezzanine financing lender. After considering the nature, circumstances, and purpose of the agreement to provide mezzanine financing, this Court found no indication that the parties contemplated liability for lost profits because:

> [the developer's] potential profits from the subject [real estate] transaction were only tenuously related to the mezzanine loan. The profits in this transaction, if any, would have wholly come from the conversion and sale of condo units. . . . Nothing suggests that [the lender] had . . . control over the profitability of the condominium conversion through its mezzanine loan. While it might be said that [the lender] may have "controlled" whether [the developer] was able to initially purchase the property, that does not mean that it controlled the eventual profitability of the project. *Id.*

As in *Randolph Equities*, here there can be no question that iStar, who agreed only to fund land acquisition, entitlements and certain infrastructure costs relating to the hotel and residential components of the Paradise Valley portion of the project, and who did not direct any other business operations, did not control the eventual profitability of the entire Paradise Valley project. Instead, like in *Randolph Equities*, the profits in the Paradise Valley project, if any, would have wholly come from the financing and construction of a luxury Ritz Carlton hotel and the sale of residential units and condominiums, and the leasing of retail space. *See also*, *Schonfeld*, 218 F.3d at 175 (affirming this Court's dismissal of lost profits claims based, in part, on finding that: "by orally promising to provide up to $20 million to fund [an] Interim Agreement [relating to cable programming license,] [defendants] cannot be supposed to have assumed liability for approximately $269 million in lost profits that might have been garnered in the future by a nonexistent operating entity [from operation of the cable channel]") (internal quotation marks omitted; citation omitted).

In short, Five Star cannot show that the particular lost profits that it purports to have suffered were anything but speculative, and should be excluded from trial for that reason as well.

## CONCLUSION

Defendant respectfully requests that this Court issue an Order: (a) precluding any evidence supporting Plaintiff's claim for consequential, special, indirect or punitive damages including but not limited to the testimony and reports of Saul Solomon and Gadi Kaufmann, who are being proffered as Five Star's witnesses to substantiate its lost profits claim, and documents identified as Exhibits 305-307 of Plaintiff's Rule 26(a); and (b) for such other and further relief as to this Court may seem just and proper.

Dated: New York, New York
      May 17, 2012

KATTEN MUCHIN ROSENMAN LLP

*[signature]*
Anthony L. Paccione
Timothy Patenode
575 Madison Avenue
New York, NY 10022
Telephone: (212) 940-8800
Facsimile: (212) 940-8776

*Attorneys for Defendant iStar RC Paradise Valley LLC*