Mary E. Flynn
Danielle C. Lesser
Brett Dockwell
MORRISON COHEN LLP
909 Third Avenue
New York, New York  10022
(212) 735-8600
*Attorneys for Plaintiff*
*Five Star Development Resort Communities, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

FIVE STAR DEVELOPMENT RESORT
COMMUNITIES, LLC,

                    Plaintiff,

      -against-

iSTAR RC PARADISE VALLEY LLC,

                    Defendant.

-----------------------------------------------------------------X

Case No. 09 Civ. 2085 (LTS)(AJP)

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF ALLEGED CONSEQUENTIAL, INDIRECT AND SPECIAL DAMAGES

# MorrisonCohen LLP

909 Third Avenue, New York, NY 10022–4731 • p:212.735.8600 • f:212.735.8708

#3918987 v14 \020396 \0004

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 2

ARGUMENT ....................................................................................................................... 9

I.     iSTAR'S FAILURE TO RAISE THE EXCULPATORY CLAUSE
       IN ITS TWO PRIOR DISPOSITIVE MOTIONS SHOULD
       PRECLUDE iSTAR FROM RAISING IT NOW ON THE
       EVE OF TRIAL ............................................................................................. 9

II.    iSTAR'S BAD FAITH MISCONDUCT VITIATES
       THE EXCULPATORY CLAUSE IN THE LOAN AGREEMENT ................... 10

       A.    New York Courts Will Not Enforce An Exculpatory
             Clause When The Breaching Party Acts Willfully ................................ 10

       B.    The Cases Cited By iStar Are Not Applicable Here ............................. 14

       C.    iStar's Reliance on This Court's Prior Decisions is Unavailing ............ 19

III.   FIVE STAR MAY RECOVER ITS GENERAL AND CONSEQUENTIAL
       DAMAGES CAUSED BY iSTAR'S BREACH, AND THEY ARE NOT
       SPECULATIVE ............................................................................................. 21

IV.    THE EXCULPATORY CLAUSE DOES NOT PRECLUDE A
       SET-OFF OF FIVE STAR'S CONSEQUENTIAL DAMAGES
       AGAINST AMOUNTS ALLEGED TO BE DUE UNDER
       THE LOAN AGREEMENT ............................................................................ 24

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alleyne v. Four Seasons Hotel – New York,*
No. 99 Civ. 3432, 2001 WL 135770 (S.D.N.Y. Feb. 15, 2001)
*aff'd*, 25 Fed. Appx. 74 (2d Cir. Jan. 23, 2002) ......................................11, 15, 16

*Ally Gargano/MCA Advertising, Ltd. v. Cooke Properties, Inc.,*
1989 U.S. Dist. LEXIS 12245, 1989-2 Trade Cas. (CCH) P68
(S.D.N.Y 1989) ......................................................................................... 11

*Bank of China v. Chan,*
937 F.d 780 (2d Cir. 1991) ......................................................................... 20

*Berk v. Tradewell, Inc.,*
No. 01 Civ. 9035, 2003 U.S. Dist. LEXIS 12078
(S.D.N.Y. July 15, 2003) ............................................................................ 20

*In re CCT Communications,*
464 B.R. 97 (S.D.N.Y. 2011) ...................................................................... 18

*CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.,*
No. 07 Civ. 11078, 2009 U.S. Dist. LEXIS 59540
(S.D.N.Y. July 13, 2009) ............................................................................ 20

*Campers' World International, Inc. v. Perry Ellis International, Inc.,*
221 F.R.D. 409 (S.D.N.Y. 2004) ................................................................. 9

*Concord Asset Management v. Intercredit Corp.,*
No. 92 Civ. 7756, 1994 U.S. Dist. LEXIS 5854
(S.D.N.Y. May 5, 1994) .............................................................................. 20

*MyPlayCity, Inc. v. Conduit, Ltd.,*
No. 10 Civ. 1616 (CM), 2011 WL 3273487
(S.D.N.Y. July 29, 2011) ............................................................................ 17

*Refinemet International Co. v. Eastbourne N.V.,*
25 F.3d 105 (2d Cir. 1994) ......................................................................... 24

*Schonfeld v. Hilliard,*
218 F.3d 164 (2d Cir. 2000) ....................................................................... 22

*Siemens Westinghouse Power Corp. v. Dick Corp.,*
219 F.R.D. 552 (S.D.N.Y. 2004) ................................................................. 9

*Simon-Whelan v. Andy Warhol Foundation for the Visual Arts,*
    No. 07 Civ. 6423 (LTS), 2009 U.S. Dist. LEXIS 44242
    (S.D.N.Y. May 26, 2009) ........................................................................ 12

*Tradex Europe SPRL v. Conair Corp.,*
    No. Civ. 1760 (KMW) (FM),
    2008 WL 19990464, (S.D.N.Y. May 7, 2008) ............................ 14, 18

*Wechsler v. Hunt Health Sys.,*
    330 F. Supp. 2d 383, 415 (S.D.N.Y. 2004).................................... 24

*World-Link, Inc. v. Citizens Telecommunications Co.,*
    No. 99 CIV 3054 (GEL), 2000 WL 1877065
    (S.D.N.Y. Dec. 26, 2000) ........................................................ 14, 18

## STATE CASES

*Banc of America Securities LLC v. Solow Building Co. II, L.L.C.,*
    47 A.D.3d 239, 847 N.Y.S.2d 49 (1st Dep't 2007) .................. 10, 11, 12, 13, 14

*Berenges v. 261 W. LLC,*
    93 A.D.3d 175, 940 N.Y.S.2d 4 (1st Dep't 2012) ............................ 10

*Components Direct, Inc. v. European American Bank & Trust Co.,*  21
    175 A.D.2d 227, 572 N.Y.S.2d 359 (2d Dep't 1991) ........................ 20

*Corinno Civetta Construction Corp. v. City of N.Y.,*
    67 N.Y.2d 297, 502 N.Y.S.2d 681 (1986) ........................................ 10

*Emptage & Associates v. Cape Hampton, LLC,*
    19 A.D.3d 536, 799 N.Y.S.2d 525 (2d Dep't 2005) ........................ 11

*Friends Lumber v. Cornell Dev. Corp.,*
    243 A.D.2d 886, 663 N.Y.S.2d 326 (3d Dep't 1997) ........................ 12

*Graphic Scanning Corp. v. Citibank, N.A.,*
    116 A.D.2d 22, 499 N.Y.S.2d 712 (1st Dep't 1986) ........................ 11

*Great N. Associates v. Cont'l Casualty Corp.,*
    192 A.D.2d 976, 596 N.Y.S.2d 938 (3d Dep't 1993) ........................ 11

*Hanover Insurance Co. v. D&W Central Station Alarm Co.,*
    164 A.D.2d 112, 560 N.Y.S.2d 293 (1st Dep't 1990) ........................ 11

*Kalisch-Jarcho, Inc. v. City of N.Y.,*
    58 N.Y.2d 377, 461 N.Y.S.2d 746 (1983) .................................. 10, 17

*Kaplan v. Madison Park Group Owners, LLC*,
      2012 N.Y. App. Div. LEXIS 3079 (1st Dep't April 24, 2012) ......................... 24

*Metropolitan Life Insurance Co. v. Noble Lowndes Int'l*,
      192 A.D.2d 83, 600 N.Y.S.2d 212 (1st Dep't 1993)
      *aff'd*, 84 N.Y.2d 430, 618 N.Y.S.2d 882 (1994) .................................... 14, 15, 16

*Mokar Properties Corp. v. Hall*,
      6 A.D.2d 536, 179 N.Y.S.2d 814 (1st Dep't 1958) ............................................ 11

*Musick v. 330 Wythe Avenue Associate, LLC*,
      41 A.D.3d 675, 838 N.Y.S.2d 620 (2d Dep't 2007) ........................................... 11

*Net2Globe Int'l v. Time Warner Telecom of N.Y.*,
      273 F. Supp. 2d 436 (S.D.N.Y. 2003) .................................................... 14, 17, 18

*Progressive Solar Concepts v. Gabes*,
      161 A.D.2d 752, 556 N.Y.S.2d 105 (2d Dep't 1990) ........................................ 11

*Sommer v. Federal Signal Corp.*,
      79 N.Y.2d 540, 583 N.Y.S.2d 957 (1992) ......................................................... 11

*TIC Holdings, LLC v. HR Software Acquisition Group, Inc.*,
      194 Misc. 2d 106, 750 N.Y.S.2d 425 (Sup. Ct. N.Y. Cnty. 2002),
      *aff'd*, 301 A.D.2d 414, 755 N.Y.S.2d 19 (1st Dep't 2003) ............................... 11

*Vanderlinde Electric Corp. v. City of Rochester*,
      54 A.D.2d 155, 388 N.Y.S.2d 388 (4th Dep't 1976) ........................................ 10

## MISCELLANEOUS

1 Dobbs Law of Remedies at §3.3(7) ........................................................................ 22

Plaintiff Five Star Development Resort Communities LLC ("Five Star") respectfully submits this memorandum of law in opposition to the motion *in limine* of Defendant iStar RC Paradise Valley LLC ("iStar") to exclude evidence of Five Star's consequential, indirect or special damages.

## PRELIMINARY STATEMENT

In December 2008, after timely funding and honoring eighteen of Five Star's draw requests made under a May 2007 Loan and Security Agreement (the "Loan Agreement"), iStar abruptly breached its funding obligations to Five Star, setting in motion the ultimate demise of Five Star's luxury mixed-use development in Paradise Valley and Scottsdale, Arizona (the "Project"). At the time of its breach, iStar fully recognized that refusing to fund Five Star's nineteenth draw request ("Draw 19") would inflict devastating harm on Five Star – indeed, that recognition was what motivated iStar to withhold funding. By withholding funding, iStar sought to place Five Star under economic duress so that iStar could seize the valuable Project for itself, or at the least could extract from Five Star new loan terms more favorable to iStar, because iStar knew Five Star had no financing alternatives at that time. As iStar's Executive Vice President R. Michael Dorsch III ("Dorsch") told Five Star's managing member Jerry Ayoub ("Ayoub") in demanding, without justification, that Five Star agree to a $10 million pay down, higher interest rate and extension fees, "[y]ou couldn't get financing in today's market like you have today."

Under settled New York law, iStar's willful bad faith conduct precludes iStar from enforcing the consequential damages limitation contained in Section 11.2 of the Loan Agreement (the "exculpatory clause"). Five Star will present evidence at trial that iStar had no good faith basis to terminate funding under the Loan Agreement, and that the excuses that iStar now proffers – Five Star's alleged failure to meet certain conditions precedent – were merely a pretext

to justify iStar's decision to (in Dorsch's words) "turn off the spigot" and deprive Five Star of financing at a critical point in the Project. Given iStar's bad faith conduct as detailed below, the exculpatory clause is simply not enforceable.

Furthermore, the damages that Five Star seeks in this action are not speculative under New York law and were expressly within the contemplation of the parties at the time of the Loan Agreement. Indeed, iStar internally valued the Project based in part upon the anticipated future cash flows, and Five Star's expert used similar projections in connection with his damages analysis. Moreover, whether the contractual damages limitation of the exculpatory clause is in effect or not, Five Star is entitled to recover all of its direct damages, including its out-of-pocket expenses and its cash investment in the Project, all of which were lost as a direct consequence of iStar's breach. Such direct damages are not speculative at all; indeed, iStar was fully aware that Five Star was investing substantial sums of its own in the Project. For the reasons set forth below, Five Star should be permitted to offer proof of all of its damages at trial, and iStar's motion *in limine* should be denied.

## STATEMENT OF FACTS[1]

In May 2007, Five Star and iStar entered into the Loan Agreement, which contemplated Five Star's acquisition and horizontal development of approximately 120 acres of property in Paradise Valley and Scottsdale, Arizona (the "Property"). Between June 2007 and November 2008, iStar funded 18 consecutive draw requests. Pl. 56.1 St. Resp. to ¶ 25. iStar admits that it

---

[1] References to "Pl. 56.1 St." are to the Local Civil Rule 56.1 Counterstatement of Material Facts of Five Star Development Resort Communities LLC submitted on January 11, 2011 in opposition to iStar's motion for summary judgment. References to "Lesser Decl." are to the January 31, 2011 Declaration of Danielle Lesser, also submitted in opposition to iStar's motion for summary judgment. References to "Chmil Decl." are to the November 22, 2010 Declaration of Bonnie Chmil. These documents are hereby incorporated by reference into this submission. Additional material not previously submitted is annexed to the June 4, 2012 Declaration of Mary Flynn ("Flynn Decl.").

never declared Five Star to be in default and never suggested that any delay in construction, to that point, constituted a default. Pl. 56.1 St. Resp. to ¶ 60. During this time, Five Star greatly enhanced the value of the Project at its own expense, spending millions of its own dollars to obtain certain construction entitlements from the municipality, including by lobbying for and winning a public referendum that would permit Five Star to develop the Property in the manner that both Five Star and iStar had envisioned. Indeed, iStar's own internal valuation made prior to its breach acknowledged that:

> the entitlements [obtained by Five Star] will significantly enhance the value of iStar's collateral. Upon finalization of these entitlements, the value of the Property will be well in excess of iStar's basis. . .

Flynn Decl. Ex. 1.

On December 12, 2008, shortly after its victory in the referendum, Five Star submitted Draw 19 to iStar. Chmil Decl. Ex. 7. Draw 19 sought reimbursement for "Soft Costs" under the Loan Agreement, most of which were payments to the same consultants for which iStar had previously reimbursed Five Star, and which were for services rendered prior to December 2008. Pl. 56.1 St. Resp. to ¶¶ 26, 29; Loan Ag. at 20 ("Soft Costs").[2] Upon receipt of Draw 19, iStar Construction Manager Troy Stephan ("Stephan") advised Five Star that he would require time to review the draw request and the back-up, plus additional information he requested and that Five Star immediately supplied. Lesser Decl. Exs. 3, 4 (Cowart Exs. GG, II). On December 22, 2008, Stephan was satisfied with Five Star's submitted documentation and confirmed iStar's

---

[2]  While iStar initially claimed that Draw 19 was for "Hard Costs" and therefore purportedly subject to additional conditions to funding, iStar ultimately conceded in a letter to Five Star that Draw 19 was a "Soft Cost" draw (as these terms were defined in the Loan Agreement). Pl. 56.1 Resp to ¶ 26. Once litigation was commenced, iStar did an about-face, and claimed that Draw 19 was for "Hard Costs," despite its earlier letter to Five Star and internal correspondence in which iStar personnel admit Draw 19 was for "Soft Costs"

approval of Draw 19.  Lesser Decl. Exs. 5, 6 & 7 (Cowart Inj. Decl. ¶ 34; Cowart Inj. Decl. Ex. 5; Cowart Ex. KK).

Five Star had no reason to doubt that Stephan's December 22, 2008 approval of Draw 19 was final because iStar never advised Five Star that anything more than Stephan's approval was necessary.  Flynn Decl. Exs. 2, 3, 4 (Ayoub 114:12-19; Cowart 167:13–168:10; 231:7-21; Neubecker 109:13-21).  Although it had not yet received funding of Draw 19, Five Star proceeded with the Project and on December 30, 2008, its contractor and subcontractors had a "kick off" meeting, anticipating imminent mobilization and construction.  Pl. 56.1 St. Resp. to ¶ 19; Lesser Decl. Ex. 12 (Shepherd 122:18-22; 123:5-11).

Just after Stephan advised Five Star that Draw 19 was approved, other iStar executives who had no direct communication with Five Star as borrower, and of whose role Five Star was completely unaware, had secretly decided to stop funding for the Project under the Loan Agreement. *See* Pl. 56.1 St. pp. 50-55.  After Stephan's initial approval, iStar went silent for an eight day period and did not return Five Star's calls inquiring about the funding of the approved Draw 19.  Lesser Decl. Ex. 5 (Cowart Inj. Decl. ¶ 78).  On December 30, 2008, the day of the "kick off" meeting and the day the draw was to have been funded, iStar's Vice President, David Sotolov ("Sotolov") unexpectedly advised Five Star by telephone that iStar would not fund Draw 19, that Five Star should immediately halt work on the Project and that Five Star's principals should meet with iStar's management after the new year.  Flynn Decl. Exs. 2, 3 (Ayoub 117:7–118:25; Cowart 187:5–188:3 239:15–240:15); Lesser Decl. Ex. 12 (Shepherd 94:20–95:1).

Discovery has revealed that, unbeknownst to Five Star, during this period the members of the iStar team responsible for overseeing the Five Star loan, and other iStar executives, were engaged in a feverish dialogue, including with iStar's counsel, to contrive any possible basis for

refusing to fund Draw 19. *See* Lesser Decl. Ex. 16 (iStar Privilege Log pp. 2-10). Dorsch, who was generally responsible for overseeing iStar's land loan portfolio, had not previously been involved with this loan, but was instrumental in shutting down funding. Dorsch wanted to "turn off the spigot," and he directed those responsible for administering and funding the Loan to "get creative" so iStar could avoid funding. Lesser Decl. Exs. 18, 19 (Dorsch Exs. 4, 7). In an attempt to curry favor with his superior, Stephan assured Dorsch that he "understands what you mean by creative" and began combing the Loan Agreement for possible justifications for iStar's refusal to fund. Lesser Decl. Exs. 17, 19 (Dorsch 80:17-81:9; Dorsch Ex. 7).

iStar saw opportunity for itself in refusing to fund. iStar's parent was in imminent danger of violating its own bank debt covenants, and Moody's Investors Service had downgraded iStar Financial's bonds to junk. Lesser Decl. Ex. 5 (Cowart Inj. Decl. ¶¶ 79-80). With other loans in its portfolio in distress, Five Star's loan was an attractive target for iStar's executives because Five Star's Project was reaching fruition, making the collateral for the loan extraordinarily valuable. *See* Flynn Decl. Ex. 9 (1/21/09 iStar Marketing Summary of Five Star's Loan). iStar itself valued the project at $172 million at that time based upon iStar's own projections of the "revenue of the Property" – more than $100 million over the amount it had loaned Five Star. Flynn Decl. Exs. 1, 5, 6. In its January 21, 2009 marketing materials, iStar touted not only the Project, but also Five Star's capabilities as a developer and Five Star's substantial equity contribution. Flynn Decl. Ex. 9. iStar knew the Project was poised to succeed, and wanted to take the Project for itself.

By improperly refusing to fund in a very tight credit market, iStar could force Five Star into a position where it faced imminent default, and then iStar could use Five Star's economic duress to iStar's advantage. Improperly declaring a default would permit iStar to halt funding

pretextually and then it could either 1) exact more lucrative loan terms from Five Star or 2) foreclose and take possession of a newly-entitled, unique parcel of land which iStar had internally appraised as ultimately worth substantially more than the debt it secured. As iStar's parent, iStar Financial, admitted in its First Quarter 2009 Earnings Report, it was pursuing an aggressive strategy of monetizing assets:

> In order to maximize recovery, it is sometimes necessary to foreclose on assets. Some NPLs [non-performing loans] have excess value in them. It is really more a matter of who is going to own the upside of the asset. So if a borrower is not willing to negotiate with us and we think there is going to be a fight, that can go on NPL even though there is sufficient value to protect us.

Flynn Decl. Ex. 7.

iStar saw another benefit to forcing a Five Star default: the $13.3 million letter of credit Five Star had posted in connection with a completion guaranty. iStar's Sotolov confirmed in writing iStar's intent to take the Project as its own and *finish it with Five Star's money*:

> There is no chance, even with us funding, that they will have it completed . . . which will open the door for us to take and apply the LOC proceeds [a $13.3 million letter of credit posted by Five Star] to finish the work (*with their $$ not ours*).

Lesser Decl. Ex. 44 (Sotolov Ex. 43) (emphasis added).[3]

On January 6, 2009, the parties met as Sotolov had demanded in his December 30, 2008 phone call. Lesser Decl. Ex. 2 (Sotolov 240:2-9). At the meeting, Dorsch tried to strong-arm Five Star by citing current conditions in the real estate market, dismissing Five Star's ability to complete construction and demanding that Five Star produce "missing" documents allegedly required by the Loan Agreement, but which Dorsch was unable to identify for Five Star,

---

[3] Indeed, iStar even subsequently hired away Five Star's sales team to work on a nearby project that iStar had foreclosed upon -- presumably so iStar could "hit the ground running" once it stole away Five Star's Project as a result of its bad faith breach of the Loan Agreement. Ayoub Decl. ¶ 11.

responding "read the loan documents." Flynn Decl. Ex. 2 (Ayoub 132:21–133:24; 134:13-17; 137:17–138:3). Dorsch demanded that, if he were Five Star, he would ask iStar to agree to new loan terms, including a "$10 million pay down, higher interest rate and extension fees," that were far more lucrative for iStar than the loan's existing terms. Flynn Decl. Exs. 2, 4 (Ayoub 129:18-22, 151:13–152:17; Neubecker 63:9-23). If Five Star did not comply, Five Star would face default, as iStar knew that Five Star could not secure alternative financing in the time remaining before maturity. In fact, Dorsch warned, "[y]ou couldn't get financing in today's market like you have today," to which Five Star's president, Jerry Ayoub responded "I'm not looking for financing today. I'm happy with my loan." Flynn Decl. Ex. 2 (Ayoub 158:4-10).

Five Star had fully complied with the Loan Agreement and refused to capitulate to iStar's demands. Pl. 56.1 St. Resp. to ¶¶ 32-57 Five Star submitted two additional fully-compliant draw requests that iStar again refused to fund (under the terms of the Loan Agreement, draw requests were due monthly and Five Star had submitted its January and February 2009 draw requests). When it became clear that iStar had no intention of complying with its commitment to fund the remaining $43 million under the Loan Agreement, and prior to iStar ever declaring a default under the terms of the Loan Agreement, Five Star commenced this suit, several months later.

While Five Star was poised to continue the Project at the time of iStar's breach, and even continued to pursue the requisite approvals for the Project after iStar's breach, in the absence of iStar's funding and with the passage of time, Five Star's Project has become non-viable. The entitlements that Five Star had obtained, which had greatly enhanced the value of the Property, have been lost by lapse of time. Pursuant to the "Special Use Permit" (the "SUP") which governed the construction of the Project, the infrastructure, which was the phase of the Project

funded by iStar's loan, had to be completed by November 24, 2010 and construction of the Project had to be completed by within five years or by November 24, 2015. The delays caused by iStar render these dates impossible to meet. Moreover, a new town administration was elected during the pendency of this action, and the officials who previously approved Five Star's entitlements are no longer in office, so the ability to re-acquire the entitlements remains uncertain. The Purchase and Sale Agreement and other documents by which Five Star had acquired the property and which governed the use of the Ritz Carlton branding in its development – which iStar recognized as a centerpiece of the Project (Flynn Decl. Exs. 1, 5, 6, 9) – have now expired. The parties who once expressed interest in purchasing homes or taking retail leases, and the purchaser who committed to buy 12 of the 15 lots, have long since moved on. In short, the millions of dollars that Five Star paid out of its own pocket to develop the Property have effectively been lost.

Five Star's expert Saul Solomon issued an expert report in February 2010 calculating Five Star's damages caused by, at that time, a one-year delay in funding by iStar. Mr. Solomon projected the future cash flows expected from the Property assuming a 2009 start of construction and sales if iStar had funded and construction had proceeded according to Five Star's plans, and the diminished cash flows assuming a 2010 start to construction following iStar's breach. iStar's own internal loan valuation reports utilized anticipated future cash flows as a basis for valuation of the Property, both at the inception of the loan, and thereafter. Flynn Decl. Exs. 5, 6, 8. Utilizing the same metric that the parties themselves used to value the Property (the anticipated future cash flows that the Property was expected to generate) was an appropriate methodology to assess the viability of the Project. In addition, Five Star's expert calculated Five Star's out-of-pocket losses attributable to the breach (as of the date of Mr. Solomon's report), which would

include all cash expenditures made by Five Star in reliance on the Loan Agreement.  These out-of-pocket expenses include, for example, Five Star's expenditures on marketing, construction of a sales center, employee costs and overhead, property taxes, and other cash investment in the Project, which have now become a total loss.  Direct out-of-pocket losses are not precluded by the exculpatory clause on which iStar bases this motion and can be proven directly, without speculation.

## ARGUMENT

**I.    ISTAR'S FAILURE TO RAISE THE EXCULPATORY CLAUSE IN ITS TWO PRIOR DISPOSITIVE MOTIONS SHOULD PRECLUDE ISTAR FROM RAISING IT NOW ON THE EVE OF TRIAL**

iStar did not raise the exculpatory clause in its motion to dismiss the complaint or in its motion for summary judgment.  Having passed up two opportunities to appropriately address the issue, iStar should be precluded from raising the issue now in what is, in essence, an untimely second motion for summary judgment, made shortly before trial without the attendant requirements of Rule 56.  *See Campers' World Int'l, Inc. v. Perry Ellis Int'l, Inc.*, 221 F.R.D. 409 (S.D.N.Y. 2004) (denying second motion for summary judgment and stating "[I]t is improper for a party to file a successive motion for summary judgment which is not based upon new facts and which seeks to raise arguments it could have raised in its original motion."); *Siemens Westinghouse Power Corp. v. Dick Corp.*, 219 F.R.D. 552, 554 (S.D.N.Y. 2004) ("The Court does not approve in general the piecemeal consideration of successive motions for summary judgment because parties ought to be held to the requirement that they present their strongest case for summary judgment when the matter is first raised.").

#3918987 v14 \020396 \0004

**II.   ISTAR'S BAD FAITH MISCONDUCT VITIATES THE EXCULPATORY CLAUSE IN THE LOAN AGREEMENT**

**A.   New York Courts Will Not Enforce An Exculpatory Clause When The Breaching Party Acts Willfully**

It is well-established under New York law that an exculpatory clause, such as Section 11.2 of the Loan Agreement, "no matter how flat and unqualified its terms, will not exonerate a party from liability under all circumstances." *Kalisch-Jarcho, Inc. v. City of N.Y.*, 58 N.Y.2d 377, 384, 461 N.Y.S.2d 746, 750 (1983). The New York Court of Appeals has made clear that an exculpatory clause such as the one at issue here does not apply to intentional, bad faith or grossly negligent conduct. *See, e.g., Corinno Civetta Constr. Corp. v. City of N.Y.*, 67 N.Y.2d 297, 309, 502 N.Y.S.2d 681, 686 (1986). "More pointedly, an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing. This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith." *Kalisch-Jarcho, Inc.*, 58 N.Y.2d at 385, 461 N.Y.S.2d at 750. Exculpatory clauses such as the one on which iStar seeks to rely are narrowly construed against the party seeking their enforcement. *See Vanderlinde Elec. Corp. v. City of Rochester*, 54 A.D.2d 155, 158, 388 N.Y.S.2d 388, 391 (4th Dep't 1976) ("'No damage' clauses are not always absolute and they must be strictly construed against the party seeking to avoid liability.").

New York courts have repeatedly denied motions (like iStar's here) that seek summarily to enforce exculpatory clauses where willful misconduct is alleged. *See, e.g., Berenges v. 261 W. LLC*, 93 A.D.3d 175, 181, 940 N.Y.S.2d 4, 8 (1st Dep't 2012) (denying motion for summary judgment on grounds of an exculpatory clause due to allegations of intentional misconduct); *Banc of America Securities LLC v. Solow Building Co. II, L.L.C.*, 47 A.D.3d 239, 847 N.Y.S.2d

49 (1st Dep't 2007) (denying summary judgment based upon exculpatory clause, where bad faith breach of contract was alleged); *Graphic Scanning Corp. v. Citibank, N.A.*, 116 A.D.2d 22, 26, 499 N.Y.S.2d 712, 715 (1st Dep't 1986) (denying summary judgment based upon exculpatory clause and permitting claims of lost profits to proceed, where plaintiff alleged willful breach of contract); *Great N. Assocs. v. Cont'l Cas. Corp.*, 192 A.D.2d 976, 977-78, 596 N.Y.S.2d 938, 940 (3d Dep't 1993) (denying motion to dismiss based upon exculpatory clause, where willful, malicious and fraudulent acts are alleged); *TIC Holdings, LLC v. HR Software Acquisition Group, Inc.*, 194 Misc. 2d 106, 113, 750 N.Y.S.2d 425, 431 (Sup. Ct. N.Y. Cnty. 2002), *aff'd*, 301 A.D.2d 414, 755 N.Y.S.2d 19 (1st Dep't 2003) (denying summary judgment based upon exculpatory clause where breach was alleged to be willful or intentional); *Ally Gargano/MCA Advertising, Ltd. v. Cooke Properties, Inc.*, 1989 U.S. Dist Lexis 12245, 1989-2 Trade Cas. (CCH) P68 817 (S.D.N.Y 1989) (denying motion to enforce exculpatory clause due to allegations of bad faith); *see also Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554, 583 N.Y.S.2d 957, 963 (1992) (denying motion for summary judgment based upon exculpatory clause due to allegations of gross negligence); *Hanover Insurance Co. v. D&W Central Station Alarm Co.*, 164 A.D.2d 112, 115, 560 N.Y.S.2d 293, 295 (1st Dep't 1990) (denying motion for summary judgment based upon exculpatory clause based upon allegations of gross negligence); *Mokar Properties Corp. v. Hall*, 6 A.D.2d 536, 179 N.Y.S.2d 814 (1st Dep't 1958) (declining summarily to enforce an exculpatory clause that limited seller's liability to return of down payment because there were issues of fact with respect to seller's bad faith); *accord Musick v. 330 Wythe Ave. Assoc., LLC*, 41 A.D.3d 675, 838 N.Y.S.2d 620 (2d Dep't 2007); *Emptage & Assocs. v. Cape Hampton, LLC*, 19 A.D.3d 536, 799 N.Y.S.2d 525 (2d Dep't 2005); *Progressive Solar Concepts v. Gabes*, 161 A.D.2d 752, 753, 556 N.Y.S.2d 105 (2d Dep't 1990).

This Court, too, has recognized the rule that a "party may not invoke such an [exculpatory] agreement to insulate itself from intentional wrongdoing. . . ." *Simon-Whelan v. Andy Warhol Foundation for the Visual Arts,* No. 07 Civ. 6423 (LTS), 2009 U.S. Dist. LEXIS 44242, *13 (S.D.N.Y. May 26, 2009) (Swain, U.S.D.J.) (denying motion to dismiss based upon exculpatory clause in contract, where plaintiff alleged fraud).

Five Star alleges, and the evidence at trial will show, that iStar engaged in a willful breach of the Loan Agreement in a calculated effort either (1) to obtain millions from Five Star by way of a pay-off, a higher interest rate and extension fees (Flynn Decl. Exs. 2, 4 (Ayoub 129:18-22, 151:13–152:17; Neubecker 63:9-23)), or failing that, (2) to take the valuable property and complete the Project for iStar's benefit, using Five Star's money.   Lesser Decl. Ex. 44 (Sotolov Dep. Ex. 43).   iStar's willful breach of the Loan Agreement, calculated to place Five Star under severe economic duress at a critical juncture in the Project, and deliberately calculated to extract from Five Star enhanced loan terms, is precisely the type of willful misconduct that renders the exculpatory clause unenforceable.  See *Banc of America Securities LLC,* 47 A.D.3d at 249, 847 N.Y.S.2d at 56 (declining to enforce exculpatory clause and finding "Solow has breached the lease agreement ... by 'withholding performance unless the other party agrees to some further demand' ... a classic attempt at economic duress.") (*quoting Friends Lumber v. Cornell Dev. Corp.,* 243 A.D.2d 886, 888, 663 N.Y.S.2d 326 (3d Dep't 1997)).

By demanding that Five Star modify the loan in iStar's favor or face imminent loss of the Property, iStar engaged in the type of willful misconduct that negates application of the exculpatory clause.   In *Banc of America Securities LLC,* 47 A.D.3d at 239, 847 N.Y.S.2d at 49, the plaintiff was a tenant leasing twenty floors of office space from defendant landlord.   The parties' lease provided that the tenant had to obtain landlord consent to leasehold alterations, and

if the landlord refused to consent, the tenant's sole remedy was an action for specific performance. When the tenant proposed extensive alterations necessary to conduct its business, the landlord repeatedly refused to consent unless the tenant first paid the landlord a multi-million dollar fee to which landlord was not entitled under the lease. The tenant then sued not only for specific performance, but also for damages caused by the landlord's refusal to consent.

The landlord moved for summary judgment on the tenant's damages claim, arguing that the exculpatory clause in the lease precluded the landlord's liability for damages. The trial court denied landlord's motion for summary judgment and the landlord appealed. *Banc of America*, 47 A.D.2d at 249, 847 N.Y.S.2d at 57. In affirming the denial of summary judgment, the Appellate Division, First Department found that there were issues of fact to be tried as to whether landlord's refusal to timely review and approve the proposed alterations, coupled with its demand for unwarranted compensation, constituted malice and a bad faith breach of contract. *Id.*, 47 A.D.2d at 242, 847 N.Y.S.2d at 51. The Court noted:

> Without any lawful basis to demand payment for reviewing the alteration plans, [landlord's] attempt to exact a multi-million-dollar sum from [tenant] might be reasonably perceived by a trier of fact as an intention to inflict monetary harm, which is tortious as a matter of law, and renders the limitation on recovery contained in the lease unenforceable as a matter of public policy.

*Id.* 47 A.D.2d at 242, 847 N.Y.S.2d at 51.

Like iStar did here, the landlord in *Banc of America* intentionally breached the parties' contract with the malicious intent of extracting something to which it was not entitled. In *Banc of America*, it was a multi-million dollar fee, while in iStar's case it was enhanced loan terms or, failing that, the entire property, the value of which Five Star had substantially enhanced at its own expense. The landlord in *Banc of America* believed it could breach with impunity (because it was protected by the exculpatory clause) and that the tenant would ultimately pay the

exorbitant fee to avoid repeated litigation to compel the landlord's consent. So, too, here iStar refused to fund not for any legitimate reason, but so it could place Five Star under economic duress and extract enhanced loan terms from Five Star, or force Five Star's default. Like the landlord's conduct in *Banc of America*, iStar's conduct is willful and malicious and it negates the application of the exculpatory clause. Given iStar's willful and bad faith actions, New York law does not permit it to shield the effects of such actions behind Section 11.2, the exculpatory clause.

## B.      The Cases Cited By iStar Are Not Applicable Here

The cases upon which iStar relies to enforce the exculpatory clause are not applicable here. None of the cases cited by iStar involve a contractual situation similar to the one here, where the breaching party (iStar) had the ability to place its counterparty under severe economic duress – indeed, to threaten the counterparty's very existence – and where the breaching party maliciously inflicted that duress for economic gain. In fact, in most of the cases iStar cites there is no allegation of wrongful conduct at all, much less wrongful conduct of the severity that Five Star alleges here. Importantly, none of iStar's cases involve a loan.[4]

---

[4] The cases cited by iStar also differ from the instant action in that they involved exculpatory clauses that were substantially more sweeping than the clause at issue here, which reads: "Lender shall have no liability hereunder for any consequential, special, punitive or indirect damages." *Compare to Net2Globe Int'l v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 449 (S.D.N.Y. 2003) ("*In no event* shall the Company be liable for any incidental, indirect, special, or consequential damages (including lost revenue or profits) of any kind whatsoever *regardless of the cause or foreseeability thereof*.") (emphasis added); *World-Link, Inc. v. Citizens Telecommunications Co.*, No. 99 CIV 3054 (GEL), 2000 WL 1877065, *1 (S.D.N.Y. Dec. 26, 2000) ("*In no event* shall CTC be liable to World-Link or any other person or entity for indirect, consequential or special damages, including but not limited to lost revenues or profits, *even if CTC has been advised of the possibility thereof*.") (emphasis added); *Metropolitan Life Insurance Co. v. Noble Lowndes Int'l*, 84 N.Y.2d 430, 432 (1994) ("*In no event* shall [plaintiff] be liable for any lost profits, lost savings or other consequential damages, *even if [plaintiff] has been advised of the possibility* of or could have foreseen such damages") (emphasis added); *Tradex Europe SPRL v. Conair Corp.*, No. Civ. 1760 (KMW) (FM) 2008 WL 1990464, *1 (S.D.N.Y. May 7, 2008) ("*Under no circumstances* shall any party be liable to any other party . . .") (emphasis added).

For example, iStar relies upon *Metropolitan Life Insurance Co. v. Noble Lowndes Int'l,* 84 N.Y.2d 430, 618 N.Y.S.2d 882 (1994) and *Alleyne v. Four Seasons Hotel – New York,* No. 99 Civ. 3432, 2001 WL 135770 (S.D.N.Y. Feb. 15, 2001), *aff'd,* 25 Fed. Appx. 74 (2d Cir. Jan. 23, 2002); iStar Mem. p. 7.  But neither of these cases provide support for iStar's position because neither case involved allegations of bad faith breach of contract.

In *Metropolitan Life* the defendant, a computer software company, contracted to provide the plaintiff, an insurance company, with a license for an integrated computer system to process the plaintiff's insurance claims. *Metropolitan Life,* 84 N.Y.2d at 432-33, 618 N.Y.S.2d at 883. The contract included a cap of $390,000 on costs that the software company could charge the insurance company for the system.  *Id.*  The defendant furnished the software system, but the insurance company rejected it and insisted on modifications required under the contract.  *Id.* Thereafter, the software company demanded an upward adjustment of the cap on costs. When the insurance company refused to adjust the cap, the software company discontinued its performance of the contract.  *Id.*

The insurance company sued and sought its lost profits.  At trial, the proof demonstrated that the software company requested an increase in the cap on costs because it had determined that its computer division was unprofitable and needed to be sold and that the contractual cap would be an obstacle to that sale. *Metropolitan Life,* 84 N.Y.2d at 434, 618 N.Y.S.2d at 884. There was no allegation that in refusing to complete the work, the software company intended to inflict economic harm on the plaintiff.   Indeed, the Appellate Division acknowledged that plaintiff expressly disavowed any claim that the breach was intended to inflict economic duress upon the plaintiff.  *Metropolitan Life Ins. Co. v. Noble Lowndes Int'l,* 192 A.D.2d 83, 91, 600 N.Y.S.2d 212, 216-17 (1st Dep't 1993) *aff'd,* 84 N.Y.2d 430, 618 N.Y.S.2d 882 (1994).

Thus, the *Metropolitan Life* Court upheld the exculpatory clause (after a lengthy jury trial), because the defendant's breach was not coupled with an intent to inflict duress upon the plaintiff – the defendant simply no longer wished to perform. *Metropolitan Life,* 84 N.Y.2d at 435, 618 N.Y.S.2d at 885.  iStar's conduct, on the other hand, evidences a willful breach coupled with an ulterior motive to inflict economic duress:  to place Five Star in a position where it would have no choice but to pay iStar the enhanced loan terms it demanded or face imminent loss of the Property.  Moreover, while the *Metropolitan Life* Court ultimately found that the evidence at trial did not support a finding of defendant's "willfulness," the Appellate Division did acknowledge that "defendant's willfulness is a question of fact" to be determined by the trier of fact, and the *Metropolitan Life,* case was decided after a full trial.  *Metropolitan Life,* 192 A.D.2d at 88, 600 N.Y.S.2d at 214.  So, too, does iStar's willfulness present a factual issue to be tried here, a fact perhaps recognized by iStar who did not move on this ground in its extensive motion for summary judgment.

*Alleyne v. Four Seasons Hotel—New York,* No. 99 Civ. 3432, 2001 WL 135770 (S.D.N.Y. Feb. 15, 2001) also fails to support iStar's position here because there was no claim of bad faith in that case.  In *Alleyne,* the plaintiff was a former employee asserting claims under Title VII, as well as for breach of contract.  The defendant moved for summary judgment, asserting that the contract claim should be dismissed because the contract limited plaintiff's liability except in circumstances that were not applicable to the plaintiff's claim.  The Court enforced the exculpatory clause because "plaintiff has not argued, and there is no evidence in the record to indicate, that . . . a public policy warrants relieving the plaintiff of the contractual limitation on damages." *Alleyne,* 2001 WL 135770, at *18.  Here, there is ample evidence that

iStar willfully breached the Loan Agreement in bad faith, and the settled public policy in New York negates the enforceability of the exculpatory clause in such circumstances.

In *MyPlayCity, Inc. v. Conduit, Ltd.*, No. 10 Civ. 1616 (CM), 2011 WL 3273487 (S.D.N.Y. July 29, 2011), the court recognized that an exculpatory clause is not enforceable if the defendant's breach of contract "'smacks of intentional wrongdoing.'" *MyPlayCity*, 2011 WL 3273487, at *7 (*quoting Kalisch-Jarcho, Inc.*, 58 N.Y.2d at 385, 461 N.Y.S.2d at 750). But the court went on to find that the only wrongdoing alleged by the plaintiff "actually benefited [plaintiff] and is therefore not the type of misconduct that would prevent the Court from enforcing the Limitation of Liability provision." *MyPlayCity*, 2011 WL 3273487, at *8. Here, where the evidence demonstrates iStar's malicious attempt to extract an unwarranted windfall from Five Star (*i.e.*, enhanced loan terms), or to seize the valuable Project for itself, Five Star has alleged sufficient facts to render the exculpatory clause unenforceable, or, at the very minimum, for this Court to address the factual issues inherent in iStar's actions.

In *Net2Globe Int'l, Inc. v. Time Warner Telecom of New York*, 273 F. Supp. 2d 436 (S.D.N.Y. 2003), plaintiff sought consequential damages as a result of defendant's alleged breach of certain contracts pursuant to which defendant was to provide long distance telecommunications carriage. Shortly after the contracts were executed, the defendant migrated the plaintiff's long distance traffic from the defendant's primary carrier to two alternative carriers in an effort to avoid an increase in rates by the primary carrier, even though the parties' contracts expressly permitted the defendant to pass along its increased costs to plaintiff. Plaintiff claimed that this migration of its traffic to alternative carriers resulted in a decrease in the quality of service, and plaintiff sued defendant for its actual and consequential damages as a result of the defendant's migration.

Defendant moved for summary judgment seeking (among other things) dismissal of the plaintiff's lost profits claims in light of an exculpatory clause in the parties' agreement. While recognizing that an exculpatory clause could be invalidated by a party's malicious breach of contract, the *Net2Globe* Court found that the defendant's "economically motivated decision" to migrate the plaintiff's traffic to alternative carriers could not "rise to the level of malice or intentional wrongdoing necessary to invalidate the contracts' limitation on liability provision." *Net2Globe*, 273 F. Supp. 2d at 451.

In contrast to the conduct alleged in *Net2Globe*, Five Star's allegations of wrongdoing by iStar are far more egregious. In *Net2Globe*, the defendant's decision to migrate the plaintiff's service to alternative carriers in order to avoid a surcharge imposed by its primary carrier was purely an economic decision intended to *reduce* the *plaintiff's* costs. The defendant's action did not result in a windfall to the defendant (as the Court determined that increased costs could have been passed along to the plaintiff in any event), nor was the migration intended to extract from the plaintiff something more than that for which defendant had bargained. iStar's conduct, on the other hand, was intended to inflict economic harm on Five Star, placing Five Star in a position where it would either have to pay iStar more than that to which it was entitled under the Loan Agreement or face the loss of the Project, the value of which Five Star had greatly enhanced at its own expense.

In *World-Link v. Citizens Telecom Co.,* No. 99 Civ. 3054 (GEL), 2000 WL 1877065 (S.D.N.Y. Dec. 26, 2000), there was no allegation of malice or intentional wrongdoing, as there is here. Likewise, unlike here, *In re CCT Communications,* 464 B.R. 97, 115 (S.D.N.Y. 2011), the defendant acted purely out of economic motivation and not out of malice or bad faith. Such is not the case here. *Tradex Europe SPRL,* 2008 WL 1999 0464, at *4 (S.D.N.Y. May 7, 2008)

likewise found the alleged breach of contract was solely economically motivated, and not willfully done to inflict harm upon the plaintiff.

### C.    iStar's Reliance on This Court's Prior Decisions is Unavailing

iStar argues that this Court's finding in its March 26, 2012 decision and order denying iStar summary judgment (the "Summary Judgment Decision") that Section 3.2 of the Loan Agreement is ambiguous supports a finding that iStar acted reasonably in refusing to fund Draw 19 and the two additional draws. (iStar Mem. p. 8). To the contrary, the ambiguity in Section 3.2 highlights the fact issues presented by iStar's actions and begs the question of iStar's motivation for claiming a breach of contract. The evidence will show that iStar concocted the Section 3.2 "breaches" long after Draw 19 was submitted and iStar had decided to halt funding. Indeed, iStar had conceded in writing that Draw 19 was a "Soft Cost" draw that did not implicate Section 3.2. Pl. Rule 56.1 Resp. to ¶¶ 26-27. iStar's contemporaneous emails confirm that its conditions precedent argument, constructed well after the fact, was a pretext to justify its termination of funding. In any event, given the documents forwarded by Five Star to iStar, coupled with the stage of the project in December 2008, the evidence will show that Five Star was in compliance with any reasonable interpretation of Section 3.2 of the Loan Agreement. *See* Reply Declaration of Lanny Cowart in Support of Plaintiff's Motion of Preliminary Injunction and exhibits thereto, June 15, 2009 [D.E. 31]. Yet, iStar still refused to fund unless Five Star made substantial loan modifications favorable to iStar. iStar knew (in fact, Dorsch told Five Star's Jerry Ayoub) that Five Star had no alternative sources of financing under the circumstances.

iStar also argues that the Court's July 6, 2010 dismissal of Five Star's claim for breach of the covenant of good faith and fair dealing claim somehow illustrates that iStar acted in good

faith. (iStar Mem. p. 9). But the dismissal of the good faith and fair dealing claim was technical only – the court simply held that an allegation of a bad faith breach of contract was not independent of the breach of contract claim. *See* Memo Opinion & Order, July 6, 2010 [D.E. 64] at 5. In deciding the motion to dismiss, this Court did not resolve the fact issue as to whether iStar had acted in good faith.

iStar is not immune from the obligations of good faith and fair dealing inherent in the Loan Agreement. *See, Concord Asset Management v. Intercredit Corp.*, No. 92 Civ. 7756, 1994 U.S. Dist. LEXIS 5854, *14 (S.D.N.Y. May 5, 1994). That obligation is breached, for example, when one party takes actions "'so directly to impair the value of a contract for another party that it may be assumed that [its actions] are inconsistent with the intent of the parties.'" *CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, No. 07 Civ. 11078, 2009 U.S. Dist. LEXIS 59540, *20-21 (S.D.N.Y. July 13, 2009) (*quoting Bank of China v. Chan*, 937 F.2d 780 (2d Cir. 1991); *see Berk v. Tradewell, Inc.*, No. 01 Civ. 9035, 2003 U.S. Dist. LEXIS 12078, at *22 (S.D.N.Y. July 15, 2003). Here, Five Star has submitted evidence that iStar willfully breached in a manner calculated to cause Five Star to lose the Property. If proven, these allegations are sufficient to demonstrate Five Star's bad faith. Similarly, if a lender is to terminate its funding commitment "the obligation of good faith would require a period of notice to require the corporate plaintiff a reasonable opportunity to seek alternate credit." *Components Direct, Inc. v. European American Bank & Trust Co.*, 175 A.D.2d 227, 230, 572 N.Y.S.2d 359, 361 (2d Dep't 1991). The Loan Agreement itself also provided for specified cure periods which iStar failed to offer to Five Star. By withholding funding in breach of the Loan Agreement, at a time when iStar knew Five Star had no alternatives, iStar acted in bad faith, and cannot escape liability under New York law by invoking the consequential damages limitation while duplicitously and egregiously offering false

#3918987 v14 \020396 \0004

and constantly changing excuses for its conduct.

### III.   FIVE STAR MAY RECOVER ITS GENERAL AND CONSEQUENTIAL DAMAGES CAUSED BY ISTAR'S BREACH, AND THEY ARE NOT SPECULATIVE

Under New York law, Five Star can recover two types of damages on its claim for breach of contract: general damages and consequential damages.[5] iStar's motion *in limine* does not seek to preclude evidence of the general damages caused by iStar's breach. Thus, there is no barrier to Five Star and its experts introducing evidence of amounts Five Star expended on the Project which were rendered worthless by iStar's breach. These would include amounts that Five Star paid to acquire and improve the Property, such as its cash investment, expenses for construction of a preview center; for marketing, advertising and public relations; for employee costs and overhead; for legal and accounting fees; and for property taxes. These amounts are ascertainable with certainty and are not precluded by the exculpatory clause on which iStar relies. Recovery of these damages will simply reimburse Five Star for the amounts it spent on the Project, but for which it will now receive no benefit as a result of iStar's breach.

As a result of iStar's breach and Five Star's resulting inability to construct the Project, Five Star lost its entitlements and its contract with the Ritz-Carlton, both of which greatly enhanced the value of the Property, as iStar itself recognized. Flynn Decl. Exs. 1, 6, 8, 9. Five Star's expert Saul Solomon calculated Five Star's damages from what was a one-year delay at the time of his report utilizing the same measure that the parties themselves used to value the

---

[5] Five Star does not seek in this action damages for its lost profits that would have been realized from the completion of the Ritz Carlton and Edition hotels and the Palmeraie luxury retail shopping center, as well as the loss of profits and opportunities that would have resulted from Five Star's sale of the condominiums, the resort estate lots, the resort luxury homes and the villas. Those damages are the subject of tort claims in a pending lawsuit in Arizona against iStar Financial, Inc. (the parent of the Defendant here), and others. That case is entitled *Five Star Development Resort Communities, LLC, et al. v. iStar Financial, Inc., et al.*, No. CV2011-090503 (Ariz. Super. Ct.).

#3918987 v14 \020396 \0004

Property: the anticipated future cash flows that the Property was expected to generate. By evaluating the reduced cash flows to be expected from the Property as a result of iStar's breach, Mr. Solomon used an appropriate methodology to measure the diminished value of the Project to Five Star as a result of iStar's breach. *See Schonfeld v. Hilliard*, 218 F.3d 164, 176 (2d Cir. 2000). As the *Schonfeld* court determined:

> In some instances, the asset lost is an income-producing asset, the fair market value of which may be based, in whole or in part, on a buyer's projection of what income he could derive from the asset in the future.

*Schonfeld*, 218 F.3d at 176; *see also* 1 *Dobbs Law of Remedies* at §3.3(7) (market value damages are "based on future profits as estimated by potential buyers who form the 'market'" and "reflect the buyer's discount for the fact that the profits would be postponed and . . . uncertain.").

iStar's own internal loan valuation reports utilized anticipated future cash flows as a basis for valuation of the Property, and iStar also recognized that the now-lost entitlements greatly enhanced the value of the Property. Flynn Decl. Exs. 1, 5, 6, 8, 9. Now that the entitlements and Ritz Carlton branding have expired, the lower cash flows anticipated with a 2010 construction and home sales start (the second scenario in Five Star's damages expert's report) is no longer an issue because the Project cannot be completed. Any criticisms by iStar of the assumptions upon which that scenario relied are unavailing. The Project cash flows that were expected at the time of iStar's breach in January 2009 (the first scenario of Five Star's damages expert's report) are not dependent upon those same assumptions, but are dependent upon facts available at the time of iStar's breach. Moreover, the expected cash flows need not be proven with exactitude, since what was then a one-year delay has, with the passage of time since iStar's breach, resulted in the loss of the ability to develop the Project. The January 2009 start date scenario that is the subject of Five Star's damages report demonstrates the viability of the Project in January 2009 at the

time of iStar's breach.   The current lack of viability of the Project is demonstrated by the Development Agreement with the town of Paradise Valley and the Ritz Carlton agreements, each of which have expired.  No expert opinion is necessary to prove the loss of the Project, and the amounts that Five Star spent on the Project in reliance on iStar's performance of the Loan Agreement are not speculative.

Mr. Solomon's report demonstrated that the Project was viable and would have been profitable had iStar funded in January 2009.  However, as a result of the passage of time and the irretrievable expiration of important deadlines which directly resulted from iStar's breach, the Project is no longer viable and Five Star has lost its investment in the Project.

Thus, perhaps more simply put, the Court need not reach the issue of whether the cash flow projections offered by Five Star's expert are speculative because they are not the *measure* of damages, but rather, the January 2009 projections demonstrate that Five Star suffered damages as a result of iStar's breach.  Mr. Solomon's projections establish two things: the viability of the Project and the fact of damages.  The Project documents corroborate that it is no longer viable, and Five Star will prove at trial that the Project was lost because iStar breached its funding obligations under the Loan Agreement.  Hence, Five Star is entitled to recover or offset from any amounts due under the loan, its investment in the Project.

## IV.   THE EXCULPATORY CLAUSE DOES NOT PRECLUDE A SET-OFF OF FIVE STAR'S CONSEQUENTIAL DAMAGES AGAINST AMOUNTS ALLEGED TO BE DUE UNDER THE LOAN AGREEMENT

Even assuming the exculpatory clause is enforceable, Section 11.2 of the Loan Agreement states that the lender would have no "LIABILITY FOR CONSEQUENTIAL, SPECIAL, PUNITIVE OR INDIRECT DAMAGES."  While this language may protect iStar from having to **pay** any such damages to Five Star, on its face it does not preclude Five Star from

#3918987 v14 \020396 \0004

establishing a setoff from any amounts that may be determined to be due to iStar, which would not impose a "liability" upon iStar, but would simply reduce iStar's potential recovery.

While iStar may claim that payments due under the Loan Agreement are required to be made "without deduction, defense, setoff or counterclaim" (Loan Agreement, section 2.4(A)), this provision is not applicable if it is determined that iStar anticipatorily breached the Loan Agreement, because iStar's breach excused Five Star's compliance with and subsequent performance of the Loan Agreement. *Kaplan v. Madison Park Group Owners, LLC*, 2012 N.Y. App. Div. LEXIS 3079 at *3 (1st Dep't April 24, 2012) (once breaching party defaulted, non-breaching party excused from tendering performance); *Refinemet Int'l Co. v. Eastbourne N.V.*, 25 F.3d 105 (2d Cir. 1994) (affirming lower court's holding that appellant's material breach excused appellee from any further performance under the agreement); *Wechsler v. Hunt Health Sys.*, 330 F. Supp. 2d 383, 415 (S.D.N.Y. 2004) ("When one party commits a material breach, the other party is relieved, or excused, from its further performance obligations.").

## CONCLUSION

For the foregoing reasons, Five Star respectfully requests that the Court deny iStar's motion *in limine* in its entirety, together with such other and further relief as this Court deems just and proper.

Dated: New York, New York
      June 4, 2012

MORRISON COHEN LLP

By:_____
    Mary E. Flynn
    Danielle C. Lesser
    Brett Dockwell
    909 Third Avenue
    New York, New York  10022
    (212) 735-8600

*Attorneys for Plaintiff-Counterclaim Defendant*
*Five Star Development Resort Communities, LLC*