UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

FIVE STAR DEVELOPMENT RESORT
COMMUNITIES, LLC,

      Plaintiff,

-v-

iSTAR RC PARADISE VALLEY, LLC,

      Defendant.

-----------------------------------------------------------x

No. 09 Civ. 2085 (LTS)



MEMORANDUM OPINION AND ORDER

This action arises out of a $112,025,000 Development Loan and Security Agreement ("Loan Agreement"), dated May 18, 2007, between borrower Five Star Development Resort Communities, LLC ("Plaintiff" or "Five Star") and lender iStar RC Paradise Valley LLC ("Defendant" or "iStar"). Five Star asserts a New York state law based claim for breach of contract and iStar counterclaims, inter alia, for breach of contract and fraud. The general background and procedural history of the parties' dispute is detailed in prior decisions of the Court (see docket entries 60, 64 and 137), the parties' familiarity with which is assumed. The Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. § 1332.

Two motions are currently before the Court. In the first of these motions, which was originally interposed as a motion in limine, iStar seeks, on the basis of a limitation of

liability provision in the Loan Agreement (the "Exculpatory Clause"),[1] to exclude evidence of Five Star's alleged consequential, indirect and special damages.  Because the motion in essence seeks a determination as a matter of law of whether the Exculpatory Clause is enforceable in this action, the Court informed the parties at the June 29, 2012, final pre-trial conference that the motion would be treated as one for partial summary judgment.  In accordance with the briefing schedule set at that conference, the parties have filed supplemental memoranda of law, evidentiary proffers, and statements pursuant to S.D.N.Y. Local Rule 56.1.  The second, related, motion before the Court is Five Star's motion to bifurcate the trial into separate liability and remedies phases.  The Court has reviewed thoroughly the parties' submissions and arguments.  For the following reasons, iStar's motion for partial summary judgment enforcing the Exculpatory Clause and excluding certain evidence[2] is granted and Five Star's motion for bifurcation is denied.

## BACKGROUND

The following summary of the parties' factual contentions that are relevant to the motions currently before the Court is drawn from the parties' submissions and is undisputed

---

[1] The parties refer to the limitation of liability provision in Section 11.2 of the Loan Agreement as the "Exculpatory Clause" in their briefing on this issue.

[2] iStar's original motion papers specifically seek the exclusion from evidence of the testimony and expert reports of Saul Solomon and Gadi Kaufmann, relating to lost profits, and Plaintiff's Exhibits 305-307.  In connection with its briefing in opposition to the motion, Five Star tendered additional damages evidence relating to a lost-investment theory.  iStar requested permission to move for exclusion of the newly-tendered evidence, which also appears to relate to consequential, indirect or special damages, in the event its motion to enforce the Exculpatory Clause is granted.  Such permission is granted in the concluding paragraph of this Memorandum Opinion and Order.

unless otherwise indicated.[3]

In May of 2007, iStar agreed to lend $112,025,000 to Five Star in connection with Five Star's purchase and development of a 120-acre parcel of land for a multi-use project (the "Project"), to be anchored by a Ritz Carlton Hotel, in the adjacent towns of Paradise Valley and Scottsdale, Arizona. The Loan Agreement provided that iStar's $112,025,000 loan was to be used to enable Five Star to purchase the property and to finance "horizontal construction" (i. e., site preparation, including acquisition of the necessary permits), until Five Star could obtain a construction loan and begin the "vertical construction" development phase.

On the Loan Agreement's closing date, iStar disbursed approximately $50 million. The Loan Agreement provided for the disbursement of the remainder of the commitment amount in connection with periodic requisitions ("Draw Requests") that were to be submitted by Five Star. The Project fell behind schedule, due in large part to Five Star's difficulties in obtaining the requisite Special Use Permit for the land, which it finally obtained on November 24, 2008. After the initial disbursement of the loan, Five Star submitted 18 Draw Requests for partial disbursements of the remainder of the loan. These were all approved by iStar. On December 12, 2008, Five Star submitted its nineteenth disbursement request ("Draw 19 "). iStar did not fund that Draw Request or any other subsequent request, asserting that Five Star had failed to meet certain conditions precedent to the funding of the Draw Requests.

The evidence cited by the parties indicates that, after Draw 19 was submitted, at

---

[3] Facts characterized as undisputed are identified as such in the parties' statements of facts, or drawn from evidence as to which there is no non-conclusory, contrary factual proffer. Citations to the parties' respective Local Civil Rule 56.1 statements of undisputed facts ("_____Stmt.") and responses thereto ("_____Resp. Stmt") incorporate by reference the parties' citations to the underlying evidentiary submissions.

least one member of iStar's loan management team concluded that it should be approved, but iStar's senior executives expressed concern about the loss that iStar would incur were it to continue funding Five Star's proposed development. In light of the recession and financial crisis at the time, iStar executives stated that they worried that Five Star did not have a good understanding of its own budget and schedule. iStar's officers examined the Loan Agreement to find a contractual basis for refusing to continue with the loan or obtaining modification of the terms of the loan, and concluded that certain condition precedent provisions of Section 3.2 of the Loan Agreement, "Advances for Hard Costs and Soft Costs Related to the Completion of Construction," had not been met by Five Star. iStar officers also determined that they could invoke budget provisions in the Loan Agreement that limited Five Star's discretion to spend money (see Def. Stmt. ¶¶ 8-12, 33-36, 60, 62-66), and provisions of a Post-Closing letter, in order to limit iStar's exposure to financial risk.

Officers from Five Star and iStar met on January 6, 2009, about a week after the funding deadline for Draw 19. Although what was discussed at the meeting is disputed, iStar, at some point, asserted conditions precedent as a basis for not continuing its funding of the Project. It also asserted those conditions precedent in writing after the meeting, acknowledging Five Star's partial completion of such conditions. Five Star undertook to satisfy the conditions, but was unable to do so. Meanwhile, iStar did fund part of Five Star's Draw 19 request, providing the money for the purchase of the so-called Indian Bend right-of-way, and it offered to waive conditions for Draw 19, provided Five Star agreed to satisfy the Section 3.2 conditions precedent by a specific date.

May 18, 2009, was the maturity date established by the Loan Agreement. Five

Star had not repaid the loan by that date, and the loan remains outstanding. Five Star cites, inter alia, optimistic assessments of the Project's prospects by iStar shortly before, and during, the time period in which iStar refused to fund Draw 19, and asserts that iStar's invocation of the condition precedent provisions of the Loan Agreement as grounds for refusal to fund Draw 19 and later disbursement requests was merely a pretext for iStar's decision to shut down funding for Five Star's work on the project in order to force Five Star to agree to more iStar-favorable terms or push Five Star into default so that iStar could foreclose on the property and capture the entire value of the property and the future development profits for itself. For purposes of its determination of the enforceability of the Exculpatory Clause, the Court assumes that iStar's refusal to fund the Draw Requests was a breach of the Loan Agreement, and construes the evidence in the light most favorable to Five Star. The Court thus assumes that iStar deliberately breached the Loan Agreement to gain economic advantage at Five Star's expense.

## DISCUSSION

### iStar's Motion for Partial Summary Judgment Enforcing the Exculpatory Clause

Summary judgment will be granted in favor of a moving party where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (the moving party bears the burden of establishing that there is no genuine issue of material fact). Correspondingly, summary judgment will be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is considered material if it "might affect the outcome

of the suit under governing law," and an issue of fact is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Anderson, 477 U.S. at 248. Although the court must draw all factual inferences in favor of the nonmoving party, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d. Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

Section 11.2 of the Loan Agreement contains a provision, written in all capital letters, stating that: "LENDER SHALL HAVE NO LIABILITY HEREUNDER FOR ANY CONSEQUENTIAL, SPECIAL, PUNITIVE OR INDIRECT DAMAGES." Section 11.8 of the Loan Agreement, also written in all capital letters states, that: "THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES." iStar contends that section 11.2, the Exculpatory Clause, precludes Five Star's claims for consequential, special, punitive or indirect damages. Five Star argues that there is a genuine dispute of material fact as to whether iStar's conduct was willfully and maliciously intended to inflict harm and thus falls within the public policy exception to the enforceability of contractual liability-limitation provisions. As explained below, the Court concludes that iStar is entitled to judgment on this issue as a matter of law.

New York courts have routinely enforced liability-limitation provisions when contracted by sophisticated parties, recognizing such clauses as a means of allocating economic risk in the event that a contract is not fully performed. "[I]n a strictly commercial context, a

provision limiting recovery is enforceable according to its terms unless the special relationship between the parties, a statute or public policy imposes liability." Metropolitan Life Ins. Co. v. Noble Lowndes Int'l Inc., 192 A.D.2d 83, 89 (1st Dep't 1993), aff'd, 84.N.Y.2d 430 (1994). The New York Court of Appeals has stated that:

> [a] limitation on liability provision in a contract represents the parties' [a]greement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor . . . '[The parties] may later regret their assumption of the risks of non-performance in this manner; but the courts let them lie on the bed they made.'

Metropolitan Life Ins. Co. v. Noble Lowndes Int'l Inc., 84 N.Y.2d 430, 436 (1994) (quoting 5 Corbin, Corbin on Contracts, § 1068, at 386 (1964)).

In Metropolitan Life, the defendant software provider committed to supplying customized software to the plaintiff in accordance with the plaintiff's needs as projected when the contract was formed. Id., at 433. Both parties had agreed to a contractual clause that absolved the defendant of liability for any consequential damages other than those caused by "intentional misrepresentations, willful acts and gross negligence." Id. When the expense of the contract turned out to be greater than anticipated, the defendant demanded payment above the ceiling established by the contract and, when the plaintiff refused to pay, the defendant withdrew from the contract and provided no further service. Id. The plaintiff sued seeking, inter alia, consequential damages and, after a trial, the jury found that the defendant's conduct was willful and maliciously intended to harm the plaintiff. Id., at 434. On appeal, the Appellate Division interpreted the willful act exception in the contract as requiring tortious acts, and it found that the proof did not establish that such conduct had occurred, but instead only that there had been an "intentional abandonment" of the contract, which was held to be insufficient. 190 A.D.2d at 90.

The New York Court of Appeals approached the case as requiring an interpretation of the clear provisions of the contract in light of contract law principles, including the principle that intentional nonperformance of a contract (unlike an intentional tort) generally does not affect the measure of damages awarded to a party. 84 N.Y.2d at 435. The court emphasized that the policy of contract law is "to bind a party by what he agrees to do whether or not he intends to do what he agrees." Id. The contract, which exempted "willful acts" from the limitation on consequential damages, was properly construed narrowly to exclude only "truly culpable, harmful conduct, not merely intentional nonperformance motivated by financial self-interest," and the court explained that its construction of the contract was consistent with the public policy exception for actions that "smack of wrongdoing." Id., at 439, citing to Kalisch-Jarcho, Inc. v. City of New York, 58 N.Y.2d 377, 385 (1983).[4]

Exculpation of intentional or reckless harm from tort liability is against public policy, but the risk of economic harm stemming from deliberate non-performance that is motivated by the economic self-interest of the breaching party is, the court held, the sort of risk assumed by the commercial counterparty to an exculpatory clause. Id., at 438. Thus, it was neither inconsistent with the contract nor contrary to public policy to afford the defendant in Metropolitan Life the protection of the liability-limitation provision, even where the trial evidence had shown that the defendant abandoned the contract in order to shed itself of an

---

[4] In Kalisch-Jarcho, the Court of Appeals described how an exculpatory clause cannot exonerate a party from liability under all circumstances and would not apply to "exemption of willful or grossly negligent acts . . . More pointedly, an exculpatory clause is unenforceable when, in contravention of acceptable norms of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing." 58 N.Y.2d at 384. The Court of Appeals' decision in Metropolitan Life makes it clear, however, that intentional conduct that capitalizes on economically advantageous contract provisions to the detriment of the counterparty is not, of itself, the sort of misconduct to which the public policy exception applies.

unprofitable obligation, making itself more attractive to a potential acquirer, and the defendant knew that the plaintiff would suffer significant injury in that it would have to find another software system as a consequence of the breach. Id., at 438-39.

"[T]he decision of the New York Court of Appeals in Metropolitan Life is authoritative and it holds that an allegation that a breach of contract was willful rather than involuntary does not allow a court to disregard an unambiguous limitation of liability provision agreed to by parties of equal bargaining power." Dyncorp v. GTE Corp., 215 F. Supp. 2d 308, 318 (2002) (dismissing plaintiff buyer's contract claims against a breaching seller for consequential, special or punitive damages as precluded by the exculpatory clause in their contract). "While issues of malice, willfulness and gross negligence often present questions of fact, courts have sustained limitation of liability provisions in the context of a summary judgment motion when the surrounding facts compel such a result." Net2Globe Int'l Inc. v. TimeWarner Telecom of New York, 273 F. Supp.2d 436, 450 (S.D.N.Y. 2003) (enforcing liability-limitation provision where defendant telecommunications provider had terminated service to plaintiff as it was no longer economically profitable to provide performance and plaintiff refused to pay more, finding that defendant's behavior was not tortious so as to fall under the Metropolitan Life public policy exception). See also MyPlayCity Inc. v. Conduit, No. 10 Civ. 1615 (CM), 2011 WL 3273487, at *7 (S.D.N.Y. July 29, 2011) (granting partial summary judgment to the defendant and dismissing the plaintiff's consequential damages claim when the defendant, for economic reasons, intentionally terminated a revenue sharing agreement).

Here, the parties' contract includes a clause that excuses iStar, in clear and unambiguous terms, from liability for consequential, indirect or special damages with no stated exceptions at all. The risk allocation scheme imposed by the Exculpatory Clause is consistent

with the nature and other terms of the Loan Agreement, which provided for short term lending to fund the initial limited acquisition and the development costs on a project that was subject to a host of contingencies. iStar's potential gain on full performance under the contract was limited to the return of principal, with interest, and it bore the risks of nonpayment and diminution in the value of its collateral.

Viewed in the light most favorable to Five Star, iStar's assumed breach of the Loan Agreement was consistent with iStar's economic interests under the contract. The refusal to fund further Draw Requests protected iStar from the risk of loss associated with further outlays and, at the same time, put Five Star at risk of losing the value of its investment and potential profit. The Court of Appeals' decision in Metropolitan Life v. Lowndes establishes, however, that the intentional breach alleged here does not, as a matter of law, rise to the level required to trigger the public policy exception to the enforcement of liability limitations.

Five Star's legal arguments to the contrary are unavailing. It points in particular to the Appellate Division decision in Banc of America Securities L.L.C. v. Solow Building Co. II, L.L.C., 47 A.D.3d 239 (1st Dep't 2007). In that case, plaintiff Banc of America sought its landlord's permission to make alterations to the office space as provided for under the lease. Id., at 240. The landlord refused to review the alteration plans unless Banc of America paid an up-front fee of 3% of the projected costs of the alterations, as well as a $6 million fee based on the value of earlier, already completed alterations. Id. There was no basis in the contract for either fee. Id., at 243. When Banc of America refused to pay, the landlord served Banc of America with notices of default and Banc of America sought a declaratory judgment. Id., at 241. Denying the landlord's motion for partial summary judgment, the Appellate Division held that there were issues of fact regarding whether the limitations on liability provision protected the landlord, as

the landlord did "not even pretend [that the demand for the fee was] authorized under the lease," or was reasonable. Id., at 249. iStar, in contrast, invoked integral contract provisions. To the extent that Banc of America Securities is read to suggest that an intentional and opportunistic contract breach, without more, is grounds for non-enforcement of an exculpatory clause, it is inconsistent with state law as established by Metropolitan Life, which this Court is bound to follow. See 47 A.D.3d at 254 (McGuire, J., dissenting).

Further, Five Star's reliance on the concept of economic duress to justify non-enforcement of the limitation misapplies that doctrine, which provides a defense to the enforcement of contract provisions rather than an independent ground for broadening damages liability, and is also inconsistent with the Court of Appeals' decision in Metropolitan Life. See Def.'s Resp. to Pl.'s Supp. Mem. in Opp. to Def.'s Mot. in Limine at 10-14.

Five Star also argues that, even if the Exculpatory Clause precludes Five Star from recovering consequential damages, it should still be able to assert its damages claims as ones for set-off against any potential judgment rendered in iStar's favor without regard to the Exculpatory Clause. However, its arguments fail for substantially the reasons explained at pages 16-18 of Def.'s Reply Mem. of Law in Further Supp. of its Mot. in Limine.

Five Star's Motion to Bifurcate the Trial into Separate Liability and Remedies Phases

Five Star has moved pursuant to Federal Rule of Civil Procedure 42(b) to bifurcate the trial into separate liability and remedy phases. Under Rule 42(b), a court may order a separate trial "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed R. Civ. P. 42(b) (West 2012). Five Star contends that bifurcating the trial would simplify it, allow the Court to defer a determination on the Defendant's motion in limine to preclude

consequential, indirect and special damages, and create a framework for settlement, potentially avoiding a remedies phase. For the following reasons, Five Star's motion to bifurcate is denied.

"[W]hether to bifurcate a trial into liability and damages phases is a matter within the sound discretion of the trial court." Getty Petroleum Corp. v. Island Transp. Corp., 862 F.2d 10, 15 (2d Cir. 1988). Although bifurcation may be appropriate in some circumstances, "bifurcation remains the exception rather than the rule." Providencia V. v. Schutlze, No. 02 Civ. 9616, 2007 WL 1582996, at *7 (S.D.N.Y. May 31, 2007) and is "to be employed only in exceptional circumstances." Hirschheimer v. Assoc. Metals & Minerals Corp., No. 94 Civ. 6155 (JFK), 1997 WL 528057, at *9 (S.D.N.Y. Aug. 27, 1997). This is because "[a] single trial tends to lessen the delay, expense and inconvenience to all concerned." (internal citations omitted). Id.

The Court sees no compelling reason to depart from the normal course in this instance. Evidence relating to liability and damages is necessarily intertwined in this matter. See Vichare v. AMBAC, Inc., 106 F.3d 457, 466 (bifurcation is inappropriate where "issues of liability and damages are intertwined"). Additionally, in light of the Court's granting of iStar's partial summary judgment motion on the Exculpatory Clause, the damages phase will be much less complex, and there is no need for a separate remedies phase of trial.

## CONCLUSION

For the foregoing reasons, iStar's partial summary judgment motion is granted. The Exculpatory Clause in Section 11.2 of the Loan Agreement precludes Five Star from recovering consequential, indirect or special damages. iStar's motion in limine to preclude the testimony and reports of Saul Solomon and Gadi Kaufman and Plaintiff's Exhibits 305-307 is also granted. iStar may move within 14 days from the date of this Memorandum Opinion and

Order to preclude the additional damages evidence that Five Star proffered in connection with this motion practice. Five Star's motion for bifurcation of the trial is denied in its entirety. This Memorandum Order resolves docket entry numbers 146 and 149.

The final pretrial conference in this matter resumes on September 28, 2012, at 3:00 p.m. By September 25, 2012, the parties must file joint submissions revising their requests to charge, witness and exhibit lists, and estimates of trial length in light of this decision, with courtesy copies for Chambers.

SO ORDERED.

Dated: New York, New York
September 18, 2012

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge