Mary E. Flynn
Danielle C. Lesser
Brett Dockwell
MORRISON COHEN LLP
909 Third Avenue
New York, New York  10022
(212) 735-8600
*Attorneys for Plaintiff*
*Five Star Development Resort Communities, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

FIVE STAR DEVELOPMENT RESORT
COMMUNITIES, LLC,                                    No. 09 Civ. 2085 (LTS)(AJP)

                          Plaintiff,

              -against-

iSTAR RC PARADISE VALLEY LLC,

                          Defendant.

-------------------------------------------------------------------X


**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION *IN LIMINE* TO PRECLUDE
PLAINTIFF'S ADDITIONAL DAMAGES EVIDENCE**


# MorrisonCohen LLP

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ...................................................................................... 3

    I.     THE INITIAL REPORT ........................................................................ 3

    II.    THE HIGHLY COMPRESSED TRIAL PREPARATION PERIOD .................... 4

    III.   THE SUPPLEMENTAL REPORT ............................................................ 5

         A.    Unreimbursed Costs .................................................................. 6

              1.    Preview Center, Marketing and Retail Leasing – Exhibits 389, 390 and 391 ................................................ 6

              2.    Property Taxes – Exhibits 382, 383, 392, 393 and 400 ................ 7

              3.    Settlements with Vendors – Exhibits 395 and 399 .................... 8

              4.    Referendum – Exhibit 394 ................................................ 8

              5.    Letter of Credit – Exhibits 396, 397 and 398 ........................ 8

              6.    Summary of Unreimbursed Costs – Exhibit 388 .................... 9

         B.    Five Star's Lost Equity ............................................................ 9

         C.    Letter of Credit ....................................................................... 9

ARGUMENT .......................................................................................................... 9

    I.     LEGAL STANDARD ............................................................................. 9

    II.    ISTAR FAILS TO ARTICULATE ANY BASIS FOR PRECLUDING EVIDENCE OF UNREIMBURSED COSTS ........................................... 11

         A.    The Unreimbursed Costs Evidence Is Within the Scope of the Initial Report ...................................................................... 12

         B.    In Any Case, Any Untimely Disclosure Was Substantially Justified and Harmless ............................................................ 13

#4099212 v5 \020396 \0004

III.     UNTIMELY DISCLOSURE OF MR. SOLOMON'S OPINIONS ON
         FIVE STAR'S LOST EQUITY AND LETTER OF CREDIT DAMAGES
         WAS SUBSTANTIALLY JUSTIFIED AND HARMLESS ................................15

IV.      THE DAMAGES SET FORTH IN THE SUPPLEMENTAL REPORT
         ARE NOT CONSEQUENTIAL DAMAGES ........................................................17

CONCLUSION ....................................................................................................................23

#4099212 v5 \020396 \0004

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Aramony v. United Way of America,*
  28 F. Supp. 2d 147 (S.D.N.Y. 1998),
  *aff'd in part, rev'd in part,* 191 F.3d 140 (2d Cir. 1999) ....................................22

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.,*
  769 F. Supp. 2d 269 (S.D.N.Y. 2011) ..........................................................12

*Emig v. Electrolux Home Prods. Inc.,*
  No. 06-cv-4791, 2008 U.S. Dist. LEXIS 68811 (S.D.N.Y. Sept. 11, 2008) ....................12

*Grdinich v. Bradlees,*
  187 F.R.D. 77 (S.D.N.Y. 1999) ............................................................14, 16

*Hildago Props., Inc. v. Wachovia Mortgage Co.,*
  617 F.2d 196 (10th Cir. 1980) ...............................................................19

*Hinton v. Patnaude,*
  162 F.R.D. 435 (N.D.N.Y. 1995) .........................................................14, 16

*Manoma Realty Mgmt., LLC v. Federal Pacific Elec. Co.,*
  No. 02-cv-0494, 2007 U.S. Dist. LEXIS 54887 (S.D.N.Y. 2007) ...................................15

*Pearce v. Holland Prop. Mgmt., Inc.,*
  No. 06-cv-663, 2009 U.S. Dist. LEXIS 47723 (N.D.N.Y. June 5, 2009) ................... 12-13

*Penthouse Int'l, Ltd. v. Dominion Fed. Savings & Loan Ass'n,*
  665 F. Supp. 301 (S.D.N.Y. 1987),
  *aff'd in part, rev'd in part,* 855 F.2d 963 (2d Cir. 1988) .....................................21

*Plew v. Limited Brands, Inc.,*
  No. 08-cv-3741, 2012 U.S. Dist. LEXIS 14966 (S.D.N.Y. Feb. 6, 2012) .................11, 15

*Point Productions A.G. v. Sony Music Entertainment, Inc.,*
  No. 93-cv-4001, 2002 WL 31856951 (S.D.N.Y. Dec. 19, 2002) ....................................10

*RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.,*
  No. 94-cv-5587, 2002 U.S. Dist. LEXIS 23829 (S.D.N.Y. Dec. 11, 2002) ....................15

*Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC,*
  No. 09-cv-1086, 2012 U.S. Dist. LEXIS 19218 (S.D.N.Y. Jan. 9, 2012) ........................11

#4099212 v5 \020396 \0004

*Stanish v. Polish Roman Catholic Union of America*,
    484 F.2d 713 (7th Cir. 1973) ............................................................................20

*Versatile Housewares & Gardening Systems, Inc. v. Thill Logistics, Inc.*,
    819 F. Supp. 2d 230 (S.D.N.Y. 2011) ..............................................................17

### STATE CASES

*Bi-Economy Market, Inc. v. Harleysville Insurance Co. of N.Y.*,
    10 N.Y.3d 187, 856 N.Y.S.2d 505 (2008) ........................................................17

*David Home Builders, Inc. v. Misiak*,
    91 A.D.3d 1362, 937 N.Y.S.2d 524 (4th Dep't 2012) ......................................22

*Dambroso v. Malik*,
    12 Misc. 3d 1192(A), 824 N.Y.S.2d 768 (Civ. Ct. Queens Cnty. 2006) ..........22

*Doushkess v. Burger Brewing Co.*,
    20 A.D. 375, 47 N.Y.S. 312 (1st Dep't 1897) ............................................ 19-20

*Goldsmith v. Holland Trust Co.*,
    5 A.D. 104, 38 N.Y.S. 1032 (1st Dep't 1896) ............................................ 18-19

*Hoch v. Braxmar*,
    109 A.D. 209, 95 N.Y.S. 647 (2d Dep't 1905) ........................................... 21-22

*Hopewell Building Co. v. Callan*,
    200 A.D. 588, 193 N.Y.S. 504 (1st Dep't 1922) ...............................................20

*Kerr Steamship Co. v. Radio Corp. of America*,
    245 N.Y. 284, 157 N.E. 140 (1927) ................................................2-3, 17-18, 22

*Lincor Contractors, Ltd. v. Hyskell*,
    39 Wash. App. 317, 692 P.2d 903 (Wash. Ct. App. 1984) ...............................21

*St. Paul at Chase Corp. v. Manufacturers Life Insurance Co.*,
    262 Md. 192, 278 A.2d 12 (Md. Ct. App. 1971) ..............................................19

*United California Bank v. Prudential Insurance Co. of America*,
    140 Ariz. 238, 681 P.2d 390 (Ariz. Ct. App. 1983) ..................................... 20-21

### FEDERAL STATUTES

Fed. R. Civ. P. 37(c) ...........................................................................................10-11

**MISCELLANEOUS**

11 <u>Corbin on Contracts</u>, Damages, § 56.6 Forseeability (Rev. ed. 2005)  ....................................18

Plaintiff Five Star Development Resort Communities, LLC ("Five Star") submits this memorandum of law in opposition to the motion *in limine* of Defendant iStar RC Paradise Valley LLC ("iStar") to preclude Five Star's additional damages evidence.

## PRELIMINARY STATEMENT

The critical inquiry for determining whether claimed damages are "direct" damages is whether the damages flow directly from the breach. All of the damages set forth in the Supplemental Report of Saul Solomon dated June 15, 2012 (the "Supplemental Report") easily meet this test. iStar's motion sidesteps this critical inquiry by inappropriately lumping together several discrete categories of Five Star's damages, and incorrectly labeling them a "new damages theory" that was purportedly first disclosed in the Supplemental Report. By setting up this strawman argument, iStar seeks to preclude Five Star from recovering even its direct damages.

As will be shown below, each of the 15 trial exhibits that iStar seeks to preclude relate directly to Five Star's unreimbursed out-of-pocket costs, which were fully disclosed to iStar in the Expert Report of Saul Solomon on *February 26, 2010* (the "Initial Report"), and then updated in the Supplemental Report given the passage of time and the accrual of additional damages. Five Star's unreimbursed costs damages were referenced in the Summary of Opinions of the Initial Report, described in more detail in the main body of the report, and fully itemized in the report's Exhibit 5L. These unreimbursed costs are simply not a "new damages theory." Moreover, even if there were merit to iStar's argument that the Supplemental Report introduces a "new damages theory" with respect to Five Star's out-of-pocket direct damages, iStar's motion should still not be granted because under prevailing law, even late-disclosed damages evidence

can be introduced where, as here, the evidence is within the scope of an initial report or the late disclosure was substantially justified and harmless.

iStar's attempt to preclude other damages referenced in the Supplemental Report – namely, Five Star's loss of equity and its $13.3 million letter of credit – should similarly be denied. Mr. Solomon's opinions on these damages are not based on a "new theory," but rather on changed circumstances that occurred after submission of the Initial Report, and which became apparent during Five Star's trial preparation.  The facts underlying these two categories of damages were known to iStar, but they only became "damages" based on the fact that, during the pendency of this case, the project as originally contemplated could no longer be built within the required deadlines.  Given the compressed time period for trial preparation, coupled with the fact that the Supplemental Report was served approximately six months before trial, the disclosure of these additional categories of direct damages (based on facts fully disclosed and known to iStar) was substantially justified and harmless.  The drastic remedy of preclusion is not warranted under these circumstances.

Finally, there is no merit to iStar's argument that all damages set forth in the Supplemental Report are consequential and therefore must be precluded under this Court's September 18, 2012 ruling precluding consequential damages.  Contrary to iStar's argument, there is no bright line rule that makes certain types of damages automatically "consequential" and certain types automatically "direct."  The distinction between consequential or special damages, on the one hand, and direct or general damages, on the other, "is not absolute, but relative.  To put it in other words, damage which is general in relation to a contract of one kind may be classified as special in relation to another." *Kerr Steamship Co. v. Radio Corp. of*

*America*, 245 N.Y. 284, 288-289, 157 N.E. 140, 141 (1927).  As set forth more fully below, Five Star's damages itemized in the Supplemental Report are "direct" damages, and Five Star is entitled to recover these damages as a result of iStar's breach.   Accordingly, iStar's motion should be denied.


## FACTUAL BACKGROUND

### I.   THE INITIAL REPORT

On or about February 26, 2010, Five Star served the Initial Report on iStar.  (Declaration of Danielle C. Lesser, 10/19/12 ("Lesser Decl."), Ex. 1).  When the Initial Report was served, Five Star expected to complete construction of a mixed-use development featuring a Ritz-Carlton hotel, condominiums, single-family residences, and a retail center (collectively, the "Project"). The Initial Report determined damages for each element of the Project, based on the assumption that the Project would still be completed but delayed for slightly more than one year as a result of iStar's wrongful termination of project financing.  (*Id.* at 2).  These damages, together with increased financing costs (together, the "Project Delay Costs"), totaled $210,665,588.  (*Id.*).

In addition to the Project Delay Costs, the Initial Report included as damages a series of unreimbursed out-of-pocket costs borne by Five Star ("Unreimbursed Costs").   These costs totaled $6,953,275 and were disclosed within the Initial Report and set forth in the report's Exhibit 5L.  (Lesser Decl., Ex. 2).[1]  Given the compressed timeframe for discovery in this case, both parties agreed to waive depositions of expert witnesses.  After receiving the Initial Report,

---

[1]  For the Court's convenience, Exhibit 5L, which is included in Lesser Declaration Ex. 1, is produced separately as Ex. 2.

iStar did not request any additional documents relating to the Initial Report, including any back-up to the Unreimbursed Costs itemized in Exhibit 5L of the Initial Report.

## II.   THE HIGHLY COMPRESSED TRIAL PREPARATION PERIOD

On November 23, 2010, iStar moved for summary judgment.   That motion was fully briefed and submitted to the Court on March 23, 2011.   When the motion was submitted, Five Star expected that the Project would still be completed, albeit after a delay because of iStar's termination of funding.

Given the complexity of this case, the motion was *sub judice* until March 26, 2012, when the Court issued its Memorandum Opinion and Order.   During that time, Five Star reasonably waited before preparing its damages case for trial, given the possibility that the Court's summary judgment decision might have rendered some or all trial preparation moot.

The Court's March 26, 2012 order directed the parties to attempt mediation again.   To maximize the potential for settlement, the parties, with leave of the Court, arranged to mediate their dispute through JAMS on May 8, 2012.   At the same time, a June 15, 2012 pre-trial conference control date remained on the Court's calendar.   That date required the parties to make their final pre-trial disclosures on May 1, 2012 – before the parties' mediation and only a month after the Court's summary judgment decision.   Five Star requested an adjournment of the pre-trial conference date, which iStar opposed and the Court denied.

From April 2012 through the pre-trial conference on June 28, 2012, Five Star worked intensely to prepare for trial.   During trial preparation, it became apparent that completion of the Project within the timeframes required by the land-use entitlements had become increasingly unlikely.   Similarly, certain deadlines within Five Star's contractual arrangment with Ritz-

Carlton had expired and were unlikely to be fully restored.[2] The expiration of these deadlines undermined the Project Delay Costs set forth in the Initial Report, which costs were premised on the ongoing viability of the Project.

Accordingly, Five Star re-engaged its expert to reexamine Five Star's damages disclosures in the Initial Report. Mr. Solomon concluded that the Project Delay Costs set forth in his Initial Report were no longer viable, given the passage of time and the expiration of entitlements and the Ritz-Carlton contract. As a result, Mr. Solomon updated his report to reflect the fact that Five Star would no longer seek the Project Delay Costs of $210,665,588, and would, instead, seek only to recover Five Star's Unreimbursed Costs, which would be updated to include any costs incurred since the date of the Initial Report.

## III.    THE SUPPLEMENTAL REPORT

The Supplemental Report (Lesser Decl., Ex. 3) updated the Unreimbursed Costs calculations contained in Exhibit 5L of the Initial Report, and added two additional unreimbursed costs – namely, Five Star's lost equity and its $13.3 million letter of credit – which had not been lost at the time of the Initial Report, but which now were a total loss given the fact that the Project was no longer viable absent renegotiations with the Town of Paradise Valley and Ritz-Carlton. (*Id.* at 7).  The total damages set forth in the Supplemental Report – $60,377,918 – are a

---

[2]  Pursuant to the November 24, 2008 Special Use Permit and Development Agreement between Five Star and the Town of Paradise Valley (the "Town"), Project construction must be completed by November 24, 2015.  (Declaration of Jerry C. Ayoub, 7/12/12 [D.E. 114] ¶¶ 6, 7).  However, the delays caused by iStar's termination of funding have rendered this deadline impossible to meet.  (*Id.* ¶ 8).  Similarly, Five Star's branding agreement with Ritz-Carlton has now expired. (*Id.* ¶¶ 10-11).  Accordingly, to move forward with the Project, Five Star must obtain the Town's approval of a revised Development Agreement and Ritz-Carlton's approval of a revised branding agreement.  At this time, the prospect of successfully obtaining either the Town's or Ritz-Carlton's approval of the necessary revisions is highly uncertain.  (*Id.*).

fraction of Five Star's total losses caused by iStar's wrongful termination of the Loan, and reflect Five Star's direct losses flowing from iStar's breach.  The Supplemental Report was served on iStar on June 15, 2012.  (iStar's Memorandum of Law in Support of its Motion in Limine to Preclude Five Star's Additional Damages Evidence, 10/2/12 [D.E. 195] ("iStar Br.") at 4).

The three categories of damages set forth in the Supplemental Report are Unreimbursed Costs, Five Star's lost equity and the $13.3 million letter of credit.  Each of the 15 trial exhibits that iStar seeks to preclude relates to Unreimbursed Costs – the same damages category that was included in the Initial Report.

**A.      Unreimbursed Costs**

The Supplemental Report contains the following subcategories of Unreimbursed Costs –

(i)  the sales preview center,

(ii)  marketing,

(iii)  office overhead and employee leasing,

(iv)  retail leasing

(v)  property taxes,

(vi)  referendum,

(vii)  settlements with vendors, and

(viii)  the letter of credit.

**1.      Preview Center, Marketing and Retail Leasing –
Exhibits 389, 390 and 391**

The preview center, marketing and retail leasing costs set forth in the Supplemental Report are the same as those set forth in the Initial Report.  However, the Supplemental Report itemizes each of the individual expenses that comprise these damages subcategories and

eliminates any expenses that were not clearly traceable to these subcategories. Accordingly, the damages amounts set forth in the Supplemental Report are 10% lower than the amounts set forth in the Initial Report ($5,925,789 v. $5,334,730).

Trial Exhibits 389, 390 and 391 list the individual expenses for each subcategory and provide the backing invoices for each category. Contrary to iStar's claim, none of these exhibits relates to a "new damages theory." (iStar Br. at 1).

### 2. Property Taxes – Exhibits 382, 383, 392, 393 and 400

Like the Initial Report, the Supplemental Report includes an Unreimbursed Cost subcategory for property taxes paid by Five Star. At the time of the Initial Report, taxes for 2010 had not yet been paid, so the Supplemental Report was updated to include Five Star's property taxes for the tax years 2010, 2011 and 2012.

iStar was well aware of these costs. In fact, in a letter dated June 30, 2010, iStar's counsel wrote to Five Star's counsel "to demand that Five Star pay the past due RE taxes . . . and that it pay all future property tax installments before they become past due." (Lesser Decl., Ex. 4). Five Star responded by providing iStar's counsel with receipts showing payment of the property taxes. (Lesser Decl., Ex. 5). iStar's counsel continued to monitor Five Star's property tax payments on the Maricopa County Treasurer's website and alerted Five Star's counsel when payments became past due. (Lesser Decl., Ex. 6). For example, in a February 8, 2012 email, iStar's counsel informed Five Star's counsel of an unpaid late fee of $35.57 pertaining to one of the tax parcels – "The Borrower paid all parcels on 10-31-11, but for some reason parcel 174-58-052 6 was paid late on 11-8-11." (*Id.*). Since 2009, Five Star has paid $2,100,924 in property taxes.

#4099212 v5 \020396 \0004

Trial Exhibits 382, 383, 392, 393 and 400 provide the tax statements and proof of payment for each tax parcel for the tax years 2009, 2010, 2011 and 2012, all of which iStar has been aware.

### 3.  Settlements with Vendors – Exhibits 395 and 399

The Supplemental Report includes a cost subcategory for settlements paid by Five Star to satisfy outstanding invoices from vendors that were to have been paid from loan proceeds, had iStar not wrongfully terminated funding.  These costs were itemized in Trial Exhibit 395, which was produced to iStar on March 2, 2010.  (Declaration of Jason Reid, 10/19/12 at ¶ 9).  Exhibit 399 consists of checks demonstrating proof of payment for the line items in Exhibit 395, which totaled $421,590.

### 4.  Referendum – Exhibit 394

The Supplemental Report includes a subcategory for expenses incurred by Five Star in support of the voter referendum to approve the Project's entitlements.  iStar knew that Five Star was incurring these costs at the time.  (*See* Declaration of B. Lanny Cowart, 5/14/09 [D.E. 22] at ¶¶ 24-26).

Trial Exhibit 394 consists of three invoices documenting Five Star's referendum costs, which totaled $67,201.

### 5.  Letter of Credit – Exhibits 396, 397 and 398

The Supplemental Report includes a subcategory for expenses incurred by Five Star in obtaining and maintaining the $13.3 million letter of credit that was drawn down and deposited into the Court's escrow account on May 17, 2011.  Because the Loan Agreement required Five Star to obtain the letter of credit, iStar had notice that Five Star would incur these costs, which totaled $961,078, as documented by Trial Exhibits 396, 397 and 398.

#4099212 v5 \020396 \0004

6. **Summary of Unreimbursed Costs – Exhibit 388**

Trial Exhibit 388 summarizes Five Star's Unreimbursed Costs. This exhibit is also included as Exhibit 5 to the Supplemental Report. (Lesser Decl., Ex. 3).

**B.    Five Star's Lost Equity**

The Supplemental Report includes a direct damages category for Five Star's lost equity in the Property. This category reflects the fact that the Project is no longer viable absent further approvals, and that Five Star's initial cash investment of nearly $38 million has been wiped out due to iStar's breach. (Lesser Decl., Ex. 3 at 7). Mr. Solomon's opinion on Five Star's lost equity is based on the fact that Five Star's cash equity investment of $37,804,050 is now a total loss because the balance of the Loan exceeds the current value of the land. (*Id.*).

**C.    Letter of Credit**

The Supplemental Report includes a damages category for the $13.3 million letter of credit posted by Five Star. This $13.3 million loss was not included in the Initial Report because the letter was not drawn down until May 2011, after the Initial Report was prepared in February 2010. (*Id.*).

## ARGUMENT

**I.    LEGAL STANDARD**

iStar fails to identify the Federal Rule of Civil Procedure on which it bases its motion. Although the crux of iStar's motion is based on the duty to supplement disclosures imposed by Rule 26(e), iStar's memorandum of law focuses on Rule 15(a). According to iStar, in determining whether to preclude "evidence of a new damages theory," the Court must apply "the same factors relevant to a request for leave to amend a complaint pursuant to Rule 15(a)." (iStar Br. at 5-6). However, iStar is wrong on two grounds.

#4099212 v5 \020396 \0004

9

First, the Supplemental Report and Trial Exhibits 382, 383 and 388 through 400 (the "Supplemental Exhibits") are not "evidence of a new damages theory." The Supplemental Report contains three separate categories of damages: Unreimbursed Costs, Five Star's lost equity, and the $13.3 million letter of credit. Unreimbursed Costs were included as a category of damages in the Initial Report and thus are not a "new" damages theory. Furthermore, every one of the Supplemental Exhibits relates to Unreimbursed Costs. Because iStar's motion focuses entirely on a so-called "new damages theory," iStar fails to articulate any basis for excluding evidence relating to Unreimbursed Costs.

Second, the factors relevant to a request for leave to amend a complaint under Rule 15(a) are inapplicable here. iStar's focus on Rule 15(a) is based on a short, curious line of cases that misread Judge Buchwald's decision in *Point Productions A.G. v. Sony Music Entertainment, Inc.*, No. 93-cv-4001, 2002 WL 31856951, at *2 (S.D.N.Y. Dec. 19, 2002), which involved a motion to *reconsider*, not a motion to preclude. In *Point Productions*, the court was asked to reconsider a prior decision permitting plaintiff to pursue an alternative damages theory. *Id.* at *1. In reconsidering whether to preclude the alternative damages evidence, the court found that the factors that are relevant to motion to amend a complaint under Rule 15(a) provided "a meaningful analogy." *Id.* at *3. However, *Point Productions* does not stand for the proposition that evidence that is not timely disclosed under Rule 26(e) can be precluded based on a Rule 15(a) analysis. Accordingly, almost all of the case law relied on by iStar is inapplicable to its motion.

Instead, the applicable rule for iStar's motion is Rule 37(c), which states: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not

allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c). "[D]espite the seeming 'self-executing' nature of the preclusion sanction in the Rule, imposition of the preclusion sanction remains within the trial court's discretion. . . . Further, as preclusion of evidence is a 'harsh remedy,' it 'should be imposed only in rare situations.'" *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, No. 09-cv-1086, 2012 U.S. Dist. LEXIS 19218, at *21-22 (S.D.N.Y. Jan. 9, 2012) (internal citations omitted). *Accord Plew v. Limited Brands, Inc.*, No. 08-cv-3741, 2012 U.S. Dist. LEXIS 14966, at *16 (S.D.N.Y. Feb. 6, 2012) (Swain, J.) ("In general, absent prejudice and bad faith, courts will not resort to exclusion."). Exclusion of the Supplemental Report and Supplemental Exhibits is inappropriate here for the reasons set forth more fully below.

## II.   ISTAR FAILS TO ARTICULATE ANY BASIS FOR PRECLUDING EVIDENCE OF UNREIMBURSED COSTS

iStar's motion *in limine* fails to acknowledge that part of the Supplemental Report and all of the Supplemental Exhibits pertain to Unreimbursed Costs (together, the "Unreimbursed Costs Evidence"), which is a category of damages that was explicitly addressed in the Initial Report, and merely updated in the Supplemental Report. Because iStar's motion addresses *only* the exclusion of evidence of a "new damages theory," iStar fails to articulate any basis for precluding the Unreimbursed Costs Evidence.

Nor can iStar articulate any such basis. Preclusion is inappropriate where, as here, the challenged evidence is within the scope of an earlier expert report or where the late disclosure is substantially justified or harmless.

#4099212 v5 \020396 \0004

11

A.    **The Unreimbursed Costs Evidence Is Within the Scope of the
Initial Report**

Courts have regularly found that where, as here, an expert is merely giving new

"evidentiary details" to support opinions that have already been expressed, then such expert

evidence should not be precluded under Rule 37. For example, in *Cedar Petrochemicals, Inc. v.

Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269 (S.D.N.Y. 2011), the defendant sought to

preclude an expert's declaration under Rule 37(c) on the grounds that it was outside the scope of

his previously submitted report. *Id.* at 277. However, the court held that such a declaration

would be permissible if it was "within the scope of the initial expert report" and simply provided

evidentiary details for an opinion expressed in that report. *Id.* at 279. The court refused to

exclude the declaration, finding that it "merely summarizes, formalizes, and contextualizes

references" to norms described in the expert's report. *Id.* at 280.

Similarly, in *Emig v. Electrolux Home Prods. Inc.*, No. 06-cv-4791, 2008 U.S. Dist.

LEXIS 68811 (S.D.N.Y. Sept. 11, 2008), defendants urged the court under Rule 37(c) to

disregard an expert affidavit submitted in opposition to their motion to preclude on the grounds

that it purportedly contained information that was not in the expert report. *Id.* at *9-10. The

court denied the motion because the expert affidavit "offers more information and elaboration on

opinions previously expressed in the [expert] report."[3]  *Id.* at *12 n.4. Likewise, in *Pearce v.

Holland Prop. Mgmt., Inc.*, No. 06-cv-663, 2009 U.S. Dist. LEXIS 47723 (N.D.N.Y. June 5,

2009), the court denied plaintiffs' argument to disregard expert deposition testimony because the

---

[3] The court did preclude a sample instruction sheet that was never provided to defendants. *Id.* at
*12 n.4. However, that branch of the decision is not relevant here, insofar as all of the
Supplemental Exhibits have been provided to iStar.

#4099212 v5 \020396 \0004

testimony was "consistent with the conclusions in their expert reports" and "the reports make clear what the experts' opinions are." *Id.* at *7 n.3.

The Unreimbursed Costs Evidence is consistent with the conclusions in the Initial Report and simply updates and provides evidentiary detail on the opinions expressed in the Initial Report. iStar's motion to preclude the Unreimbursed Costs Evidence should be denied.

## B.   In Any Case, Any Untimely Disclosure Was Substantially Justified and Harmless

In any case, Rule 37(c) does not apply if the late disclosure was substantially justified or harmless. All of the Unreimbursed Costs Evidence was disclosed to iStar by June 15, 2012, two weeks before the parties' June 28, 2012 pre-trial conference. These disclosures, even if untimely, resulted from preparation of the Supplemental Report. Because the Initial Report did not reference the documents relied upon in calculating those costs, the Supplemental Report itemized the individual expenses and presented them in tabular form to provide iStar and the Court with the exhaustive back-up for those calculations. The Supplemental Exhibits are merely the underlying invoices and proof of payment of these expenses. These exhibits are straightforward and uncomplicated.[4]

Contrary to iStar's unfounded claims, the late disclosure of the Supplemental Exhibits was not bad faith by Five Star, but rather the result of the highly compressed time period for trial preparation between the Court's March 28, 2012 summary judgment decision and the May 1,

---

[4]   Moreover, iStar declined to depose Mr. Solomon during discovery. iStar's claim that the absence of the ability to depose Mr. Solomon with respect to the Supplemental Report is therefore unfounded. (*See* iStar Br. at 7.)

#4099212 v5 \020396 \0004

2012 deadline for pre-trial disclosures.[5]  Five Star reasonably postponed trial preparation while iStar's summary judgment motion was pending, and then worked diligently to prepare for trial once that motion was decided, while simultaneously pursuing a mediation, as the Court had directed.  Accordingly, Five Star's untimely disclosures were substantially justified.  *Grdinich v. Bradlees*, 187 F.R.D. 77, 79 (S.D.N.Y. 1999) (denying motion to exclude late-disclosed expert because "plaintiff appears to have acted justifiably and cost-effectively in temporarily suspending expert preparation" during pendency of settlement negotiations); *Hinton v. Patnaude*, 162 F.R.D. 435, 439 (N.D.N.Y. 1995) (denying motion to exclude late-disclosed expert where "[a]s a result of pending settlement, plaintiff's counsel suspended further trial preparation involving experts").

Moreover, none of the Unreimbursed Costs Evidence is a surprise to iStar.  As noted above, five of the eight subcategories of Unreimbursed Costs Evidence – the sales preview center; marketing; office overhead and employee leasing; retail leasing; and property taxes – were disclosed in the Initial Report.  In addition, iStar's counsel "demand[ed]" that Five Star pay property taxes and monitored the Maricopa County Treasurer's website to ensure Five Star's compliance.  (*See* pp. 6-8, *supra*).  Likewise, the costs relating to the referendum, settlements with vendors, and the letter of credit were all known to iStar.  (*Id.*).

There was no eve-of-trial disclosure here.  This case is scheduled for trial, at the soonest, in early January 2013, by which time iStar will have had the Unreimbursed Costs Evidence for six months or more.  This provides iStar with ample time to review the Unreimbursed Costs

---

[5]  iStar claims incorrectly that "all of the contested Trial Exhibits had never been produced" prior to their being listed on Five Star's exhibit list. (iStar Br. at 5).  As noted above, Trial Exhibit 395 was produced to iStar on March 2, 2010. (*See* p. 8, *supra*).

Evidence. Accordingly, iStar cannot demonstrate any prejudice from the late disclosure of the Unreimbursed Costs Evidence, and its motion to preclude should be denied. *See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94-cv-5587, 2002 U.S. Dist. LEXIS 23829, at *13 (S.D.N.Y. Dec. 11, 2002) (refusing to preclude new expert report served less than one month before trial); *Plew*, 2012 U.S. Dist. LEXIS 14966, at *16-17.

## III.   UNTIMELY DISCLOSURE OF MR. SOLOMON'S OPINIONS ON FIVE STAR'S LOST EQUITY AND LETTER OF CREDIT DAMAGES WAS SUBSTANTIALLY JUSTIFIED AND HARMLESS

iStar's motion should also be denied to the extent that it seeks to exclude evidence of Five Star's lost equity and letter of credit damages. "Even in the event that a party has not strictly complied with Rule 26, precluding testimony of an expert 'may at times tend to frustrate the Federal Rules' overarching objective of doing substantial justice to litigants." *Manoma Realty Mgmt., LLC v. Federal Pacific Electric Co*., No. 02-cv-0494, 2007 U.S. Dist. LEXIS 54887, at *15-16 (S.D.N.Y. 2007) (Swain, J.) (*quoting In re: Kreta Shipping, S.A.*, 181 F.R.D. 273, 277 (S.D.N.Y. 1998)). Exclusion of the opinions Mr. Solomon set forth in his Supplemental Report would frustrate the objective of the Federal Rules to do "substantial justice."

Mr. Solomon's opinions on these damages are not based on new evidence or a new theory, but rather on changed circumstances that occurred in the period between the Initial Report and this Court's decision on iStar's summary judgment motion. In particular, Mr. Solomon's opinion on Five Star's lost equity damages is based on Five Star's $37 million cash equity investment and the subsequent loss in value of the property, while his opinion on Five Star's letter of credit damages is based on iStar's May 2011 drawn down of the $13.3 million letter of credit. (Lesser Decl., Ex. 3 at 7). The facts underlying these categories of evidence

#4099212 v5 \020396 \0004

were known to iStar from the inception of this case, and iStar will have had approximately six months (and possibly longer) to consider the Supplemental Report before this case is actually tried. The late disclosure of Mr. Solomon's opinions on Five Star's lost equity and letter of credit damages poses no harm to iStar.

Moreover, late disclosure of Mr. Solomon's opinions on these damages was substantially justified. When the Initial Report was served, Five Star expected to complete the Project, albeit with a delay caused by iStar's termination of funding. Thus, the Initial Report disclosed Mr. Solomon's opinions on Project Delay Costs, totaling $210,665,588. Five Star reasonably postponed trial preparation of expert reports while iStar's summary judgment motion was pending, and began trial preparation while simultaneously attempting to resolve this dispute through mediation. *Grdinich*, 187 F.R.D. at 79; *Hinton*, 162 F.R.D. at 439-440.

Five Star worked diligently to prepare for trial once the summary judgment motion was decided; however, during Five Star's trial preparation, it became apparent that timely completion of the Project was unlikely, and Project Delay Costs were no longer a feasible measure of Five Star's damages. Five Star re-engaged Mr. Solomon to reexamine his Initial Report, which led Mr. Solomon to conclude that Five Star's lost equity was a more appropriate measure of Five Star's damages given that Five Star could no longer reasonably expect to complete the Project within the timeframes required by the Special Use Permit and the contractual agreements with Ritz-Carlton. Even though Five Star's lost equity captured only a fraction of Five Star's true economic loss, Mr. Solomon opined that it was an out-of-pocket loss flowing directly from iStar's breach. Mr. Solomon's opinions were set forth in the Supplemental Report and provided

to iStar two weeks in advance of the parties' pre-trial conference, and months in advance of the trial of this action.

Because the late disclosure of the Supplemental Report was substantially justified and harmless, iStar's motion should be denied.

## IV.   THE DAMAGES SET FORTH IN THE SUPPLEMENTAL REPORT ARE NOT CONSEQUENTIAL DAMAGES

iStar contends that the Supplemental Report and Supplemental Exhibits should be precluded on the basis of the Court's September 18, 2012 order enforcing the consequential damages limitation in the Loan Agreement.   (iStar Br. at 9).   According to iStar, all of the damages sought by Five Star are consequential and thus non-recoverable.   However, iStar's argument is based on the mistaken premise that certain types of damages are universally classified as "direct," while other types of damages are universally classified as "consequential." The case law does not support this bright-line distinction.

The New York Court of Appeals has recently held that general or direct damages are those "which are the *natural and probable consequence* of the breach," whereas consequential or special damages are those "which '*do not so directly flow* from the breach.'" *Bi-Economy Market, Inc. v. Harleysville Insurance Co. of N.Y.*, 10 N.Y.3d 187, 192, 856 N.Y.S.2d 505 (2008) (internal citations omitted) (emphasis added); *see also Versatile Housewares & Gardening Systems, Inc. v. Thill Logistics, Inc.*, 819 F. Supp. 2d 230, 237 (S.D.N.Y. 2011).

However, a certain type of loss might be, in one fact setting, the "natural and probable consequence" of a breach, and thus a general damage, and in a different fact setting, an indirect consequence of a breach, and thus a consequential damage.   Judge Cardozo explained the problem as follows –

> At the root of the problem is the distinction between general and special damage as it has been developed in our law. *There is need to keep in mind that the distinction is not absolute, but relative. To put it in other words, damage which is general in relation to a contract of one kind may be classified as special in relation to another.* If A and B contract for the sale of staple goods, the general damage upon a breach is the difference between the market value and the price. But if A delivers to X a telegram to B in cipher with reference to the same sale, or a letter in a sealed envelope, the general damage upon the default of X is the cost of carriage and no more. As to him the difference between price and value is damage to be ranked as special, and, therefore, not recoverable unless the message is disclosed.

*Kerr Steamship*, 245 N.Y. at 288-289, 157 N.E. at 141 (emphasis added). *Accord* 11 <u>Corbin on Contracts</u>, Damages, § 56.6 Forseeability, pp. 106-108 (Rev. ed. 2005) ("'consequential damages' is a term used loosely as a synonym for "special" as opposed to "general" damages. . . . It should be borne in mind that the appropriate term will vary with the context.")

As suggested by Judge Cardozo, the key in determining whether a given loss qualifies as general or as consequential is the knowledge chargeable to the breaching party. "One way of analyzing the distinction between general or direct damages and special or consequential damages is to say that direct damages are foreseeable to any reasonable person in the position of the parties and that consequential damages are foreseeable only if the promisor is aware of special circumstances." 11 <u>Corbin on Contracts</u>, Damages, § 56.6 Forseeability, p. 107 (Rev. ed. 2005). In the instant case, all of the damages set forth in the Supplemental Report were foreseeable to any reasonable person in iStar's position and thus qualify as direct damages.

Indeed, New York courts have long found that where, as here, a lender loans money for a specific purpose and then breaches its obligation, the borrower's resulting expenses and even lost equity are recoverable as direct damages. For example, in *Goldsmith v. Holland Trust Co.*, 5 A.D. 104, 109, 38 N.Y.S. 1032 (1st Dep't 1896), a lender breached its obligation to advance

funds to plaintiff for the purchase of real estate. Noting that the lender was aware that the borrower needed the loan proceeds to complete the purchase, just as iStar was aware that Five Star needed the loan proceeds to complete construction, the Court found that the lender was liable for costs incurred by the borrower as direct damages. "The damage which the plaintiff has shown to have *directly resulted* from the breach of contract is the amount paid to the Title Guaranty Company and to lawyers, and such amount as he may be liable for to Soloman for commissions which Soloman claims to have earned in negotiating the transaction with the Holland Trust Company." *Id.* at 109 (emphasis added). *See also St. Paul at Chase Corp. v. Manufacturers Life Insurance Co.*, 262 Md. 192, 253, 278 A.2d 12, 41 (Md. Ct. App. 1971) ("portions of the construction costs paid by St. Paul or for which it still remains liable are part and parcel of St. Paul's loss *directly chargeable* to the breach by Manufacturers") (emphasis added); *Hildago Props., Inc. v. Wachovia Mortgage Co.*, 617 F.2d 196, 198-99 (10th Cir. 1980) ("Hildago has chosen to forego recovery of the value of the full performance by Wachovia, and instead seeks only to collect the expenses incurred by it in performing the contract. This is a proper measure of damages."). Five Star's Unreimbursed Costs damages and letter of credit damages are directly analogous to the fees and commissions that the plaintiff was permitted to recover in *Goldsmith.*

Similarly, in *Doushkess v. Burger Brewing Co.*, 20 A.D. 375, 378, 47 N.Y.S. 312 (1st Dep't 1897), a lender agreed to apply loan proceeds to pay off another lender's mortgage on plaintiff's property. The lender, however, failed to satisfy the mortgage, and when the plaintiff lost his property through foreclosure, the court held that plaintiff was entitled to recover for his lost equity. "The loss to the plaintiff by the foreclosure was the *direct result* of the failure of the

defendant to apply the money according to its promise to satisfy the Consumers' Company lien."

*Id.* at 379 (emphasis added).  Likewise, in *Hopewell Building Co. v. Callan*, 200 A.D. 588, 592,

193 N.Y.S. 504 (1st Dep't 1922), the First Department found that the evidence adduced at trial

supported a judgment in favor of plaintiff for its lost equity as a result of the defendant's breach

of its contractual obligation to lend money.

> There was evidence tending to show that the defendants knew that the plaintiff was dependent upon the surplus of these loans and upon the proceeds of a loan on a second mortgage to protect its equities; and, in the circumstances, it might well have been claimed that *the loss of the values of the equities over and above the amount realized on the sale thereof constituted damages directly flowing from the failure of the defendants to make the loans as agreed.*

*Id.* (emphasis added).  *See also Stanish v. Polish Roman Catholic Union of America*, 484 F.2d

713, 725 (7th Cir. 1973) ("PRCU well knew, when it breached its contract to lend, that Stanish

would not be able to construct his apartment building and would not be able to repay his

$390,000 loan on the entire 8+ acre site.  We therefore agree with the district court that Stanish

should recover from PRCU the difference between the value of the entire site and the amount

Stanish may still owe to PRCU on the $390,000 loan.").  Here, as in *Doushkess* and *Hopewell*

*Building*, iStar knew that Five Star could not procure substitute financing and was dependent on

the proceeds of the loan to complete construction and protect its equity.  Accordingly, Five Star's

loss of its equity constitutes damages directly flowing from iStar's failure to fund the loan as

agreed.

The cases cited by iStar do not state otherwise.  iStar's contention that "Courts treat

losses of equity as a consequential damage" ***is not supported by any of the case authority iStar***

***cites.***  (iStar Br. at 11).  For example, in *United California Bank v. Prudential Insurance Co. of*

*America*, 140 Ariz. 238, 681 P.2d 390 (Ariz. Ct. App. 1983), the court found that the measure of direct damages when a lender breaches a contract to loan money *includes* the borrower's loss of equity. "The traditional measure of damages for breach of a contract to loan money is the additional interest required for a replacement loan. However, this measure has been broadened to include loss of equity if the breach of the loan agreement caused the borrower to lose ownership of its assets." *Id.* at 295-96, 681 P.2d at 447-448 (internal citations omitted). Likewise, in *Lincor Contractors, Ltd. v. Hyskell*, 39 Wash. App. 317, 692 P.2d 903 (Wash. Ct. App. 1984), the court did not find that a borrower's loss of equity was a consequential (or special or indirect) damage, but rather couched borrower's loss in terms of direct damages. "As a *natural and proximate result* of Continental's breach, Lynnwood Pacific could not construct the building. Lynnwood Pacific's equity in the building can be proven with reasonable certainty. Thus, Lynnwood Pacific is entitled to an award of damages, measured by its loss of equity." *Id.* at 322, 692 P.2d at 907 (emphasis added) (internal citations ommited). And in *Penthouse Int'l, Ltd. v. Dominion Fed. Savings & Loan Ass'n*, 665 F. Supp. 301, 311 (S.D.N.Y. 1987), *aff'd in part, rev'd in part*, 855 F.2d 963 (2d Cir. 1988), the court scarcely mentioned lost equity damages, other than to decline to simultaneously award damages for both lost equity and lost profits. Indeed, the decision does not even include the terms "consequential damages," "special damages," or "indirect damages." Notably, the court awarded lost profits, finding that the loss was "directly caused" by defendants' breach. *Id.* at 311-312.

Nor does iStar provide any support for its contention that "New York courts have likewise long characterized out-of-pocket costs as consequential, not general, damages." (iStar Br. at 11). Contrary to iStar's parenthetical citation for *Hoch v. Braxmar*, 109 A.D. 209, 210, 95

N.Y.S. 647, 647 (2d Dep't 1905), the court did not characterize out-of-pocket costs as "consequential damages." To the contrary, the court found that "[t]he expense of searching and passing upon the title, of drawing the bond and mortgage and satisfaction and of recording instruments incident to the transaction *flowed directly* from and were made necessary by the breach of defendant's contract." *Id*. (emphasis added). Another case cited by iStar, *Aramony v. United Way of America*, 28 F. Supp. 2d 147 (S.D.N.Y. 1998) ), *aff'd in part, rev'd in part*, 191 F.3d 140 (2d Cir. 1999) does not even, in relevant part, involve contract damages, but rather the recovery of damages for breach of fiduciary duty from an executive who engaged in criminal conduct. *Aramony* has no application here. Finally, *David Home Builders, Inc. v. Misiak*, 91 A.D.3d 1362, 937 N.Y.S.2d 524 (4th Dep't 2012) and *Dambroso v. Malik*, 12 Misc. 3d 1192(A), 824 N.Y.S.2d 768 (Civ. Ct. Queens Cnty. 2006) both involved real estate purchase contracts, not loan agreements, and in neither case were the damages sought directly traceable to the breach. As such, these two decisions merely demonstrate Judge Cardozo's teaching that "damage which is general in relation to a contract of one kind may be classified as special in relation to another." *Kerr Steamship*, 245 N.Y. at 288-289, 157 N.E. at 141.

In sum, the damages set forth in the Supplemental Report were the natural and probable consequence of iStar's breach and were foreseeable to any reasonable person in iStar's position. These damages are thus direct and recoverable here, and iStar's motion must be denied.

## CONCLUSION

For the foregoing reasons, iStar's motion *in limine* to exclude Five Star's additional damages evidence should be denied.

Dated: New York, New York
        October 19, 2012

                    **MORRISON COHEN LLP**

                    By: _____*Brett Dockwell*_____
                        Mary E. Flynn
                        Danielle C. Lesser
                        Brett Dockwell
                    909 Third Avenue
                    New York, New York  10022
                    (212) 735-8600

                    *Attorneys for Plaintiff*
                    *Five Star Development Resort Communities, LLC*